# Case No. 18-17192

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MEHIER TAAMNEH; LAWRENCE TAAMNEH;
SARA TAAMNEH; DIMANA TAAMNEH,

*Plaintiffs - Appellants*,

v.

TWITTER, INC.; GOOGLE LLC; FACEBOOK, INC.,

*Defendants - Appellees.*

On Appeal from the United States District Court
for the Northern District of California
No. 17-cv-04107-EMC
Hon. Edward M. Chen

## APPELLANTS' OPENING BRIEF

Daniel W. Weininger
Keith L. Altman
EXCOLO LAW, PLLC
26700 Lahser Road, Suite 401
Southfield, MI 48033
Tel: (248) 251-0594

*Counsel for Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT .................................................. 1

STATUTORY AUTHORITIES ........................................................ 2

ISSUE PRESENTED .......................................................................... 4

STATEMENT OF THE CASE ........................................................... 5

SUMMARY OF THE ARGUMENTS ................................................ 8

ARGUMENTS .................................................................................... 10

I. The District Court Improperly Dismissed The ATA Secondary Liability Claim ........................................................... 10

    A.     Standard Of Review ........................................................ 10

    B.     Overview of the ATA ....................................................... 10

    C.     International Terrorism – 18 U.S.C. § 2331(1) ........... 12

    D.     Aiding and Abetting – 18 U.S.C. § 2333(d)(2) ............. 13

        1.     *ISIS Is The "Person Who Committed" The "Act of International Terrorism"* ................................. 13

        2.     *Defendants Knowingly Provided Substantial Assistance to ISIS* ............................................... 17

    E.     Causation ......................................................................... 22

        1.     *Plaintiffs' Injuries Must Proximately Result From The "Act of International Terrorism"* ........ 23

i

2. *The Direct Relationship Test Is Ill-Suited For ATA Claims* ..................................................25

CONCLUSION .........................................................................34

STATEMENT OF RELATED CASES ....................................................35

CERTIFICATE OF COMPLIANCE.........................................................36

CERTIFICATE OF SERVICE..............................................................37

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................10

*Associated General Contractors v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983) ........................................................................28

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006) ........................................................................28

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
824 F.3d 858 (9th Cir. 2016) ........................................................10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................10

*Boim v. Holy Land Found. for Relief & Dev.*,
549 F.3d 685 (7th Cir. 2008) ........................................................32

*Canyon County v. Syngenta Seeds, Inc.*,
519 F.3d 969 (9th Cir. 2008) ........................................................28

*Crosby v. Twitter, Inc.*,
2019 U.S. App. LEXIS 11105 (6th Cir. Apr. 16, 2019) ............15, 32

*Crosby v. Twitter, Inc.*,
303 F. Supp. 3d 564 (E.D. Mich. 2018) ........................................25

*Fields v. Twitter, Inc.*,
881 F.3d 739 (9th Cir. 2018) ................................................ passim

*Gelboim v. Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016) ..........................................................27

iii

*Gill v. Arab Bank, PLC,*
  893 F. Supp. 2d 474 (E.D.N.Y. 2012) ............................................. 21

*Halberstam v. Welch,*
  705 F.2d 472 (D.C. Cir. 1983) ................................................ 9, 17-20

*Hussein v. Dahabshiil Transfer Servs.,*
  230 F. Supp. 3d 167 (S.D.N.Y. 2017) ................................. 12, 21, 25

*In re Apple iPhone Antitrust Litig.,*
  846 F.3d 313 (9th Cir. 2017) ......................................................... 10

*In re Chiquita Brands Int'l, Inc.,*
  284 F. Supp. 3d 1284 (S.D. Fla 2018) ..................................... 25, 28

*In re Terrorist Attacks on Sept. 11, 2001,*
  718 F. Supp. 2d 456 (S.D.N.Y. 2010) ........................................... 21

*J. Truett Payne Co. v. Chrysler Motors Corp.,*
  451 U.S. 557 (1981) ....................................................................... 28

*Linde v. Arab Bank, PLC,*
  882 F.3d 314 (2d Cir. 2018) .................................................. passim

*Owens v. BNP Paribas, S.A.,*
  897 F.3d 266 (D.C. Cir. 2018) ....................................... 22, 24, 31, 32

*Rothstein v. UBS AG,*
  708 F.3d 82 (2d Cir. 2013) ........................................................ 30-31

## **Statutes**

Justice Against Sponsors of Terrorism Act,
Pub. L. No. 114-222, 130 Stat. 852 (2016) .................................... passim

1 U.S.C. § 1 ................................................................................. 3, 14, 28

8 U.S.C. § 1189 .......................................................................... 3, 11, 14

iv

18 U.S.C. § 2386 ...................................................................................... 14

18 U.S.C. § 2331(1) ................................................................. 2, 11-12, 18

18 U.S.C. § 2333(a) ..............................................................7, 11, 24, 26

18 U.S.C. § 2333(d)(2) ...................................................................... passim

18 U.S.C. § 2339A ......................................................................................7

18 U.S.C. § 2339B ................................................................... 7, 15, 23, 26

18 U.S.C. § 2339C ......................................................................................7

28 U.S.C. § 1291 .........................................................................................1

28 U.S.C. § 1331 .........................................................................................1

50 U.S.C. § 1705 .........................................................................................7

Cal. Penal Code § 187(a) ........................................................................12

N.Y. Penal Law § 125.25(1) ...................................................................12

## Court Rules

Fed. R. App. P. 4(a)(1)(A) .........................................................................1

Fed. R. Civ. P. 12(b)(6) ..............................................................7-8, 10, 31

## Rules and Regulations

Executive Order 13224, 31 C.F.R. Part 594 .............................................7

## Other Sources

S. Rep. No. 102-342 (1992) ....................................................................29

## **JURISDICTIONAL STATEMENT**

The United States District Court for the Northern District of California exercised jurisdiction over this action pursuant to 28 U.S.C. § 1331. The district court entered final judgment dismissing the case on October 29, 2018. (ER 2). Appellants filed a timely notice of appeal with the district court on November 13, 2018. (ER 1). Fed. R. App. P. 4(a)(1)(A). This Court exercised jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## **STATUTORY AUTHORITIES**

**Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016):**

Sec. 2.

Findings and purpose

(b) Purpose. The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

## **18 U.S.C. § 2331(1)**

(1) the term "international terrorism" means activities that –

(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B) appear to be intended –

(i) to intimidate or coerce a civilian population;
(ii) to influence the policy of a government by intimidation or coercion; or
(iii) to affect the conduct of a government by mass destruction, assassination or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they

appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

**18 U.S.C. § 2333:**

(a) Action and jurisdiction. Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

(. . .)

(d) Liability.

(1) Definition. In this subsection, the term "person" has the meaning given the term in section 1 of title 1 [1 U.S.C. § 1].

(2) Liability. In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act [8 U.S.C. § 1189], as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

## **ISSUE PRESENTED**

1.     Whether the district court properly concluded that Plaintiffs' first

amended complaint failed to state a plausible secondary liability claim

under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(d)(2).

## STATEMENT OF THE CASE

On January 1, 2017, ISIS carried out a horrific terrorist attack at the Reina nightclub in Istanbul, Turkey, murdering 39 people and injuring 69 more. (ER 132). The attack was perpetrated by ISIS operative Abdulkadir Masharipov ("Masharipov"), who was recruited, funded, and directed by ISIS leaders to carry out the New Year's Eve attack. (ER 133-135).

Nawras Alassaf, who was in Istanbul with his wife celebrating the new year, was killed during the attack. (ER 143-144). He is survived by his brother, Mehier Taamneh, his nephew, Lawrence Taamneh, and two nieces, Sara and Dimana Taamneh. (ER 80-81).

For years, Twitter, Google, and Facebook (collectively, "Defendants"), have allowed ISIS to utilize their services to carry out terrorist activities, including recruiting, radicalizing, and instructing terrorists, as well as raising funds and inciting fear among civilian populations. (ER 133). ISIS uses Defendants' social media platforms as tools and weapons of terrorism. (ER 76). By furnishing these platforms to ISIS, Defendants allow the terrorist group to virtually recruit

operatives as well as publicize the success of their operations. (ER 99-101).

ISIS terror attacks are primarily organized through the provision of Defendants' social media platforms and communication services. (ER 133). ISIS's Reina nightclub attack involved year-long communications and coordination between Masharipov and ISIS emir Abu Shuhada. (*Id*.). ISIS specifically recruited Masharipov, an Uzbekistan native, for terrorist operations in Turkey due to the linguistic and cultural similarities between Uzbekistan and Turkey. (*Id*.). Masharipov is just one of many Central-Asians whom ISIS radicalized for the purpose of conducting terrorist attacks in Europe and the Middle East. (*Id*. at 133-134). Masharipov recorded a martyrdom video immediately prior to the Istanbul attack. (ER 135). ISIS frequently streams these videos on Defendants' platforms to promote the group's terrorist operations and spread its Islamic extremist ideology.

On July 20, 2017, Mehier Taamneh, Lawrence Taamneh, Sara Taamneh, and Dimana Taamneh (collectively "Plaintiffs") commenced the present action against Defendants in the United States District Court for the Northern District of California. (ER 180). They alleged causes of

action for (1) aiding and abetting an act of international terrorism (18 U.S.C. § 2333(a) and (d)), (2) conspiring to commit an act of international terrorism (18 U.S.C. § 2333(a) and (d)), (3) providing material support to terrorists (18 U.S.C. §§ 2333(a) and 2339A(a)), (4) providing material support or resources to designated foreign terrorist organizations (18 U.S.C. §§ 2333(a) and 2339B(a)(1)), along with state law claims for (5) negligent infliction of emotional distress and (6) wrongful death. (ER 170-177).

At the outset of the case, Defendants moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. (ER 73). In response, Plaintiffs amended the complaint as of right, adding causes of action for (1) concealment of material support and resources to a designated terrorist organization (18 U.S.C. § 2333(a) and 18 U.S.C. § 2339C(c)), and (2) providing funds, goods, or services to or for the benefit of specifically designated global terrorists (Executive Order 13224, 31 C.F.R. Part 594 and 50 U.S.C. § 1705). (ER 176-177). Defendants withdrew their motion to dismiss as moot (ER 69), and subsequently filed their motion to dismiss the first amended complaint ("FAC"). (ER 73).

7

The district court heard oral argument on the motion on September 6, 2018. (ER 23-68).

By order dated October 29, 2018, the district court granted Defendants' motion. (ER 3). The district court held that Plaintiffs failed to (1) adequately plead proximate cause for their ATA direct liability claims, (2) provide sufficient allegations in support of their ATA aiding and abetting or conspiracy claims, and (3) adequately plead proximate cause for their state law claims. (ER 16, 21, 22). The district court dismissed Plaintiffs' claims with prejudice and denied them leave to amend after finding that they could not allege additional facts sufficient to cure the FAC's deficiencies. (*Id*.).

Plaintiffs now appeal from the October 29, 2018 judgment entered in Defendants' favor.[1] (ER 1, 2).

## **SUMMARY OF THE ARGUMENTS**

The district court committed reversible error when it dismissed Plaintiffs' ATA aiding and abetting ("secondary liability") claim pursuant to Fed. R. Civ. P. 12(b)(6).

---

[1] Plaintiffs solely appeal from the portion of the district court's order dismissing their ATA aiding and abetting claim (Count I).

8

First, the district court dismissed this cause of action based on the mistaken impression that (1) the FAC had to plausibly allege that Defendants aided and abetted *Masharipov* rather than *ISIS*, and (2) the FAC failed to plausibly establish the aiding and abetting elements required under *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983).

Second, the district court misconstrued the ATA's causation standard by following *Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018) as opposed to contrary federal precedents that more appropriately advance the goals of the ATA and the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016), the 2016 statute that enacted 18 U.S.C. § 2333(d)(2).

For all these reasons, the Court should (1) vacate the judgment in Defendants' favor, (2) reverse the portion of the district court's order dismissing the ATA secondary liability claim, and (3) remand the case for further proceedings.

## ARGUMENTS

## I. The District Court Improperly Dismissed The ATA Secondary Liability Claim

A. Standard of Review

This Court reviews *de novo* an order dismissing a complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). *In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 317 (9th Cir. 2017).

To survive Rule 12(b)(6) dismissal, "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Courts must also "accept the complaint's well-pleaded factual allegations as true, and construe all inferences in the plaintiff's favor." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 864 (9th Cir. 2016).

B. Overview of the ATA

The ATA authorizes civil actions for "[a]ny national of the United States injured in his or her person, property, or business by reason of an

10

act of international terrorism." 18 U.S.C. § 2333(a). The statute imposes liability on "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism" so long as the "act of international terrorism" is "committed, planned, or authorized" by a designated "foreign terrorist organization." *Id.* at § 2333(d)(2); *see also* 8 U.S.C. § 1189 (establishing the requirements and process for designating a foreign terrorist organization).

"International terrorism" comprises activities that (1) "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State"; (2) "appear to be intended to intimidate or coerce a civilian population" or influence governmental policy through "intimidation or coercion"; and (3) "transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum." 18 U.S.C. § 2331(1).

Every type of ATA claim entails the same basic elements: (1) "unlawful action," (2) "the requisite mental state," and (3) "causation."

*Hussein v. Dahabshiil Transfer Servs.*, 230 F. Supp. 3d 167, 170-71 (S.D.N.Y. 2017) (citations omitted).

C.    International Terrorism – 18 U.S.C. § 2331(1)

The district court assumed, without deciding, that the Istanbul attack constituted an act of international terrorism.  Defendants' never challenged that notion below.

Suffice it to say, Plaintiffs plausibly alleged that (1) the Reina nightclub shooting was a "violent act" subject to criminal prosecution in nearly every state, *see e.g.*, N.Y. Penal Law § 125.25(1); Cal. Penal Code § 187(a), (2) since the shooting targeted civilians in a public space, it "appear[ed] to be intended to intimidate or coerce a civilian population," and (3) because ISIS perpetrated the attack by ordering Masharipov to travel to Turkey and kill Turkish civilians, along with people of other nationalities, the operation "transcend[ed] national boundaries in terms of the means by which" it was "accomplished" and "the persons" it was "intended to intimidate or coerce." (ER 133-35, 140-42 at ¶¶ 334-348, 367-68, 370-71, 379-81, 383).

Accordingly, the Istanbul attack satisfied all the elements of an "act of international terrorism."

D.     Aiding and Abetting – 18 U.S.C. § 2333(d)(2)

   1.     *ISIS Is The "Person Who Committed" The "Act of International Terrorism"*

The district court dismissed Plaintiffs' ATA secondary liability claim, citing the FAC's failure to allege that Defendants knowingly provided substantial assistance to Masharipov. (ER 17-18).

As discussed above, section 2333(d)(2) assigns civil liability for aiding and abetting any "person" who commits "an act of international terrorism" so long as the "act of international terrorism" is "committed, planned, or authorized" by a designated "foreign terrorist organization." Herein lies the district court's fundamental misstep; it assumed (incorrectly) that the assailant must be the "person" who receives the "substantial assistance." According to the district court, "Congress chose to refer to aiding/abetting or conspiring with a person who committed 'an act of international terrorism,' not aiding and abetting or conspiring with a foreign terrorist organization." (ER 17).

Section 2333(d)(2)'s plain meaning, statutory purpose, and interpretive precedents all demonstrate that Congress never intended to draw ATA secondary liability that restrictively.

13

Section 2333(d)(1) cross-references 1 U.S.C. § 1 for the meaning of the term "person." A "person" may include "*corporations*, companies, *associations*, firms, partnerships, *societies*, and joint stock companies, *as well as individuals*." (Emphasis added). Designated foreign terrorist organizations neatly fit this definition. *See* 8 U.S.C. § 1189(a)(1)(A) (requiring that a designated foreign terrorist organization must first be a "foreign organization"); *cf.* 18 U.S.C. § 2386(A) (defining "organization" as "any group, club, league, *society*, committee, *association*, political party, or *combination of individuals*, whether incorporated or otherwise") (emphasis added). Since ISIS is a designated foreign terrorist organization, it qualifies as a "person" capable of receiving "substantial assistance" under section 2333(d)(2).

This reading not only finds support in the section 2333(d)(2)'s plain text, but it reflects Congress's express intention that the statute "provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against . . . entities . . . that have provided material support, directly or indirectly, to *foreign organizations or persons* that engage in terrorist activities against the United States." JASTA § 2(b) (emphasis added).

14

Recent authorities corroborate this interpretation as well. In *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018), the Second Circuit distinguished the elements necessary to establish a section 2333(d) aiding and abetting claim from an 18 U.S.C. § 2339B material support claim. Vacating the judgment in that case on account of defective jury instructions, the Second Circuit found that, although it could "assume that the jury found Arab Bank to have provided material support" to Hamas under section 2339B:

> aiding and abetting an act of international terrorism [under section 2333(d)] requires more than the provision of material support to a designated terrorist organization . . . aiding and abetting requires the secondary actor to be "aware" that, by assisting the principal, it is itself assuming a "role" in terrorist activities . . . [w]hat the jury did have to find was that, in providing such services, the bank was "generally aware" that it was thereby playing a "role" *in Hamas's violent or life-endangering activities.*

*Id.* at 329 (emphasis added). Notably, the Second Circuit centered its analysis on whether the bank knew it was funding *Hamas's* terrorist activities – not those of the individual "Hamas operatives [who] carried out the three attacks underlying plaintiffs' ATA claims." *Id.*

The Sixth Circuit's decision in *Crosby v. Twitter, Inc.*, No. 18-1426, 2019 U.S. App. LEXIS 11105 (6th Cir. Apr. 16, 2019) supports this

15

approach. There, the plaintiffs alleged that Defendants aided and abetted ISIS's June 2016 attack at the Pulse nightclub in Orlando, Florida. The district court ruled that the plaintiffs failed to plausibly allege that Defendants knowingly provided substantial assistance to the assailant. The Sixth Circuit agreed.

But in affirming the district court, the court of appeals did not categorically preclude ISIS from *ever* qualifying as the "person who committed" the "act of international terrorism." 18 U.S.C. § 2333(d)(2). Rather, the Sixth Circuit held that ISIS was not the "person who committed" the Orlando attack because the operative complaint did not sufficiently establish that ISIS ever knew about the assailant who perpetrated the shooting. *Id.* at *19 ("the Amended Complaint contains not allegations that ISIS was involved with the Pulse Night Club shooting."). The FAC avoided this same pitfall by making one thing clear: ISIS committed the Istanbul attack. (ER 133-35, 140-42 at ¶¶ 334-348, 367-68, 370-71, 379-81, 383).

Because the district court evaluated whether the FAC plausibly asserted that Defendants knowingly provided substantial assistance to *Masharipov* – as opposed to *ISIS* – this Court should reverse the

dismissal of the ATA secondary liability claim and instruct the district court to assess the FAC's allegations consistent with section 2333(d)(2)'s plain text, statutory purpose, and interpretive caselaw. (ER 18).

> 2. *Defendants Knowingly Provided Substantial Assistance to ISIS*

Since section 2333(d)(2) pertains to foreign terrorist organizations that receive "substantial assistance," reversal is further warranted because the FAC sufficiently alleged that Defendants knowingly provided "substantial assistance" to ISIS.

In enacting JASTA, Congress endorsed the three-pronged test enunciated in *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983), as the appropriate standard for assessing ATA aiding and abetting liability. JASTA § 2(a)(5) ("The decision of the United States Court of Appeals for the District of Columbia in *Halberstam v. Welch* . . . provides the proper legal framework for how such liability should function"). Under *Halberstam*, aiding and abetting liability rests on three elements: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury," (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he

provides the assistance," and (3) "the defendant must knowingly and substantially assist the principal violation." *Halberstam*, 705 F.2d at 477.

*Halberstam* lists six factors for determining "how much encouragement or assistance is substantial enough" to satisfy the last prong: (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance. *Id.* at 483-84; *see also Linde*, 882 F.3d at 329.

Applying *Halberstam*, the FAC contains sufficient factual allegations showing that Defendants aided and abetted ISIS. *First*, the FAC plausibly alleged that Masharipov perpetrated the Reina nightclub shooting on ISIS's behalf and (as noted above) the attack meets section 2331(1)'s definition of international terrorism. (ER 133-35, 140-42 at ¶¶ 334-348, 367-68, 370-71, 379-81, 383). *See Linde*, 882 F.3d at 329.

*Second*, the FAC plausibly established that Defendants were "generally aware" they played a "role" in ISIS's "violent or life-endangering activities" by allowing ISIS to utilize their social media platforms for radicalization, recruitment, and to an extent, operational

18

training. (ER 99, 101, 104, 133, 169 at ¶¶ 142-44, 153-55, 168-69, 331-332, 490. *See Linde*, 882 F.3d at 329. Section 2333(d)(2) in no way required Plaintiffs to assert that Defendants "knew of the specific attacks at issue" when they opened their social media platforms to ISIS. *Linde*, 882 F.3d at 329.

And *third*, the FAC plausibly demonstrated that Defendants substantially assisted ISIS. They provided ISIS with the infrastructure to "virtually" radicalize prospective recruits and encourage them to commit acts of terrorism throughout the world (*Halberstam* factor one); without Defendants' social media platforms ISIS would practically have no means of radicalizing prospective recruits beyond ISIS's territorial borders and encouraging them to commit acts of terrorism (factor two); again, Defendants were "generally aware" that they played a "role" in ISIS's "violent or life-endangering activities" by allowing ISIS to utilize their social media platforms for radicalization, recruitment, and to an extent, training for terrorist operations (factor five); and Defendants' social media platforms facilitated ISIS's radicalization, recruitment, and operational efforts over the span of several years (factor six).

One additional point.  With respect to *Halberstam*'s fourth factor –
the secondary actor's relationship to the principal, the district court
characterized Defendants interactions with ISIS as "arms'-length" and "a
market relationship at best." (ER 20).  Analogizing to the banking and
financial services industry, the district court held that Defendants
provided ISIS with nothing more than "routine services generally
available to members of the public." (ER 21).  The difference between
international banks and social media companies, however, is a critical
one.

Defendants are not financial institutions that facilitate the
movement of generic funds from one bank to another.  They are social
media outlets whose platforms are publicly viewable.  And in this case,
Defendants knowingly provided ISIS with the infrastructure to post
images (clearly marked with ISIS's insignia) of executions, decapitations,
immolations, and other violent material for the purpose of radicalizing,
recruiting, and "virtually" training operatives across the globe – services
that are anything but "routine."

Not to mention, the district court ignored numerous authorities
that bolster the conclusion that services are not "routine" when patently

rendered to a designated foreign terrorist organization. *Compare Hussein*, 230 F. Supp. 3d at 176 ("an inference of knowing or deliberately-indifferent support is generally implausible when the only allegations are that the defendants provided 'routine' banking services unaccompanied by any allegations tending to show that ***the defendants had reason to believe that their customers were terrorists or were assisting terrorists***") (emphasis added), *with Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 486 (E.D.N.Y. 2012) ("The Bank beginning in the late 1990s knowingly maintained accounts for—and accepted wire transfers on behalf of—Hamas (or its proxies), well-known Hamas leaders, and other Hamas operatives"); *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 489 (S.D.N.Y. 2010) ("The claimed wrongdoing of DIB . . . does not relate to the performance of routine banking and financial services, or its use as a passive conduit through which monies were indirectly channeled to and from al Qaeda. Rather, the allegations indicate that *DIB **was an intentional, knowing and direct participant in providing money laundering services to al Qaeda***, which allowed for direct funding of terrorist attacks") (emphasis added).

21

Therefore, construing the FAC in the light most favorable to Plaintiffs, and accepting all well-pleaded factual allegations as true, *Iqbal*, 556 U.S. at 678, the FAC stated a plausible claim that Defendants violated section 2333(d)(2).[2]

## E. Causation

Adhering to the Ninth Circuit panel decision *Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018), the district court held that the "direct relationship" test is the appropriate standard for evaluating ATA causation.[3] (ER 14; *see also* ER 12-13). Since the *Fields* panel decided that case incorrectly, the district court misplaced its reliance on *Fields* and applied the wrong causation standard.[4]

---

[2] Although the district court failed to address Plaintiffs' contention that Google shares advertising revenue with ISIS, the corresponding allegations in the FAC plausibly establish that Google's conduct violates section 2333(d)(2). (ER 80, 102, 152-53 at ¶¶ 31, 158, 432, 435, 457).

[3] The district court did not address proximate causation as an element of Plaintiffs' ATA secondary liability claim because Defendants never challenged the sufficiency of the FAC's allegations in that regard. (ER 14 n.5) ("Defendants are simply making a proximate cause argument on Plaintiffs' direct liability claims, and not their indirect liability claims"). Nonetheless, proximate causation remains an element of ATA secondary liability insofar as the principal must have proximately caused the plaintiffs' injuries. *Linde*, 882 F.3d at 331 (citing 18 U.S.C. § 2333(d)(2)); *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 276-77 (D.C. Cir. 2018).

1.  *Plaintiffs' Injuries Must Proximately Result From The "Act of International Terrorism"*

Before defining the contours of the ATA's causation standard, federal courts must first identify the "act of international terrorism" to which the plaintiffs attribute their injuries. The answer to that question depends on whether the particular ATA claim assigns direct or secondary liability to the defendant.

Take for instance, an ATA direct liability claim alleging material support to a designated foreign terrorist organization. 18 U.S.C. § 2339B. Courts must assess proximate causation from the "act of international terrorism" that is the focus of the claim, *i.e.*, the provision of material support. The resulting damages must proximately stem from that unlawful act.

The analysis is different when the ATA claim is grounded in secondary liability. Then courts must also assess proximate causation from the "act of international terrorism." But with ATA secondary liability claims, the principal's terrorist attack is the "act of international terrorism" – not the secondary conduct that aided and abetted the "person who committed" the "act of international terrorism." 18 U.S.C. § 2333(d)(2) (permitting aiding and abetting liability "[i]n an action under

23

subsection (a) for an injury *arising from an act of international terrorism*") (emphasis added); *see also* 18 U.S.C. § 2333(a) (authorizing ATA lawsuits for injuries suffered "by reason of an act of international terrorism").

The Second Circuit drew this very same distinction in *Linde*, where it observed:

> Causation focuses on the relationship between an alleged act of international terrorism and a plaintiff's injury . . . [b]y contrast, aiding and abetting focuses on the relationship between the act of international terrorism and the secondary actor's alleged supportive conduct.

*Linde*, 882 F.3d at 330-331 (internal citation omitted).

The D.C. Circuit also noted this difference in *Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018). Deciding whether the plaintiffs could hold a French bank secondarily liable for a series of al Qaeda related bombings that occurred before section 2333(d)(2)'s effective date, the D.C. Circuit commented that:

> If aiding and abetting liability were available under the ATA, BNPP would not need to satisfy any of the ATA's elements to be held liable for Plaintiffs' injuries. Instead, BNPP would be liable for al Qaeda's acts of international terrorism, so long as BNPP "knowingly and substantially assist[ed] *the principal violation" of the ATA by al Qaeda* and was "generally aware" of

24

its role as part of al Qaeda's illegal activities when
providing that assistance.

*Id.* at 276-77 (emphasis added).

Consequently, when deciding ATA secondary liability claims,
federal courts must assess whether the alleged injuries proximately flow
from the principal's terrorist attack, not the secondary actor's supportive
conduct.[5] *See Linde*, 882 F.3d at 331 (stating that section 2333(d)(2) now
allows plaintiffs to assert liability "on the alternative theory that
[defendants] aided and abetted acts of terrorism *by others*, which *acts
caused* plaintiffs' injuries.") (emphasis added).

### 2. The Direct Relationship Test Is Ill-Suited For ATA Claims

As for the relevant ATA causation standard, the district court erred
when it exclusively relied on *Fields* to supply the appropriate test.

---

[5] Insomuch as the district court suggested that different causation
standards apply to direct and secondary ATA liability claims, that
contention is incorrect. (ER 14 n.5). The causation standards for ATA
direct and secondary liability claims are identical. *See Hussein*, 230 F.
Supp. 3d at 170-71 ("Liability under the ATA has three formal elements:
unlawful action, the requisite mental state, and causation."). This
explains why district courts singularly analyze proximate causation for
both direct and secondary ATA liability claims. *See e.g. Crosby v. Twitter,
Inc.*, 303 F. Supp. 3d 564, 577-80 (E.D. Mich. 2018); *In re Chiquita Brands
Int'l, Inc.*, 284 F. Supp. 3d 1284, 1309-14 (S.D. Fla 2018).

In *Fields*, the plaintiffs commenced an ATA direct liability action against Twitter for knowingly providing social media accounts and messaging services to ISIS after the terrorist group conducted an attack on a police training base in Amman, Jordan. *Fields*, 881 F.3d at 741-42; *see also* 18 U.S.C. § 2339B. Twitter moved to dismiss the lawsuit and the district court granted the motion in part because the plaintiffs "failed to plead that they were injured 'by reason of' Twitter's conduct." *Id.* at 741 (quoting 18 U.S.C. § 2333(a)). The plaintiffs appealed that decision and a three-judge panel of this Court affirmed.

On appeal, the parties' disputed the meaning of the ATA's "by reason of" requirement. 18 U.S.C. § 2333(a). Although neither party contested that "the ATA's 'by reason of' language requires a showing of proximate causation," the plaintiffs argued that proximate cause under the ATA requires a showing that defendants' "acts were a substantial factor in the sequence of responsible causation," and that the consequent injuries were "reasonably foreseeable or anticipated as a natural consequence." *Id.* at 744. Twitter urged the panel to adopt a more stringent framework, calling for the plaintiffs to establish a "direct relationship" between Twitter's conduct and their injuries. *Id.*

26

The panel ultimately sided with Twitter for several reasons; two of which are relevant to this litigation. *One* – the panel assumed that, because Congress employed the same phrase – "by reason of" – in the ATA as it used previously in the Sherman, Clayton, and Racketeer Influenced and Corrupt Organizations (RICO) Acts, Congress intended that phrase to mean the same thing as it does in "those contexts." *See id.* at 744. And *two* – the panel found that the same factors which motivated the Supreme Court to adopt the "direct relationship" for antitrust and civil RICO violations apply with equal force to ATA claims. *See id.* at 746.

To begin with, the panel's assumption – that Congress must have assigned the same meaning to the phrase "by reason of" as when it enacted antitrust and antiracketeering legislation – contravenes the ATA's purpose. The Sherman, Clayton, and RICO Acts are complex remedial provisions, where ascertaining damages often involves "some degree of uncertainty." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 779 (2d Cir. 2016). As the Supreme Court observed:

> Our willingness to accept a degree of uncertainty in [antitrust] cases rests in part on the difficulty of ascertaining business damages as compared, for example, ***to damages resulting from a personal injury*** or from condemnation of a parcel of land. The vagaries of the marketplace usually deny us sure

> knowledge of what plaintiff's situation would have been
> in the absence of the defendant's antitrust violation.

*J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981) (emphasis added).

The direct relationship test assures that intricate and nuanced damage inquiries are not unduly speculative. *See Associated General Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 543 (1983) ("The indirectness of the alleged injury also implicates the strong interest, identified in our prior cases, in keeping the scope of complex antitrust trials within judicially manageable limits."); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 472 (2006) (commenting that direct proximate causation "is meant to prevent . . . intricate, uncertain [damage] inquiries from overrunning RICO litigation."); *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 982 (9th Cir. 2008) (same). That same concern is marginal in the civil anti-terrorism context, "where the policy considerations underpinning traditional tort analyses, including less stringent common law causation principles, more fairly and logically apply." *In re Chiquita*, 284 F. Supp. 3d at 1314 n.9.

What is more, unlike those statutes, Congress uniquely fashioned the ATA to "impos[e] . . . liability at any point along the causal chain of

28

terrorism" to counter "a wrong that, by its nature, falls outside the usual jurisdictional categories of wrongs that national legal systems have traditionally addressed." S. Rep. No. 102-342 (1992). And this contrast becomes all the more apparent given JASTA's recent amendments to the ATA, whose aim is to "provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against . . . entities . . . that have provided material support, directly or *indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA § 2(b) (emphasis added).

As with civil RICO violations, the *Fields* panel additionally found that the absence of a "direct relationship" standard for assessing ATA causation:

> (1) would make it extremely difficult to attribute damages to the provision of material support as distinct from other intervening factors, (2) would force courts to develop complicated damages-apportionment rules to avoid multiple recoveries, and (3) would create these difficulties needlessly, because victims injured more directly by the provision of material support would not be prevented from recovery by a "direct relation" requirement.

*Fields*, 881 F.3d at 746.

29

But again, the court overlooked how these factors openly conflict with the ATA's – and now JASTA's – statutory aims. And since the *Fields* plaintiffs never raised JASTA's applicability (because Congress had not yet enacted the statute), the panel never addressed its import, let alone its very existence, even though JASTA's purpose undermines the rationale for endorsing a "direct relationship" test.

Even more concerning is that the *Fields* panel did not have the benefit of reviewing subsequent decisions from other federal appellate courts that declined to adopt the "direct relationship" test.

Consider the Second Circuit's opinion in *Linde*. Rejecting the defendant's evidentiary sufficiency challenge on the issue of ATA causation, the Second Circuit opined that the defendant bank "does not— and cannot—dispute the sufficiency of the evidence to prove that the Hamas terrorists who committed the three attacks at issue caused plaintiffs' injuries, whether as a matter of proximate or but-for causation. Thus, causation provides no ground for reversal." *Linde*, 882 F.3d at 331.

Arriving at its decision, the Second Circuit applied the two-part test from *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013), which asks (1) whether the "act of international terrorism" was a "substantial factor" in

30

the sequence of events leading to the plaintiffs' injuries, and (2) whether those injuries were "reasonably foreseeable or anticipated as a natural consequence of" that act.

Translated into the Rule 12(b)(6) setting of this case, *Rothstein*'s proximate cause test, in effect, asks one simple question: whether the operative complaint plausibly alleges that ISIS perpetrated the "act of international terrorism" that caused the plaintiffs' injuries. If it does (and assuming the remaining elements are met), the secondary ATA liability claim must survive Rule 12(b)(6) dismissal. *See Linde*, 882 F.3d at 332 ("there can be no question that Hamas acts of terrorism satisfy both the proximate and but-for causation standards").

*Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018) suggests the same result. There, the D.C. Circuit explicitly rejected *Fields*'s "direct relationship" standard. *Id.* at 273 n.8. Adopting the Second Circuit's *Rothstein* test instead, the D.C. Circuit held that secondary actors who substantially assist "the person who committed" the "act of international terrorism" need not "satisfy any of the ATA's elements to be held liable for [the plaintiffs'] injuries" so long as the principal proximately caused those injuries. *Id.* at 276-277.

31

And the Seventh Circuit's decision in *Boim v. Holy Land Found. for Relief & Dev.* ("*Boim III*"), 549 F.3d 685 (7th Cir. 2008) – which not only preceded *Fields*, but which the *Fields* panel declined to address altogether – frames the ATA causation standard even more broadly. In the Seventh Circuit's view, ATA causation requires plausible assertions that the "person who committed" the "act of international terrorism" – in this case, ISIS – "significantly enhanced the risk of terrorist acts and thus the probability that the plaintiff's decedent would be a victim." *Boim III*, 549 F.3d at 698. Since the FAC contains plausible nonconclusory allegations that ISIS planned and carried out the Reina nightclub shooting, Plaintiffs' allegations certainly meet this lower threshold.[6] (ER 133-35, 140-42 at ¶¶ 334-348, 367-68, 370-71, 379-81, 383).

Finally, should this Court choose to reaffirm *Fields*'s "direct relationship" test, the FAC plausibly alleged that: (1) ISIS ordered Masharipov to carry out the Istanbul attack; (2) Islamic State emir Abu Shuhada coordinated the attack with Masharipov; (3) ISIS provided

---

[6] The Sixth Circuit's recent opinion in *Crosby* contributed little to this debate, except to say that ATA causation is somehow an amalgam of *Fields*, *Linde*, *Owens*, and *Boim III*. *Id.* at *15 (holding that "substantiality, directness, and foreseeability are all relevant in a proximate cause determination.").

Masharipov with the weapons he used during the shooting; (4) Masharipov stated that he carried out the attack on ISIS's behalf; and (5) ISIS claimed responsibility for the shooting. (*Id.*). Together, these allegations establish a direct causal link between Plaintiffs' injuries and ISIS's attack at the Reina nightclub.

In sum, the district court improperly viewed proximate causation through *Fields*'s "direct relationship" test. But no matter what causation standard this Court ultimately adopts, the FAC plausibly established that ISIS's attack proximately caused Plaintiffs' damages.

## <u>CONCLUSION</u>

In view of the foregoing, Plaintiffs respectfully request that the Court (1) vacate the judgment in Defendants' favor, (2) reverse the portion of the district court's order dismissing the ATA secondary liability claim, and (3) remand the case for further proceedings.


Dated: April 24, 2019

/s/ *Daniel W. Weininger*
Daniel W. Weininger
Keith L. Altman
EXCOLO LAW, PLLC
26700 Lahser Road, Suite 401
Southfield, MI 48033
Tel: (248) 251-0594

*Counsel for Appellants*

## STATEMENT OF RELATED CASES

There are four related cases currently pending before this Court:

1.  *Reynaldo Gonzalez, et al v. Google LLC*, 18-16700
    (Docketed Sep. 10, 2018)

2.  *Kimberly Copeland v. Twitter, Inc., et al*, 18-17327
    (Docketed Dec. 6, 2018)

3.  *Gregory Clayborn, et al v. Twitter, Inc., et al*, 19-15043
    (Docketed Jan. 8, 2019)

4.  *Danelle Sinclair, et al v. Twitter, Inc., et al*, 19-15625
    (Docketed Apr. 3, 2019)

## **CERTIFICATE OF COMPLIANCE**

With Type-Volume Limitation, Typeface Requirements,
and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f):

[X]    this brief contains <u>6,019</u> words, or

[ ]    this brief uses a monospaced typeface and contains [state the number of] lines of text.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X]    this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook, or

[ ]    this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

Dated: April 24, 2019                    */s/ Daniel W. Weininger*

                                            *Counsel for Appellants*

36

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 24, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: April 24, 2019                                /s/ *Daniel W. Weininger*

*Counsel for Appellants*