No. 18-17192

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MEHIER TAAMNEH; LAWRENCE TAAMNEH;
SARA TAAMNEH; DIMANA TAAMNEH,
*Plaintiffs-Appellants*,

*v.*

TWITTER, INC.; GOOGLE LLC; FACEBOOK, INC.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of California, No. 3:17-CV-04107-EMC
Hon. Edward M. Chen

## BRIEF FOR DEFENDANTS-APPELLEES

Brian M. Willen
Lauren Gallo White
WILSON SONSINI GOODRICH
  & ROSATI, P.C.
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Telephone: (212) 999-5800

*Attorneys for Defendant-Appellee*
  *Google LLC*

Kristin A. Linsley
Daniel L. Chen
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: (415) 393-8200

*Attorneys for Defendant-Appellee*
  *Facebook, Inc.*

Seth P. Waxman
Patrick J. Carome
Ari Holtzblatt
WILMER CUTLER PICKERING
  HALE & DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 663-6000

*Attorneys for Defendant-Appellee*
  *Twitter, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Defendant Twitter, Inc. states that Twitter, Inc. is a publicly-traded corporation and that no publicly-traded entity owns 10% or more of its stock.

/s/ *Patrick J. Carome*
Patrick J. Carome

*Attorney for Defendant-Appellee*
  *Twitter, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Defendant Google LLC states that Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company holds more than 10% of Alphabet Inc.'s stock.

/s/ *Brian M. Willen*
Brian M. Willen

*Attorney for Defendant-Appellee*
  *Google LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Defendant Facebook, Inc. states that Facebook, Inc. is a publicly traded corporation, that it has no parent corporation, and that no publicly traded corporation owns more than 10% of its stock.

/s/ *Kristin A. Linsley*
Kristin A. Linsley

*Attorney for Defendant-Appellee
  Facebook, Inc.*

**TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................1

JURISDICTION................................................................................................3

ISSUES PRESENTED.......................................................................................3

STATUTORY PROVISIONS ...........................................................................3

COUNTERSTATEMENT OF THE CASE........................................................4

      A.     Plaintiffs' Allegations About The Reina Nightclub Attack And
            ISIS's Use Of Social Media Platforms...................................................4

      B.     Procedural History..............................................................................8

SUMMARY OF ARGUMENT ..........................................................................13

ARGUMENT ....................................................................................................16

I.     THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS'
      CLAIM FOR AIDING AND ABETTING UNDER SECTION 2333(d).....16

      A.     Aiding And Abetting Requires Knowing And Substantial
            Assistance To The Principal Violation—A Standard That
            Plaintiffs Did Not Even Try To Meet .................................................17

            1.     Plaintiffs' Allegations Established No Link—Let Alone
                  A Knowing And Substantial Link—To The Reina Attack.......17

            2.     Plaintiffs Cannot Escape The Requirement To Link
                  Defendants' Assistance To The Reina Attack ..........................22

      B.     Even Under Their Erroneous Standard, Plaintiffs Cannot
             Establish That Defendants "Knowingly" Provided "Substantial
            Assistance" To ISIS's General Activities ..........................................30

            1.     Plaintiffs Failed To Allege That Defendants Provided
                  "Substantial Assistance".............................................................31

            2.     Plaintiffs Failed To Allege That Defendants Had The
                  State Of Mind Required For Aiding and Abetting ..................34

C.      Proximate Cause Is Not An Issue On This Appeal ............................37

II.     SECTION 230 PROVIDES AN INDEPENDENT BASIS TO
AFFIRM THE JUDGMENT ..........................................................................40

A.     Section 230 Bars Plaintiffs' Aiding And Abetting Claim..................41

B.     Plaintiffs' Efforts To Circumvent Section 230 Are Contrary To
Established Law ..................................................................................47

CONCLUSION .....................................................................................................56

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................20, 21

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009) ...............................................41, 45

*Batzel v. Smith*,
  333 F.3d 1018 (9th Cir. 2003) .................................................*passim*

*Branch v. Smith*,
  538 U.S. 254 (2003)........................................................................52

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
  274 F. Supp. 2d 86 (D.D.C. 2003)..................................................33

*Cohen v. Facebook, Inc.*,
  252 F. Supp. 3d 140 (E.D.N.Y. 2017)......................................45, 50

*Coto Settlement v. Eisenberg*,
  593 F.3d 1031 (9th Cir. 2010) .........................................................6

*Craft Beer Stellar, LLC v. Glassdoor, Inc.*,
  2018 WL 5505247 (D. Mass. Oct. 17, 2018) ................................46

*Crosby v. Twitter, Inc.*,
  921 F.3d 617 (6th Cir. 2019) ..................................................*passim*

*Daniel v. Armslist, LLC*,
  926 N.W.2d 710 (Wis. 2019) ..................................................45, 51

*Dig. Realty Tr., Inc. v. Somers*,
  138 S. Ct. 767 (2018).....................................................................55

*District of Columbia v. Heller*,
  554 U.S. 570 (2008).......................................................................54

*Doe I v. Nestle USA, Inc.*,
  766 F.3d 1013 (9th Cir. 2014) .......................................................28

*Doe v. Backpage.com, LLC*,
  817 F.3d 12 (1st Cir. 2016)............................................................53

*Doe v. Internet Brands, Inc.*,
    824 F.3d 846 (9th Cir. 2016) .................................................................43, 44

*Doe v. MySpace, Inc.*,
    528 F.3d 413 (5th Cir. 2008) ........................................................................51

*Epic Sys. Corp. v. Lewis*,
    138 S. Ct. 1612 (2018).................................................................................52

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) ...............................................................*passim*

*Fields v. Twitter, Inc.*,
    200 F. Supp. 3d 964 (N.D. Cal. 2016)...........................................41, 45, 50

*Fields v. Twitter, Inc.*,
    217 F. Supp. 3d 1116 (N.D. Cal. 2016).................................................*passim*

*Fields v. Twitter, Inc.*,
    881 F.3d 739 (9th Cir. 2018) .................................................................*passim*

*Force v. Facebook, Inc.*,
    304 F. Supp. 3d 315 (E.D.N.Y. 2018).......................................45, 50, 51, 54

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 474 (E.D.N.Y. 2012).........................................................33

*Goddard v. Google, Inc.*,
    2008 WL 5245490 (N.D. Cal. Dec. 17, 2008) ............................................49

*Gonzalez v. Google, Inc.*,
    282 F. Supp. 3d 1150 (N.D. Cal. 2017).................................................*passim*

*Gonzalez v. Google, Inc.*
    335 F. Supp. 3d 1156 (N.D. Cal. 2018)...........................................37, 45, 51

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983)..............................................................*passim*

*Hart v. Massanari*,
    266 F.3d 1155 (9th Cir. 2001) .....................................................................39

*Hauser v. Farrell*,
    14 F.3d 1338 (9th Cir. 1994) .......................................................................28

*Hawaii v. Office of Hawaiian Affairs*,
    556 U.S. 163 (2009)..............................................................................53, 54

*Hinton v. Amazon.com.dedc, LLC,*
  72 F. Supp. 3d 685 (S.D. Miss. 2014) ........................................49

*HomeAway.com, Inc. v. City of Santa Monica,*
  918 F.3d 676 (9th Cir. 2019) ...............................................43, 44

*Hui v. Castaneda,*
  559 U.S. 799 (2010) ..............................................................53

*Hussein v. Dahabshiil Transfer Servs. Ltd.,*
  230 F. Supp. 3d 167 (S.D.N.Y. 2017) ........................................33

*In re Terrorist Attacks on Sept. 11, 2001,*
  718 F. Supp. 2d 456 (S.D.N.Y. 2010) ........................................33

*Investors Research Corp. v. SEC,*
  628 F.2d 168 (D.C. Cir. 1980) ..................................................23

*Jones v. Dirty World Entm't Recordings, LLC,*
  755 F.3d 398 (6th Cir. 2014) ....................................42, 43, 46, 47

*Kimzey v. Yelp! Inc.,*
  836 F.3d 1263 (9th Cir. 2016) ...........................................43, 44, 48

*Kingdomware Techs., Inc. v. United States,*
  136 S. Ct. 1969 (2016) ...........................................................54

*Klayman v. Zuckerberg,*
  753 F.3d 1354 (D.C. Cir. 2014) ..........................................41, 43

*Linde v. Arab Bank, PLC,*
  882 F.3d 314 (2d Cir. 2018) ..............................................*passim*

*Marshall's Locksmith Serv., Inc. v. Google LLC,*
  2019 WL 2398008 (D.C. Cir. June 7, 2019) ...........................48, 49

*Mosier v. Stonefield Josephson, Inc.,*
  815 F.3d 1161 (9th Cir. 2016) ..................................................27

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,*
  591 F.3d 250 (4th Cir. 2009) ....................................................40

*Pennie v. Twitter, Inc.,*
  281 F. Supp. 3d 874 (N.D. Cal. 2017)...................................*passim*

*PLIVA, Inc. v. Mensing,*
  564 U.S. 604 (2011)...............................................................52

*Posadas v. Nat'l City Bank of N.Y.*,
    296 U. S. 497 (1936)................................................................52

*Radzanower v. Touche Ross & Co.*,
    426 U.S. 148 (1976)................................................................52

*Russello v. United States*,
    464 U.S. 16 (1983)................................................................26

*SEC v. Fehn*,
    97 F.3d 1276 (9th Cir. 1996) ........................................28, 39

*SEC v. Todd*,
    642 F.3d 1207 (9th Cir. 2011) ...........................................28

*United States v. $493,850.00 in U.S. Currency*,
    518 F.3d 1159 (9th Cir. 2008) ......................................51, 52

*United States v. Osborne*,
    76 F.3d 306 (9th Cir. 1996) .................................................39

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*,
    478 F.3d 413 (1st Cir. 2007)...............................................51

*Woodward v. Metro Bank of Dallas*,
    522 F.2d 84 (5th Cir. 1975) .................................................23

*Zeran v. Am. Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997) ...............................................47

## STATUTES

18 U.S.C. § 2333 .........................................................*passim*

18 U.S.C. § 2333(a) .....................................................*passim*

18 U.S.C. § 2333(d) .....................................................*passim*

18 U.S.C. § 2339A ...............................................................7

18 U.S.C. § 2339B ...............................................7, 26, 33

18 U.S.C. § 2339C ...............................................................7

28 U.S.C. § 1291 ..................................................................3

47 U.S.C. § 230 ...........................................................*passim*

50 U.S.C. § 1705(c) .............................................................7

Justice Against Sponsors of Terrorism Act, Pub. L. 114-222,
130 Stat. 852 (Sept. 28, 2016) .............................................................*passim*

## LEGISLATIVE MATERIAL

H.R. 3143, 113th Cong., 1st Sess. (2013) .................................................54

S. Res. 2040, 114th Cong. (2016) .............................................................54

## OTHER AUTHORITIES

U.S. Const. amend. V ................................................................................54

Restatement (Second) of Torts § 876 (1979) .............................................27

**INTRODUCTION**

This appeal arises from one of more than a dozen similar lawsuits seeking to hold Twitter, Google, and/or Facebook liable for the consequences of various terrorist attacks committed around the world: here, an attack on the Reina nightclub in Istanbul, Turkey committed by Abdulkadir Masharipov in January 2017. Every court that has ruled in these cases has dismissed the claims, holding either that the plaintiffs failed to state a cause of action under the Anti-Terrorism Act, 18 U.S.C. § 2333 ("ATA"), and/or that the claims were barred by the immunity that Congress created for providers of online services in Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c) ("Section 230").

Two appellate courts, including the Ninth Circuit, are among the courts that have unanimously rejected Plaintiffs' theory. In *Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018), this Court issued the first appellate decision in this line of cases, affirming the dismissal of direct liability ATA claims against Twitter for lack of proximate cause—that is, lack of a "direct relationship" between the alleged actions of Twitter and the specific terrorist attack at issue. The Sixth Circuit recently followed suit in *Crosby v. Twitter, Inc.*, 921 F.3d 617 (6th Cir. 2019), affirming the dismissal of both direct and secondary liability claims against Twitter, Google, and Facebook under the ATA. Despite these rulings, Plaintiffs'

counsel have noticed appeals from dismissals in six very similar cases, all of which appeals are now pending (or stayed) in this Court.[1]

In this case, the district court rejected each of Plaintiffs' eight causes of action and dismissed their Amended Complaint with prejudice. On appeal, Plaintiffs do not challenge the dismissal of their ATA direct liability, ATA conspiracy, or state law claims. Instead, they appeal only the dismissal of their claim for aiding and abetting under Section 2333(d) of the ATA.

The district court's dismissal of Plaintiffs' aiding and abetting claim for failure to state a claim should be affirmed. As the district court correctly held, Plaintiffs' claim fails as a matter of law because they have not alleged that Defendants knowingly provided substantial assistance to ISIS (or anyone else) in connection with the Reina attack. In addition, the judgment may be affirmed on the alternative ground that Plaintiffs' claim is barred by Section 230 of the CDA,

---

[1] Five of the six appeals (including this one) involve the same three defendants-appellees and the same counsel for plaintiffs-appellants. The parties agreed by stipulation to stay three of the appeals—*Copeland v. Twitter*, No. 18-17327 (Mar. 6, 2019), Dkt. No. 7; *Palmucci v. Twitter, Inc.*, No. 19-15937 (May 14, 2019), Dkt. No. 3; and *Sinclair v. Twitter, Inc.*, No. 19-15625 (May 14, 2019), Dkt. No. 10—pending the resolution of this appeal and the separate but related appeal in *Clayborn v. Twitter, Inc.*, No. 19-15043. This Court entered stays in each of those proceedings on March 18, 2019 (*Copeland*, Dkt. No. 8) and June 6, 2019 (*Palmucci*, Dkt. No. 6, and *Sinclair*, Dkt. No. 13). In the sixth appeal, *Gonzalez v. Google LLC*, No. 18-16700, which is not stayed, Google is the only defendant-appellee and one plaintiff-appellant is represented by the same counsel who represents Plaintiffs here.

as Plaintiffs seek to hold Defendants liable for the alleged consequences of third-party content posted on their platforms. Although Defendants abhor the terrorist violence that occurred in Istanbul, and deeply sympathize with Plaintiffs' losses, established law does not allow their claim to proceed.

## JURISDICTION

Appellees agree that this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.     Whether the district court correctly dismissed with prejudice Plaintiffs' aiding and abetting claim, brought under the civil remedies provision of the ATA, 18 U.S.C. § 2333(d), on the ground that Plaintiffs did not plead that Defendants knowingly provided substantial assistance in connection with the Reina attack.

2.     Whether, as an alternative basis for affirmance, Plaintiffs' aiding and abetting claim is barred by Section 230 of the CDA, 47 U.S.C. § 230, because the claim seeks to hold Defendants liable for the alleged effects of third-party content allegedly posted on Defendants' Internet platforms and for Defendants' allegedly inadequate efforts to police that content.

## STATUTORY PROVISIONS

An addendum to this brief sets forth all relevant statutory provisions.

- 3 -

## COUNTERSTATEMENT OF THE CASE

### A. Plaintiffs' Allegations About The Reina Nightclub Attack And ISIS's Use Of Social Media Platforms

This case arose from a heinous terrorist attack committed by Abdulkadir Masharipov, who shot and killed 39 people at the Reina nightclub in Istanbul, Turkey on January 1, 2017. ER 74 ¶ 1, ER 141 ¶¶ 374-377. Among those tragically killed was Nawras Alassaf, a citizen of Jordan and a relative of Plaintiffs. ER 80-81 ¶¶ 33-37. Plaintiffs' Amended Complaint alleged that Masharipov committed the attack at the direction of ISIS, and under the guidance of an alleged "ISIS emir" named Abu Shuhada, whom the Amended Complaint alleged was the head of ISIS's operations in Turkey. *See* ER 132-35 ¶¶ 325, 334, 337, 342-343, ER 140-41 ¶¶ 367-370.

This lawsuit was not brought against Masharipov, Shuhada, ISIS, or any other person alleged to have assisted in any way in Masharipov's murderous attack. Instead, Plaintiffs sued Twitter, Google, and Facebook—operators of global Internet platforms that are used by billions of people across the world to send and share hundreds of millions of messages, Tweets, videos, and other posts on myriad topics every day. *See* ER 107-08 ¶¶ 189-196, ER 111-12 ¶¶ 212-219, ER 115-16 ¶¶ 231-238, ER 158-59 ¶¶ 457, 465.

The Amended Complaint did not allege that any of the Defendants helped to commit the Reina attack, or even had any connection to the attack or to

- 4 -

Masharipov or Shuhada. Indeed, Plaintiffs did not even allege that Masharipov or Shuhada ever had accounts on Twitter, YouTube, or Facebook, or that either individual ever used the Defendants' platforms for any reason at all. The only link that the Amended Complaint drew between the attackers and *any* online service was to "the messaging app Telegram"—a service with no connection to any Defendant—that Masharipov may have used to communicate with Shuhada in planning the attack, according to a source cited in the Amended Complaint. A. Yayla, *The Reina Nightclub Attack and the Islamic State Threat to Turkey* (Mar. 2017), https://ctc.usma.edu/posts/the-reina-nightclub-attack-and-the-islamic-state-threat-to-turkey/ (cited at ER 134-35 ¶¶ 337 n.39 & 347 n.44).

Instead of alleging any link between Defendants and the Reina attack, the Amended Complaint broadly alleged that other ISIS members and sympathizers—not connected to the Reina attack—used Defendants' services. *See* ER 76 ¶ 12. It alleged, for example, that ISIS members or sympathizers used Twitter to send messages to recruit terrorists, raise funds, and spread propaganda, while admitting that Twitter repeatedly shut down accounts opened by persons associated with ISIS (*e.g.*, ER 99-100 ¶¶ 143-148, ER 101-02 ¶¶ 155-157, ER 105-06 ¶¶ 178-187, ER 160-66 ¶¶ 469, 474-478); it referred to a handful of videos that allegedly appeared on YouTube at various times between 2013 and 2015—one of which it admitted YouTube took down—and alleged that ISIS used these videos to recruit terrorists

and to disseminate propaganda (*e.g.*, ER 99-100 ¶ 146, ER 102-03 ¶ 159, ER 107 ¶ 188, ER 120 ¶¶ 255-258, ER 122-31 ¶¶ 271-277, 287-311); and it alleged that unspecified "ISIS supporters" directed users to Facebook pages containing ISIS propaganda, while admitting that Facebook was "continuously" removing these pages (ER 113 ¶ 223). Neither Masharipov nor Shuhada was alleged to have posted or viewed *any* of this material.

The Amended Complaint conceded that all of this allegedly ISIS-related content was created by, and posted solely at the direction of, third parties—alleged terrorists or their supporters—and not by Defendants. *See, e.g.*, ER 105-07 ¶¶ 177-188. It further conceded that each Defendant has rules against posting content that threatens or promotes terrorist activity or other forms of violence (*see, e.g.*, ER 161 ¶ 473, ER 168 ¶ 485), and that Defendants regularly enforced those rules by removing content and shutting down accounts (*see, e.g.*, ER 99-100 ¶ 146, ER 113 ¶ 223, ER 160 ¶ 469).[2] The Amended Complaint nonetheless faulted Defendants

---

[2] Defendants' rules prohibit the use of their platforms for terrorist activities or content. *See* The Twitter Rules, https://support.twitter.com/articles/18311 (last visited June 24, 2019); YouTube Violent or Graphic Content Policies, https://support.google.com/youtube/answer/2802008?hl=en (last visited June 24, 2019); Facebook Community Standards, https://www.facebook.com/communitystandards/violence_criminal_behavior (last visited June 24, 2019). These rules were incorporated into the Amended Complaint because it "necessarily relies upon" them, their "authenticity is not in question and there are no disputed issues as to [their] relevance." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).

for allegedly failing to take "meaningful action to stop" ISIS by "proactively" and preemptively "censor[ing] user content," "shut[ting] down … ISIS-linked account[s]," or blocking ISIS-related accounts from "springing right back up."  ER 76 ¶ 12, ER 108 ¶ 197, ER 159-60 ¶¶ 466, 469; *see also* ER 113 ¶¶ 222-223. Because Defendants allegedly failed to take these steps, it asserted, they provided material support (ER 76 ¶ 12) and knowing and substantial assistance (ER 171 ¶ 506) to ISIS, and became civilly liable for all injuries that could theoretically be traced back to ISIS's activities—including injuries arising from Masharipov's attack on the Reina nightclub.

Based on this attenuated theory, Plaintiffs' Amended Complaint sought treble damages under the ATA and recovery under state law.  Counts I and II sought to hold Defendants secondarily liable under 18 U.S.C. § 2333(d) on the theories that Defendants aided and abetted, and conspired with, ISIS.  Counts III, IV, VII, and VIII asserted claims for direct liability under § 2333(a), based on alleged violations of 18 U.S.C. §§ 2339A, 2339B, and 2339C(c)—as well as terrorism sanctions regulations issued pursuant to the International Emergency Economic Powers Act ("IEEPA"), 31 C.F.R. Part 594, 50 U.S.C. § 1705(c). Counts V and VI asserted claims under state law for negligent infliction of emotional distress and wrongful death.  Only the aiding and abetting count (Count

I) remains relevant, as Plaintiffs have abandoned all of their other counts on appeal. *See* Br. 8 n.1.

### B. Procedural History

On June 6, 2018, Defendants moved to dismiss the Amended Complaint for failure to allege essential elements of their claims and on the additional ground that all of Plaintiffs' claims are barred by Section 230 of the CDA. Dkt. No. 62. The district court (Edward M. Chen, J.) held a hearing on Defendants' motion on September 6, 2018. During the hearing, Judge Chen noted that the Amended Complaint included only general "allegation[s] that ISIS promotes its agenda via [Defendants'] platforms," and that it failed to assert any link between alleged use of Defendants' platforms by ISIS (or its supporters) and either Masharipov or the Reina attack. ER 26. In response, Plaintiffs' counsel confirmed the absence of any allegations that Masharipov ever used any of Defendants' platforms. ER 28. Instead, Plaintiffs' theory was that Defendants should be held liable for injuries arising from the Reina attack because ISIS allegedly directed Masharipov to conduct the attack and because ISIS allegedly benefited from its (or its supporters') general and unrelated usage of Defendants' online platforms. *See* ER 28-30.

On October 29, 2018, the district court issued an order granting Defendants' motion and dismissing all of Plaintiffs' claims with prejudice. *First*, the district court dismissed Plaintiffs' claims for direct liability under the ATA and state law

because Plaintiffs had not alleged facts that would establish proximate cause. The court held that Plaintiffs had not alleged a "direct relationship" between Defendants' actions and the injuries resulting from the Reina attack, as required by this Court's decision in *Fields v. Twitter, Inc.*, 881 F.3d at 744. ER 12-16. The only allegation even possibly linking Masharipov's attack to Defendants' platforms, the court noted, was the wholly conclusory allegation that Masharipov had been "radicalized by ISIS's use of social media." ER 14 (quoting ER 169 ¶ 493). But Plaintiffs failed to allege that Masharipov ever used Defendants' platforms at all, much less to view any ISIS-related content. ER 14. Nor did Plaintiffs allege "any clear or direct linkage between Defendants' platforms and the Reina attack," and in fact the details alleged in the Amended Complaint about Masharipov's and Shuhada's year-long plotting of the attack indicated that all aspects of the attack were planned and/or carried out by those two men with no involvement of Defendants or their services. *Id.* For these reasons, the court dismissed all of Plaintiffs' direct liability claims with prejudice for failure to allege facts establishing proximate cause. ER 16, 21-22. Plaintiffs did not appeal the dismissal of those claims. Br. 8 n.1.

*Second*, the district court addressed Plaintiffs' secondary liability claims. Section 2333(d)(2) authorizes secondary liability only in an action "for an injury arising from *an act of international terrorism* committed, planned, or authorized

by" an officially designated foreign terrorist organization, and only where the defendant "aid[ed] and abet[ted], by knowingly providing substantial assistance, or … conspire[d] with the person who committed *such an act of international terrorism*." ER 16. The district court held that Plaintiffs failed to state a claim for secondary liability—either conspiracy or aiding/abetting—under the ATA. As with their claims for direct liability under the ATA and state law, Plaintiffs have abandoned their conspiracy claim on appeal and challenge only the dismissal of their aiding and abetting claim. Br. 8 n.1.

Addressing Plaintiffs' aiding and abetting claim, the district court observed that Plaintiffs "expressly tied their aiding/abetting … claim[] to ISIS, and not Mr. Masharipov," relying on a theory that Defendants aided and abetted "ISIS's acts of international terrorism" generally. ER 17. The court initially noted that Plaintiffs' entire theory raised "concerns" because "Plaintiffs seem to take the position that, in the instant case, ISIS's 'act of international terrorism' encompasses *all* of ISIS's terrorist operations, and not the Reina attack specifically." *Id.* It was "questionable that this is what Congress intended," the court explained, because this interpretation would "effectively transform" the ATA's aiding and abetting provision into a statute that "provides for liability for aiding/abetting or conspiring with a foreign terrorist organization generally." *Id.* But Congress did not use language suggesting that it intended to create that kind of broad, general liability,

- 10 -

the court noted. Instead, Congress indicated "that the injury at issue must have arisen from '*an act* of international terrorism' and that the secondary tortfeasor assisted the principal tortfeasor in committing '*such an act* of international terrorism.'" ER 17-18. As the court recognized, the text of the statute contemplates a specific link between the assistance provided and the actual crime that caused the plaintiff's injury—a construction that comports both with other decisions interpreting the ATA and with "the common law's understanding of aiding and abetting." ER 18.

The district court then held that Plaintiffs' allegations would fail *even if* it were proper to assert a secondary liability claim "based on a defendant's assistance of a foreign terrorist organization or such an organization's general course of conduct." ER 18. An aiding and abetting claim under Section 2333(d), the court noted, requires the plaintiff to establish (among other things) three elements: "(1) 'the party whom the defendant aids must perform a wrongful act that causes an injury,' (2) 'the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance,' and (3) 'the defendant must knowingly and substantially assist the principal violation.'" ER 19 (quoting *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018)). The court held that—even as to their claim that Defendants somehow aided and abetted

ISIS at a general level—Plaintiffs had not alleged either the second or the third of those elements.

As to the second element, the district court held, Plaintiffs failed to allege that Defendants were aware that they were assuming any role in ISIS's terrorist activities. ER 19. "There is no allegation, for example, that Defendants knew that ISIS members had previously used Defendants' platforms" to plan or carry out terrorist attacks. ER 19-20.

The district court next held that Plaintiffs had not stated facts establishing that Defendants provided "substantial assistance" in furtherance of the attack that caused Plaintiffs' injuries. ER 20. The court reviewed the six factors articulated by the D.C. Circuit in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), and held that Plaintiffs' allegations were insufficient to establish substantial assistance to ISIS, even assuming that broad frame of reference was appropriate under Section 2333(d). ER 20-21.

For all of these reasons, the district court dismissed Plaintiffs' claims for secondary liability with prejudice. ER 21. The court entered judgment in favor of Defendants on October 29, 2018. ER 2. This appeal—limited to the dismissal of Plaintiffs' aiding and abetting claim—followed.

- 12 -

## SUMMARY OF ARGUMENT

The only issues before this Court are whether Plaintiffs stated a viable claim for aiding and abetting under the ATA, and whether such a claim is barred by Section 230 of the CDA. The ATA provides that, if an act of international terrorism is "committed, planned, or authorized" by a designated foreign terrorist organization, "liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2). The district court correctly held that Plaintiffs failed to state a claim under this provision.

Liability for aiding and abetting requires that the secondary actor have "knowingly and substantially assist[ed] the principal violation"—that is, the act that caused the plaintiff's injury. *Linde*, 882 F.3d at 329 (citation omitted). Here, that act is the Reina attack, but Plaintiffs failed to allege that any Defendant provided *any* assistance—much less knowing and substantial assistance—to anyone in connection with the attack. Indeed, Plaintiffs did not even try to make that showing. They argue instead that all they needed to allege was that Defendants provided generalized assistance to ISIS, regardless of whether such assistance had any relationship to what happened at the Reina nightclub. Plaintiffs are wrong: their argument is contrary to basic principles of aiding and abetting

liability, which are reflected in the ATA's text and in every case that has addressed this issue. Plaintiffs' inability to meet this fundamental requirement for an aiding and abetting claim is reason alone to affirm the district court's decision.

Even if Plaintiffs' misguided approach to aiding and abetting were actually the law, the district court's dismissal of their claim still would have to be affirmed. Section 2333(d) requires that the defendant have "knowingly" provided "substantial assistance." But Plaintiffs did not meet either aspect of this requirement. Their factual allegations did not plausibly establish that any assistance Defendants allegedly provided to ISIS was "substantial" under the factors laid out in *Halberstam v. Welch*. To the contrary, as the district court held, those factors—individually and collectively—make clear that Plaintiffs did not and could not allege that Defendants substantially assisted any aspect of ISIS's general course of terrorist activities.

Nor did the Amended Complaint plausibly allege that Defendants acted with the state of mind necessary for ATA aiding and abetting liability. The state of mind element requires not only that the secondary actor have provided "knowing[]" assistance to the "principal violation," but *also* that that actor have been "'aware' that, by assisting the principal, it [was] itself assuming a 'role' in terrorist activities." *Linde*, 882 F.3d at 329. Here, nothing like that was—or could have been—alleged. Plaintiffs did not plausibly allege that Defendants

- 14 -

"knowingly" provided support to terrorist activities conducted by ISIS, even at a general level. Nor did Plaintiffs allege that Defendants, merely by making their services broadly available to the public, had culpable knowledge that they were somehow taking on a "role" in ISIS's heinous actions. For these reasons as well, Plaintiffs' aiding and abetting claim fails.

Finally, although the district court did not (and did not need to) reach the issue, Section 230 of the CDA provides an alternative basis for affirming the judgment. Section 230 confers broad immunity on online platforms against claims based on the alleged effects of third-party content that appeared on their sites, as well as claims based on their editorial decisions or omissions relating to such content. As Plaintiffs' Amended Complaint and opening brief make clear, their aiding and abetting claim rests squarely on the content of material that ISIS and its followers allegedly posted on Defendants' platforms and that ISIS and its followers allegedly used to recruit new members, solicit funds, disseminate propaganda, and offer training materials. Br. 19-20. Plaintiffs admit that Defendants have and enforce rules prohibiting terrorist groups and terrorist content on their sites, but assert that Defendants should have done more to find and remove ISIS-related content. That theory falls squarely within Section 230. It seeks to do exactly what Section 230 forbids: impose liability on online service providers because they

- 15 -

allegedly failed to do enough to prevent or stop third parties from posting harmful content on their platforms.

For these reasons, the district court's judgment dismissing the action with prejudice should be affirmed in all respects.

## ARGUMENT

## I.   THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' CLAIM FOR AIDING AND ABETTING UNDER SECTION 2333(d)

In enacting the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. 114-222, 130 Stat. 852, in 2016, Congress created a limited form of secondary liability under the ATA.  Section 2333(d)(2) allows a U.S. national who is a victim of an "act of international terrorism" that was "committed, planned, or authorized" by a designated foreign terrorist organization to assert a claim against "any person who aids and abets, by knowingly providing substantial assistance, … the person who committed such an act of international terrorism."  18 U.S.C. § 2333(d)(2).

The district court correctly held that Plaintiffs failed to state an aiding and abetting claim under this provision.  The flaw in their claim is fundamental. Plaintiffs never have argued that their allegations establish that Defendants provided *any* assistance (let alone substantial and knowing assistance) in connection with the Reina attack—the act of international terrorism from which their injuries arose.  But Section 2333(d)—like civil aiding and abetting more generally—requires the plaintiff to link a defendant's assistance and knowledge to

- 16 -

"the principal violation" that injured the plaintiff. ER 17-18. Plaintiffs' inability to make that showing here requires affirmance.

Plaintiffs' only response is a legal argument, and a flawed one at that: they contend that "knowingly providing substantial assistance" to some broader course of activity of ISIS, without any connection to the Reina attack, should be sufficient to state a claim under Section 2333(d). This argument fails for two crucial reasons. *First*, as explained below, Plaintiffs are simply wrong about the law: core principles of aiding and abetting liability—reflected in decades of cases under both the ATA and other statutes, and embodied in the text of Section 2333(d) itself— make clear that the defendant's alleged knowing and substantial assistance must be tied to the principal wrong at issue—here, the Reina attack. *Second*, as the district court correctly held (ER 18-21), the allegations of the Amended Complaint are insufficient to satisfy even Plaintiffs' erroneous legal standard. Either way, Plaintiffs' claim under Section 2333(d) fails as a matter of law, and the judgment must be affirmed.

### A. Aiding And Abetting Requires Knowing And Substantial Assistance To The Principal Violation—A Standard That Plaintiffs Did Not Even Try To Meet

#### 1. Plaintiffs' Allegations Established No Link—Let Alone A Knowing And Substantial Link—To The Reina Attack

As multiple courts applying Section 2333(d)(2) have made clear—including the Second Circuit in *Linde* and the Sixth Circuit in *Crosby*—this provision

- 17 -

requires a plaintiff to show that the defendant knowingly assisted in *the principal violation*, that is, the "act of international terrorism" from which the plaintiffs' injury arose. *See Linde*, 882 F.3d at 331 (aiding and abetting under Section 2333(d) requires proof that the defendant "knowingly and substantially assist[ed] the principal violation" (citation omitted)); *Crosby*, 921 F.3d at 627 n.6 (defendant must have "knowingly and substantially assist[ed] *the principal violation*" (emphasis added) (quoting *Linde*, 882 F.3d at 329)). This follows directly from the D.C. Circuit's decision in *Halberstam v. Welch*, the case that Congress identified as providing "the proper legal framework" for secondary liability under the ATA. JASTA § 2(a)(5); *accord Crosby*, 921 F.3d at 627 n.6; *Linde*, 882 F.3d at 329. *Halberstam* holds that the defendant must have "knowingly and substantially assist[ed] the principal violation." 705 F.2d at 488.

Although this is the most fundamental requirement of an aiding and abetting claim, Plaintiffs have not even tried to meet it here. In this case, the "principal violation"—the wrongful act from which Plaintiffs' claims arose—is of course Masharipov's attack on the Reina nightclub in January 2017. But Plaintiffs have never argued that their allegations establish that Defendants provided *any* assistance to *anyone* in connection with that attack—let alone "knowing" and "substantial" assistance. This dispositive shortcoming is highlighted by their failure even to try to demonstrate a legally sufficient link between Defendants and

- 18 -

the Reina attack by reference to the six factors identified in *Halberstam* for assessing "how much encouragement or assistance is substantial enough." *Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at 478). That alone defeats Plaintiffs' claim as a matter of law.

Nor could Plaintiffs make any such showing. Despite describing in detail who committed the attack and how (*see* ER 135 ¶¶ 343-344, ER 140-41 ¶¶ 367-377), the Amended Complaint nowhere suggests that Facebook, Google, or Twitter supplied any assistance at all, at any time, to Masharipov (the individual who committed the attack) or Shuhada (the "ISIS emir" who allegedly orchestrated it) (*see* ER145-69 ¶¶ 391-489). The Amended Complaint did not allege that Masharipov or Shuhada ever had an account on Twitter, YouTube, or Facebook, ever used any of the Defendants' platforms to view ISIS-related content or to communicate with any ISIS-affiliated individuals, or, indeed, ever used any of the Defendants' services at all. ER 14. Nor did it allege that the decision of either of these individuals to affiliate with ISIS—much less their decision to commit, or their commission of, the Reina attack—had anything to do with ISIS's usage of Defendants' platforms. Indeed, Plaintiffs' detailed allegations about the events leading up to those decisions make even clearer that those events did not involve Defendants. *Id.* As the district court noted, the only allegation even "suggesting that Mr. Masharipov's attack was in [any] way causally affected by ISIS's

- 19 -

presence on the social platforms" was a single, vague assertion that Masharipov was "'radicalized by ISIS's use of social media,'" *id.* (quoting ER 169 ¶ 493)—a "conclusory allegation" that is not entitled to be presumed true, *id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009)), and that does not even mention any of the Defendants' services.

Nor can Plaintiffs close this gap with allegations regarding alleged use of Defendants' platforms by ISIS or its supporters. Br. 20. Those allegations have nothing to do with the Reina attack, and they do nothing to link that attack to any of the material that ISIS or its supporters allegedly posted to Defendants' services. Instead, the allegations were entirely generic—asserting that ISIS "used Defendants' platforms" to distribute content intended to threaten the nation of Turkey, to celebrate other attacks and ISIS exploits, to "intensify the intimidation of" and claim responsibility for some unidentified attacks, and to celebrate the Reina attack *after the fact*. ER 79 ¶¶ 24-25. Indeed, to the extent the Amended Complaint linked the attack to any online service, it was not to Defendants' services but to a service provided by a different company (Telegram), which Masharipov reportedly used to communicate with Shuhada about the attack. *See* A. Yayla, *The Reina Nightclub Attack and the Islamic State Threat to Turkey* (Mar. 2017), https://ctc.usma.edu/posts/the-reina-nightclub-attack-and-the-islamic-state-threat-to-turkey/ (cited at ER 134-35 ¶¶ 337 n.39 & 347 n.44).

- 20 -

Plaintiffs similarly failed to plead that Defendants had any knowledge of Masharipov, Shuhada, or their plans to commit the Reina attack, much less knew of any usage of their services in connection with that attack or its planning (which usage was not even alleged). Nor did Plaintiffs plausibly allege that Defendants were aware of any plans by ISIS or anyone else in connection with the Reina attack. The only reference in the Amended Complaint to this subject was a conclusory assertion, wholly devoid of factual support, that "Defendants knowingly provided substantial assistance and encouragement to ISIS … in committing, planning, or authorizing … the acts of international terrorism that injured Plaintiffs." ER 171 ¶ 506. That boilerplate allegation is an implausible, threadbare recital that is "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

In short, the Amended Complaint entirely failed to link Defendants to the act of international terrorism from which Plaintiffs' injuries arose. Unable to establish *any* such link, Plaintiffs certainly cannot meet the further and more demanding requirements imposed by Section 2333(d) to show that Defendants *knowingly* and *substantially* assisted the attack. For this reason alone, the district court was correct to dismiss Plaintiffs' claim with prejudice.

### 2. Plaintiffs Cannot Escape The Requirement To Link Defendants' Assistance To The Reina Attack

Recognizing that they have not established and cannot establish *any* connection—much less a substantial and knowing connection—between Defendants' acts and the Reina attack, Plaintiffs ask this Court to rewrite the legal standard for aiding and abetting. According to Plaintiffs, Section 2333(d) should be read to require only that "Defendants substantially assisted ISIS" at a general level, unconnected to the "act of international terrorism" that injured Plaintiffs. Br. 19-22. But disconnecting aiding and abetting liability from the principal offense would be inconsistent with every case that has applied Section 2333(d). It also would depart from the statutory text and decades of civil aiding and abetting caselaw. Plaintiffs' unsupported and incongruous reading of Section 2333(d) cannot save their claim.

***ATA Case Law.*** As discussed above, *Linde* and *Crosby*—reflecting the teaching of *Halberstam*—make clear that aiding and abetting under Section 2333(d) requires knowingly providing substantial assistance to "the principal violation." *Linde*, 882 F.3d at 331; *Crosby*, 921 F.3d at 627 n.6. In this way, as the Second Circuit explained, "aiding and abetting focuses on the relationship between the act of international terrorism and the secondary actor's alleged supportive conduct." *Linde*, 882 F.3d at 331.

- 22 -

Plaintiffs misapprehend the Second Circuit's clear analysis in *Linde*. They point to the court's discussion in that case of the separate requirement that the defendant be "aware" that "'it is itself assuming a "role" in terrorist activities.'" Br. 15 (quoting *Linde*, 882 F.3d at 329). They argue, based on that discussion, that it was sufficient for them to allege knowing and substantial assistance to a terrorist organization's overall course of harmful activities, without having to connect that assistance or knowledge to the terrorist act from which their injuries arose. Br. 15; *see also* Br. 18-19 (similar). But that is not what *Linde* held. *Linde*—like *Halberstam* before it—made clear that the "awareness" element is an *additional* requirement for an aiding and abetting claim, one that is entirely separate from the "substantiality inquiry for aiding and abetting." 882 F.3d at 330, 331; *accord Halberstam*, 705 F.2d at 477, 487-88.[3] Thus, as the Second Circuit explained, a plaintiff must plead and prove *both* that the defendant was "generally aware of his role as part of an overall illegal or tortious activity at the time that he provide[d] the assistance," *and* that "the defendant … knowingly and substantially assist[ed]

---

[3] The "generally aware" element—which was developed before *Halberstam* in the context of civil claims for aiding and abetting violations of the federal securities laws—was meant to provide an *additional* state-of-mind requirement to protect against imposing liability in situations where a defendant who knowingly aided certain activity was not aware that the aided activity was actually illegal. *See, e.g.*, *Investors Research Corp. v. SEC*, 628 F.2d 168, 177-78 (D.C. Cir. 1980); *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 94-96 (5th Cir. 1975) (cited in *Halberstam*, 705 F.2d at 477).

the principal violation." *Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at

477, 487-88).[4]

Likewise, in *Crosby*, the plaintiffs' failure to link the defendants' actions to

the underlying act of international terrorism was central to the Sixth Circuit's

affirmance of the dismissal of the aiding and abetting claim. In discussing the

proximate cause requirement for direct liability, the Sixth Circuit explained that the

plaintiffs had not established any connection "between Defendants' conduct (of

allegedly providing social media platforms to ISIS) and Plaintiffs' injuries

suffered" from the shooting. *Crosby*, 921 F.3d at 624-25. Turning to secondary

liability, the court then emphasized that plaintiffs' aiding and abetting theory

presented that "same problem all over again." *Id.* at 626. *Crosby* thus confirmed

the requirement under Section 2333(d) that the plaintiff connect the defendant's

conduct to "the principal violation." *Id.* at 627 n.6. Plaintiffs' efforts to

distinguish *Crosby* on its facts do not change that fundamental legal requirement.

---

[4] While the Second Circuit in *Linde* suggested that the "awareness" element need not be directly linked to a specific attack, 882 F.3d at 329, it confirmed that the *separate* element of knowing and substantial assistance must relate to "the principal violation." *Id.* (quoting *Halberstam*, 705 F.2d at 487); *see also id.* at 329 & n.10 (explaining that, although the "awareness" element does not require "specific intent," such intent is "properly considered in deciding whether the defendant's assistance was sufficiently knowing and substantial to qualify as aiding and abetting"). This is consistent with the purpose and background of the "awareness" requirement, as set forth in *Halberstam* and the aiding and abetting cases that preceded it. *See* 705 F.2d at 477; *see also supra* p. 23 & n.3.

- 24 -

***Statutory Text.*** Plaintiffs' argument also is foreclosed by the text of Section 2333(d), which makes clear that a defendant must have knowingly and substantially assisted the specific act of international terrorism from which the plaintiff's injury arose. Section 2333, as amended by JASTA, repeatedly refers to a singular "act of international terrorism" that must give rise to the claim, and that also must be the object of the knowing and substantial assistance required for an aiding and abetting claim. Section 2333(a) creates a civil cause of action for U.S. nationals "injured … by reason of an act of international terrorism." 18 U.S.C. § 2333(a). Section 2333(d)(2), in turn, provides that "[i]n an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by [a designated] foreign terrorist organization, … liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, … the person who committed such an act of international terrorism." *Id.* § 2333(d)(2).

As the district court noted, Congress's consistent usage of the singular word "act" in three places within Section 2333 confirms that the "act of international terrorism" to which the defendant must have provided "substantial assistance" is the same "act" that caused the plaintiff's injury (subsection (a)), and the same "act" from which plaintiff's injury must have "arise[n]" (subsection (d)). This repeated reference to "act"—as opposed to some broader course or series or other collection

of acts—indicates a "connect[ion] with a specific crime," and not with a terrorist organization's "general course of conduct."  ER 17-18.

This construction is further confirmed by the dual focus in Section 2333(d) on *both* the act assisted *and* the person receiving assistance.  In contrast to a neighboring antiterrorism provision—18 U.S.C. § 2339B, which criminalizes the "knowing[] provi[sion of]  material support or resources to a foreign terrorist organization" without regard to any particular act of that organization—Section 2333(d) specifically links the Defendants' knowing and substantial assistance to both the principal tort (the "act of international terrorism") and the principal tortfeasor (the "person who committed" that terrorist act).  18 U.S.C. § 2333(d)(2). As the district court recognized, if Congress had meant to impose liability for aiding "a foreign terrorist organization generally, … it could easily have used language similar" to Section 2339B.  ER 17.  Its choice of narrower language in Section 2333(d) must be given effect.  *See generally Russello v. United States*, 464 U.S. 16, 23 (1983) (cautioning against reading different language in related statutory provisions as meaning the same thing).

Plaintiffs' argument that the relevant "person" in Section 2333(d) could be an organization, such as ISIS, rather than a human being (Br. 13-14), is beside the point.  Whether the person assisted is natural or artificial, the defining characteristic of that person must be the person's *commission* of the underlying act

- 26 -

of international terrorism—in this case, the Reina attack that gave rise to Plaintiffs' injuries. Congress's standalone use of the word "committed" in describing the assisted person—in contrast with the more expansive phrase "committed, planned, or authorized" used earlier in the provision to delimit the types of terrorist attacks that may give rise to a claim, *see* 18 U.S.C. § 2333(d)(2)—further underscores the requirement that the assistance must have been provided to the "commission" of the act itself, not to broader "planning" or "authorization" activities and certainly not to an organization's generalized activities.

*Foundational Principles of Civil Aiding and Abetting.* The requirement of Section 2333(d) that the defendant have aided and abetted the principal violation tracks a bedrock, common sense precept of civil aiding and abetting law: the defendant must have knowingly and substantially assisted in the principal wrong, not just have generally aided or assisted the perpetrator. As this Court recently explained, a claim for common law aiding and abetting requires "that the aider and abettor [have] provided assistance that was a substantial factor in causing the harm suffered." *Mosier v. Stonefield Josephson, Inc.*, 815 F.3d 1161, 1167-68 (9th Cir. 2016) (emphasis omitted); *see also* Restatement (Second) of Torts § 876 (1979) (aider and abettor must have assisted the principal tortfeasor in "conduct[ing]" or "accomplishing" the principal tort).

- 27 -

Likewise, in an action for aiding and abetting a civil securities law violation, the SEC must prove "'substantial assistance' in the commission of the primary violation." *SEC v. Fehn*, 97 F.3d 1276, 1288 (9th Cir. 1996) (citation omitted). Aiding and abetting under the Alien Tort Statute similarly requires a "causal link between the defendant[] and the commission of the [principal] crime." *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1026 (9th Cir. 2014). As the district court in this case noted, under "the common law's understanding of aiding and abetting," the assistance alleged must "be connected with a specific crime," and it is not enough to show that a defendant "assist[ed] a foreign terrorist organization generally or such an organization's general course of conduct." ER 18.

The same is true of the knowledge element of an aiding and abetting claim. Courts consistently hold that the defendants in such a claim, in addition to providing substantial assistance to the principal violation, also must have had "actual knowledge … of the wrong and of his or her role in furthering it." *Hauser v. Farrell*, 14 F.3d 1338, 1343 (9th Cir. 1994); *see also SEC v. Todd*, 642 F.3d 1207, 1225 (9th Cir. 2011) (alleged aider and abettors must have had "knowledge of the primary violation and of their own role in furthering it").

***Policy Considerations.*** Even beyond all these considerations, there are other good reasons to reject an expansive aiding and abetting concept that would permit liability for conduct untethered to the principal act that injured the plaintiff.

- 28 -

In *Fields*, plaintiffs sought to hold Twitter directly liable on the theory that, because Twitter allegedly did not prevent ISIS members or sympathizers from posting content, Twitter should be liable for any and all terrorist attacks anywhere in the world that allegedly were inspired by ISIS. This Court rejected that theory of causation because it would radically expand the scope of ATA liability. "Communication services and equipment," this Court observed, "are highly interconnected with modern economic and social life, such that the provision of these services and equipment to terrorists could be expected to cause ripples of harm to flow far beyond the defendant's misconduct." *Fields*, 881 F.3d at 749. But "[n]othing in § 2333 indicates that Congress intended to provide a remedy to every person reached by these ripples." *Id.* Accepting Plaintiffs' aiding and abetting theory—namely, that a failure to prevent members or supporters of a terrorist organization from generally using "infrastructure" that is also used by billions of other people constitutes aiding and abetting any terrorist attack carried out in that organization's name—would mean that widely available online platforms could be held liable for virtually every act of terrorism committed anywhere in world. *See Crosby*, 921 F.3d at 625 (accepting similar argument would mean that Defendants would be liable "for seemingly endless acts of modern violence"). That is the result this Court rejected in *Fields*, 881 F.3d at 749, and it should be rejected here as well.

- 29 -

* * *

For all these reasons, Plaintiffs' theory—that it is enough to show that Defendants provided support to ISIS generally, rather than in connection with the actual attack at issue—is foreclosed by the case law, the text of the statute, and established common law understandings of civil aiding and abetting. Plaintiffs' legal position is simply wrong, and Plaintiffs have not even tried to offer the kinds of allegations that would be necessary for any viable claim of aiding and abetting. The Court need go no further to affirm the district court's judgment.

### B. Even Under Their Erroneous Standard, Plaintiffs Cannot Establish That Defendants "Knowingly" Provided "Substantial Assistance" To ISIS's General Activities

Plaintiffs' claim also would fail even under their erroneous concept of aiding and abetting. As the district court held, even if Plaintiffs "were correct that a JASTA claim is viable based on a defendant's assistance of a foreign terrorist organization or such an organization's general course of conduct, the specific allegations made in the complaint fail to establish liability under JASTA." ER 18. The district court was exactly right: Plaintiffs did not plausibly allege that Defendants provided "knowing and substantial assistance" to ISIS's terrorist activities *even at a general level*.

### 1. Plaintiffs Failed To Allege That Defendants Provided "Substantial Assistance"

As Plaintiffs acknowledge (Br. 17-18), the law is clear that aiding and abetting liability under the ATA requires not just assistance but "*substantial*" assistance. The guiding decision in *Halberstam* identified six factors that bear on "how much encouragement or assistance is substantial enough": (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal tortfeasor, (5) defendant's state of mind, and (6) the period of defendant's assistance. 705 F.2d at 478, 483-84; *accord Linde*, 882 F.3d at 329. Even viewing ISIS's terrorist activities at the broader level of generality that Plaintiffs propose, the district court held that "there are insufficient allegations that Defendants played a role in any particular terrorist activities," and that "no reasonable jury could find substantial assistance taking into account the six factors above." ER 20. That conclusion was correct, and Plaintiffs make no tenable argument for disturbing it.

*First*, Plaintiffs did not allege that any Defendant actively assisted with ISIS's general terrorist mission or took *any* deliberate action to "encourage" terrorist activity, whether by ISIS or anyone else.

*Second*, Plaintiffs did not allege that "Defendants played a major or integral part in ISIS's terrorist attacks," despite the admonition in *Halberstam* that "the

- 31 -

assistance given by the defendant should play a 'major part in prompting the tort' or be 'integral' to the tort in order to be considered substantial assistance." ER 20 (quoting *Halberstam*, 705 F.2d at 484).

*Third*, although courts have recognized that allegations that the defendant "showed he was one in spirit" with the principal wrongdoer are important for establishing aiding and abetting liability, *Halberstam*, 705 F.2d at 484, here "there is no allegation that Defendants [had] any intent to further ISIS's terrorism." ER 21. To the contrary, Plaintiffs admitted that Defendants banned terrorist content from their services and worked to remove it when they learned about its presence. *E.g.*, ER 99-100 ¶ 146, ER 147-48 ¶¶ 403-404, 410, ER 160-61 ¶¶ 469, 473, ER 168 ¶ 485. This negates any suggestion that Defendants harbored any "intent and desire to make [any ISIS-related] venture succeed" or that they somehow were trying to align themselves with ISIS's mission. *Halberstam*, 705 F.2d at 488 (explaining "special importance" of intent in the substantial assistance inquiry).

*Fourth*, there is no suggestion that Defendants were present during any ISIS activity, that they contributed in any way to any of its attacks, or that they had any "relationship" with ISIS or its illegal activities beyond the fact that they provided "routine services generally available to members of the public." ER 20-21 ("[T]here is no real dispute that the relationship between Defendants and ISIS is an arms'-length one—a market relationship at best."). Although Plaintiffs insist that

Defendants' services were *not* routine (Br. 20-21), they offer nothing that would support that assertion. Plaintiffs accuse the district court of ignoring "numerous authorities that bolster the conclusion that services are not 'routine' when patently rendered to a designated foreign terrorist organization." *Id.* But those cases, which arose in the financial services context, confirm that ATA liability requires more than merely offering to the public at large a general service that a terrorist organization might (like anyone else) be able to use. *See Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 486 (E.D.N.Y. 2012); *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 489 (S.D.N.Y. 2010).[5]

In short, Plaintiffs' broad allegations that ISIS or its supporters may have used Defendants' platforms—in violation of Defendants' rules—cannot establish

---

[5] Courts have reached similar conclusions in addressing ATA civil liability claims premised on alleged provision of material support to terrorism in violation of 18 U.S.C. § 2339B—holding that, to violate that statute, the defendant must have intentionally provided services to someone it knew to be a terrorist organization. *See Hussein v. Dahabshiil Transfer Servs. Ltd.*, 230 F. Supp. 3d 167, 176-77 (S.D.N.Y. 2017) (allegations that defendants provided "routine" banking services insufficient unless they "had reason to believe that their customers were terrorists or were assisting terrorists"), *aff'd*, 705 F. App'x 40 (2d Cir. 2017); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 109 (D.D.C. 2003) (bank not liable for material support where it provided "routine banking service[s]"). Particularly given that a civil claim for aiding and abetting includes elements beyond those required under 18 U.S.C. § 2339B, these cases confirm that Plaintiffs' allegations that Defendants passively offered to the public routine, generally available services that happen to have been incidentally used by a member of a foreign terrorist organization are not enough for aiding and abetting liability under Section 2333(d).

- 33 -

"substantial assistance" under *Halberstam* and the ATA, even employing Plaintiffs' erroneous legal standard. The district court correctly dismissed Plaintiffs' aiding and abetting claim on that basis.

> **2. Plaintiffs Failed To Allege That Defendants Had The State Of Mind Required For Aiding and Abetting**

A second, independent reason why the district court's decision should be affirmed, even if the Court were to accept Plaintiffs' misconception that knowing and substantial assistance to ISIS generally is sufficient, is that, even from that perspective, the Amended Complaint failed plausibly to allege that Defendants had the state of mind required for aiding and abetting liability under Section 2333(d). As discussed above, *Halberstam* explains that "the defendant must knowingly and substantially assist the principal violation," while also being "generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance." 705 F.2d at 477, 487-88. To state an aiding and abetting claim under their erroneous reading of Section 2333(d), therefore, Plaintiffs still would have to establish two kinds of knowledge: (1) that the Defendants were *generally aware* that they were part of an overall scheme of terrorist activity, and (2) that they *knowingly* assisted the principal tortfeasor. *Id.*; *accord Linde*, 882 F.3d at 329; *see also supra* pp. 22-24. As the district court found, Plaintiffs met neither requirement, even accepting Plaintiffs' "general assistance to ISIS" theory of aiding and abetting. ER 19-21.

- 34 -

*First*, Plaintiffs did not and cannot show that Defendants "knowingly" provided substantial assistance to ISIS's terrorist activities, even at a general level. Plaintiffs failed not only to allege that Defendants knowingly allowed ISIS or its supporters to post any material connected with any terrorist attack. They failed even to allege that Defendants knew about, yet failed to remove from their platforms, any particular item of content supplied by ISIS or its supporters (whatever its nature) or any particular account belonging to ISIS or its supporters (however it may have been used). To try to fill this gap, the Amended Complaint offered only conclusory allegations that Defendants knew generally that ISIS members or supporters were among the billions of individuals who used Defendants' online services and that Defendants therefore "provided the terrorist group ISIS with accounts to use its social networks as a tool for spreading extremist propaganda, raising funds, and attracting new recruits." *See, e.g.*, ER 76 ¶ 12. But allegations that Defendants were generally aware that ISIS members or supporters were using Defendants' platforms, contrary to their rules, are not enough to establish that Defendants knowingly gave substantial support to ISIS or its terrorist campaigns. That is particularly so where, as here, Plaintiffs acknowledge that Defendants removed ISIS content and banned ISIS-affiliated accounts of which Defendants became aware. *See supra* pp. 6 & n.2, 32.

- 35 -

*Second*, Plaintiffs failed plausibly to plead facts satisfying the separate requirement that Defendants knew that, by operating their services, they were playing a role in ISIS's terrorist activities. As the Second Circuit explained in *Linde*, Section 2333(d) "requires more than the provision of material support to a designated terrorist organization" and "knowledge of the organization's connection to terrorism"; it *also* "requires the secondary actor to be 'aware' that, by assisting the principal, it [was] itself assuming a 'role' in terrorist activities." *Linde*, 882 F.3d at 329-30 (emphasis omitted). In *Linde*, the fact that the bank defendant may have been aware that "the transfers being requested therein were payments for suicide bombings" was insufficient to support a finding "that the bank was aware that by processing future transfers it was playing a role in violent or life-endangering acts." *Id.* at 330. Here, "[t]here is no allegation … that Defendants knew that ISIS members had previously used Defendants' platforms to communicate specific plans to carry out terrorist attacks." ER 19-20. Even if Plaintiffs alleged that Defendants were generally aware that persons affiliated with or sympathetic to ISIS might be using their services, that would still be far removed from Defendants' being aware that they actually were playing a role in ISIS's overall scheme of violent terrorist activity. *Id.*[6]

---

[6] Plaintiffs argue that the "district court failed to address Plaintiffs' contention that Google shares advertising revenue with ISIS" (Br. 22 n.2), but the Amended (continued...)

## C.   Proximate Cause Is Not An Issue On This Appeal

Oddly detouring into an issue not raised by this appeal, Plaintiffs argue that the district court "misconstrued the ATA's causation standard," and even go so far as to suggest that this panel should overrule this Court's recent decision in *Fields v. Twitter* regarding that standard.   Br. 9, 22-33.   This Court should disregard this argument.

The proximate cause issue, which was central in *Fields*, is not presented on this appeal.   *Fields* involved only a claim for direct liability under Section 2333(a) of the ATA.   The plaintiffs there contended that Twitter had brought about certain terrorist attacks by supposedly providing "material support" to ISIS.   *Fields*, 881 F.3d at 742.   This Court upheld the dismissal of that claim because the plaintiffs failed to allege proximate cause—that is, that they were injured "'by reason of'

_____

(...continued from previous page)

Complaint's cursory and conclusory allegations of revenue sharing (ER 151-53 ¶¶ 427-437) do not remotely suggest substantial assistance.   Plaintiffs did not plausibly allege any instances where Google purportedly shared revenue with anyone whom it knew to be part of ISIS, and they do not even try to explain how any hypothetical revenue sharing would have substantially assisted ISIS's terrorist acts, much less in some way connected to the Reina attack.   *See Pennie v. Twitter, Inc.*, 281 F. Supp. 3d 874, 888, 891-92 (N.D. Cal. 2017) (dismissing claims premised on allegations that Google shared revenue with Hamas for "failure to allege a plausible causal connection between Hamas and the Dallas attack"); *Gonzalez v. Google, Inc.* ("*Gonzalez II*"), 335 F. Supp. 3d 1156, 1179 (N.D. Cal. 2018) (dismissing claims because "Plaintiffs do not allege any direct causal connection between the Paris attack and any shared revenue provided to ISIS in connection with the single YouTube video alleged in the TAC"), *appeal docketed*, No. 18-16700 (9th Cir. Sept. 10, 2018).

Twitter's knowing provision of material support to ISIS." *Id.* at 741 (quoting 18 U.S.C. § 2333(a)). The Court held that the proximate cause standard imposed by the ATA's "by reason of" element requires a showing of "at least some direct relationship between the injuries that [the plaintiff] suffered and the defendant's acts," and held that the claim there did not meet that standard. *Id.* at 744.

In this case, Plaintiffs initially asserted multiple direct liability claims under Section 2333(a), as well as secondary liability claims under Section 2333(d). The district court held that the direct liability claims failed to satisfy *Fields'* proximate cause test. ER 16. Plaintiffs chose not to appeal that ruling (Br. 8 n.1), so it is not at issue here. They have thus abandoned any argument that the district court misapplied *Fields* or that they can establish a claim under Section 2333(a) with something less than the "direct relationship" that *Fields* requires.

The only claim that is before this Court is Plaintiffs' aiding and abetting claim, discussed above. In addressing that claim, the district court did not apply the causation standard articulated in *Fields*, for the simple reason that causation is not at issue with respect to that claim. The court dismissed the aiding and abetting claim because Plaintiffs failed to establish the elements of knowing and substantial assistance as Section 2333(d) requires. ER 19-21. As discussed above, that holding was correct. No question regarding the proximate cause element of an

ATA direct liability claim (including the "direct relationship" standard discussed in *Fields*) is presented on this appeal.[7]

To be sure, a viable aiding and abetting claim under Section 2333(d) requires a sufficiently meaningful "relationship between the act of international terrorism and the secondary actor's alleged supportive conduct," *Linde*, 882 F.3d at 331—namely that the secondary actor "knowingly and substantially assist[ed] the principal violation." *Halberstam*, 705 F.2d at 488; *see also Fehn*, 97 F.3d at 1288. And many of the same factual deficits that defeated proximate causation in this case also preclude any showing of such a "relationship." *Compare* ER 14 (reciting facts on causation), *with supra* pp. 19-21, 31-34.

Even if proximate cause were at issue, Plaintiffs' extended attack on *Fields* is improper. It is a "basic precept[]" that "a panel of this court may not overrule a decision of a previous panel; only a court *in banc* has such authority." *United States v. Osborne*, 76 F.3d 306, 309 (9th Cir. 1996) (citation omitted); *see also Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001). Although stare decisis is sufficient to reject Plaintiffs' argument, *Fields* is also correct on the merits, for the

---

[7] That is not to say that proximate cause does not matter for secondary liability. For any claim under Section 2333(d), the plaintiff must have been injured "by reason of" an act of international terrorism committed by the principal wrongdoer. 18 U.S.C. § 2333(a). For purposes of this case, that act was the Reina nightclub attack, and Defendants did not dispute that Plaintiffs' injuries resulted from that attack, so that element has never been at issue.

reasons stated by the Court in its opinion. 881 F.3d at 744-49. There would be no cause to revisit that ruling, even if the issue actually were before the Court.

## II. SECTION 230 PROVIDES AN INDEPENDENT BASIS TO AFFIRM THE JUDGMENT

Although the district court did not reach the issue, Section 230 of the CDA provides an independent and alternative basis for affirming the dismissal of Plaintiffs' aiding and abetting claim. Section 230 "immunizes providers of interactive computer services against liability arising from content created by third parties." *Fair Hous. Council of San Fernando Valley v. Roommates.com*, *LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc). That includes any claim that seeks to hold service providers liable based on whether or how they exercise "traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Batzel v. Smith*, 333 F.3d 1018, 1031 n.18 (9th Cir. 2003). The statute "protect[s] websites not merely from ultimate liability, but [also] from having to fight costly and protracted legal battles." *Roommates*, 521 F.3d at 1175; *accord Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254-55 (4th Cir. 2009) (Section 230 immunity attaches "at the earliest possible stage of the case," as it "is an *immunity from suit* rather than a mere defense to liability"). Plaintiffs' aiding and abetting claim falls squarely within the scope of Section 230.

- 40 -

## A.    Section 230 Bars Plaintiffs' Aiding And Abetting Claim

Section 230 mandates dismissal of a claim when (1) the defendant is a "provider … of an interactive computer service"; (2) the allegedly harmful content was "provided by another information content provider" and not the defendant; and (3) the suit seeks to hold the defendant liable as a "publisher or speaker" of that content.  47 U.S.C. § 230(c)(1); *see Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009).  Each of these requirements is met here.

An "interactive computer service" is defined broadly to include "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server."  47 U.S.C. § 230(f)(2). *See generally Batzel*, 333 F.3d at 1030-31.  It is undisputed that Defendants are providers of "interactive computer services" because users access their computer servers to share information with others.  ER 76 ¶ 12 (Defendants' platforms are online "social networks"), ER 157 ¶ 453; *accord Fields v. Twitter, Inc.* ("*Fields I*"), 200 F. Supp. 3d 964, 969 (N.D. Cal. 2016) (Twitter); *Gonzalez v. Google, Inc.* ("*Gonzalez I*"), 282 F. Supp. 3d 1150, 1163-64 (N.D. Cal. 2017) (Google/YouTube); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014) (Facebook).

The second element—that "another information content provider" have provided the content at issue—also is clearly satisfied here.  47 U.S.C. § 230(c)(1).

- 41 -

An "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). Plaintiffs concede that third parties, not Defendants, created *all* of the allegedly terrorist content that is claimed to have been posted on Defendants' services. ER 155 ¶ 444. Indeed, Plaintiffs' aiding and abetting theory centrally relies on the alleged fact that this content was created by third parties—by ISIS and its sympathizers. *See* Br. 5-6, 18-20 (arguing that Defendants aided and abetted ISIS by "allowing ISIS to utilize their social media platforms for radicalization, recruitment, and … training") (citing ER 99 ¶¶ 142-144, ER 101 ¶¶ 153-155, ER 104 ¶¶ 168-169, ER 133 ¶¶ 331-332, ER 169 ¶ 490).

Finally, Plaintiffs' claims seek to hold Defendants liable as the "publisher or speaker" of that third-party content. Plaintiffs' theory is that Defendants are liable for the Reina attack because they allegedly "knowingly and recklessly" allowed ISIS or its sympathizers to "spread[] extremist propaganda, raise[] funds, and attract[] new recruits," and allegedly failed to take "meaningful action to stop" such use by "censor[ing] user content" or "shut[ting] down … ISIS-linked account[s]." ER 76 ¶ 12, ER 108 ¶ 197, ER 159-60 ¶¶ 466-469. This alleged conduct—allowing content to be published—is a "traditional editorial function[]." *Batzel*, 333 F.3d at 1031 n.18; *Jones v. Dirty World Entm't Recordings, LLC*, 755

- 42 -

F.3d 398, 416 (6th Cir. 2014). And Plaintiffs' effort to hold Defendants liable for "failing to detect and remove" such content is "precisely the kind of activity for which Congress intended to grant absolution with the passage of section 230." *Roommates*, 521 F.3d at 1171-72; *accord Klayman*, 753 F.3d at 1355, 1358, 1359 (rejecting claims against Facebook for allegedly "refus[ing]" to take down third-party "Intifada" pages that "called for Muslims to rise up and kill the Jewish people").

Recent decisions of this Court confirm that Section 230 bars Plaintiffs' claims. In *Kimzey v. Yelp! Inc.*, this Court held that Section 230 "plainly bar[red]" claims that relied on the theory that "Yelp published user-generated speech"— namely, a user's review and star rating—"that was harmful to [the plaintiff]." 836 F.3d 1263, 1266 (9th Cir. 2016). By contrast, in *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019), and *Doe v. Internet Brands, Inc.*, 824 F.3d 846 (9th Cir. 2016), this Court held that Section 230 did not apply where the law or legal rule at issue did not seek to penalize conduct relating to the substance of any third-party content posted on the platform or any failure to monitor or remove such content.

In *HomeAway*, the challenged city ordinance prohibited both online and offline businesses from collecting or receiving fees for completing booking transactions between owners and renters of unregistered properties. Importantly,

- 43 -

as this Court emphasized, the ordinance did not "proscribe, mandate, or even discuss the content of the listings that [online businesses] display on their websites." *HomeAway*, 918 F.3d at 683-84.  Likewise, *Internet Brands* involved a failure-to-warn claim arising from allegations that a rapist had lured a user of an online service to a fake modeling audition, but that claim did not seek to hold the service provider liable for hosting or disseminating any allegedly harmful third-party content (or for failing to warn about any such content).  Indeed, the rapist never posted anything on the website, and the Court emphasized that allowing the claim to proceed would not require the platform operator "to remove any user content or otherwise affect how it publishes or monitors such content."  *Internet Brands*, 824 F.3d at 848-49, 851.  The Court made clear that where the theory of liability *does* pertain to harmful third-party content transmitted through the platform or would penalize the platform for not doing more to police such content (both of which are true here), Section 230 fully applies.  *HomeAway*, 918 F.3d at 684.

Plaintiffs' aiding and abetting claim here—like the claims in *Kimzey*, and unlike the claim in *Internet Brands* or the ordinance in *HomeAway*—directly turns on the allegedly harmful effects of third-party content posted on Defendants' platforms and would impose liability on Defendants for their alleged failure to do more to monitor, block, or remove such content.  *See, e.g.*, Br. 20 (arguing that

- 44 -

Defendants may be held liable for providing public platforms on which ISIS can allegedly "post images … and other violent material").  Because Plaintiffs' aiding and abetting claim rests squarely on third-party content posted on Defendants' sites that Defendants allegedly should have policed more aggressively, it falls squarely within Section 230's immunity.

Every court to reach the question has agreed that Section 230 bars claims against online service providers seeking to hold them liable under the ATA for the alleged effects of terrorist content that users may have posted on their platforms. *See Force v. Facebook, Inc.*, 304 F. Supp. 3d 315, 321-22, 327-30 (E.D.N.Y. 2018), *appeal docketed*, No. 18-397 (2d Cir. Feb. 9, 2018); *Pennie*, 281 F. Supp. 3d at 888-90; *Gonzalez I*, 282 F. Supp. 3d at 1164-67; *Gonzalez II*, 335 F. Supp. 3d at 1169-75; *Fields I*, 200 F. Supp. 3d at 974-76; *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 157-58 (E.D.N.Y. 2017); *Fields v. Twitter, Inc.* ("*Fields II*"), 217 F. Supp. 3d 1116, 1127-29 (N.D. Cal. 2016), *aff'd on other grounds*, 881 F.3d 739 (9th Cir. 2018).  That Plaintiffs couch their theory in aiding and abetting terms is immaterial: it is well settled that a plaintiff cannot avoid Section 230 simply by placing a different "label[]" on "an action that is quintessentially that of a publisher."  *Barnes*, 570 F.3d at 1103; *accord Daniel v. Armslist, LLC*, 926 N.W.2d 710, 726 (Wis. 2019) (dismissing state law aiding and abetting claims

- 45 -

under Section 230); *Craft Beer Stellar, LLC v. Glassdoor, Inc.*, 2018 WL 5505247, at \*2-3 (D. Mass. Oct. 17, 2018) (similar).

Affirming the district court's dismissal on the basis of Section 230 will also advance the purpose of the statute. As this Court has explained, Congress sought to allow and encourage platforms to self-regulate without fear of liability; it understood that if "efforts to review and omit third-party defamatory, obscene or inappropriate material make a computer service provider or user liable for posted speech, then website operators and Internet service providers are likely to abandon efforts to eliminate such material from their site." *Batzel*, 333 F.3d at 1029.

This purpose favors affirmance based on Section 230 here. It is undisputed that Defendants have engaged in exactly the kind of self-regulation that Congress intended to encourage and protect through Section 230: Defendants' operative rules prohibit threatening or promoting terrorism (*see* ER 151 ¶ 430, ER 159-60 ¶ 466, ER 161 ¶ 473, ER 168 ¶ 485), and Defendants routinely shut down accounts opened by, and take down content posted by, "pro-ISIS" users (*e.g.*, ER 160 ¶ 469). Section 230 thus is working as Congress intended—encouraging Defendants to "engag[e] in voluntary self-policing of the third-party content made available through [their] service[s]," *Jones*, 755 F.3d at 408, rather than allowing them to be subject to burdensome litigation costs and potential tort judgments based on allegations that they should have self-policed more aggressively.

- 46 -

Moreover, Defendants have billions of users who post billions of videos, messages, posts, and Tweets every month. To subject such online platforms to litigation over every piece of potentially harmful content that may be included within that torrent of third-party speech "would severely restrict the information available on the Internet." *Batzel*, 333 F.3d at 1028. Indeed, "[t]he specter of tort liability in an area of such prolific speech would have an obvious chilling effect." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997); *accord Jones*, 755 F.3d at 407.

As this Court explained in its *en banc* decision in *Roommates*, even "close cases … must be resolved in favor of immunity, lest we cut the heart out of section 230." 521 F.3d at 1174. But this is not a close case: the plain terms of the statute, and the repeated holdings of this Court and others make clear that Section 230 bars Plaintiffs' aiding and abetting claim and provides an alternate ground for affirming the district court's judgment.

## B.  Plaintiffs' Efforts To Circumvent Section 230 Are Contrary To Established Law

In the district court, Plaintiffs offered various arguments in an effort to avoid Section 230, but none has merit.

***Plaintiffs' Composite Content and Paid Advertising Theory.*** Plaintiffs first suggested that Defendants' alleged display of entirely lawful third-party advertisements alongside allegedly ISIS-related content transformed Defendants into "information content providers" of the resulting "composite" content. ER 80

¶ 32, ER 155 ¶ 442. But this Court has held that service providers do not "create" or "develop" content merely by "augmenting the content generally." *Roommates*, 521 F.3d at 1167-68; *see also Kimzey*, 836 F.3d at 1269-70 & n.4 (explaining that Yelp's "rating system d[id] 'absolutely nothing to enhance the defamatory sting of the message' beyond the words offered by the user"). Rather, to forfeit immunity as a co-creator or co-developer of content, the service provider must "contribute[] materially to the alleged illegality of the conduct"—that is, it must participate in what allegedly makes the displayed content unlawful. *Roommates*, 521 F.3d at 1167-68; *Kimzey*, 836 F.3d at 1269.

Plaintiffs never have argued that, by allegedly displaying third-party ads on the same screen as alleged terrorist content, Defendants contributed to the alleged illegality of such content. Nor could they. Plaintiffs' claim is based not on the targeted ads, but rather on ISIS's alleged use of Defendants' platforms to post terrorist propaganda, recruiting messages, and other content through which it sought to spread its hateful agenda. Br. 18-19. Targeted advertising has nothing to do with the claims in this case or with Defendants' alleged liability for aiding and abetting. Defendants' mechanisms for determining which third-party ads reach which of their users are, at most, examples of "neutral tools" that cannot deprive service providers of Section 230 protection. *Roommates*, 521 F.3d at 1169; *see also Marshall's Locksmith Serv., Inc. v. Google LLC*, 2019 WL 2398008, at *6

- 48 -

(D.C. Cir. June 7, 2019) (Section 230 protects service providers against claims based on "automated editorial act[s]" that "do not distinguish between legitimate and scam" third-party content).

Nor would Defendants lose Section 230 protection because they allegedly derived revenue from displaying advertisements that appeared alongside user content. ER 145 ¶ 391, ER 150 ¶ 423, ER 152-53 ¶¶ 434-437. There is no for-profit exception to Section 230, *Hinton v. Amazon.com.dedc, LLC,* 72 F. Supp. 3d 685, 690 & n.9 (S.D. Miss. 2014), and thus the "fact that a website elicits online content for profit is immaterial," *Goddard v. Google, Inc.*, 2008 WL 5245490, at *3 (N.D. Cal. Dec. 17, 2008); *accord Roommates*, 521 F.3d at 1161, 1174-75 (immaterial that website derived "revenue from advertisers and subscribers").

***Plaintiffs' Account-Provision Theory.*** Plaintiffs also argued that their claims did not turn on third-party content, and instead challenged Defendants' alleged failure to prevent users who were affiliated with or supported ISIS from opening new versions of previously blocked accounts. *See* ER 159-67 ¶¶ 463-483. But this argument did not even accurately depict Plaintiffs' own claims. As both the Amended Complaint and Plaintiffs' opening brief show, Plaintiffs' aiding and abetting theory is that Defendants provided substantial support to ISIS's terrorist activities—not by merely allowing ISIS members or supporters to open accounts on their platforms, but by also allowing those persons to *use* their platforms *to post*

- 49 -

*content* in order to propagandize, recruit new followers, provide training materials, and spread ISIS's hateful message. Br. 5-6, 20; ER 76 ¶ 12, ER 108 ¶ 197, ER 159-60 ¶¶ 466-469. That is why the Amended Complaint is replete with allegations that discuss and reproduce content that ISIS or its supporters allegedly posted on Defendants' platforms, allegedly in furtherance of ISIS's terrorist ends. *See, e.g.*, ER 77-79 ¶¶ 14-16, 22-24, ER 95 ¶¶ 116-117, ER 97-107 ¶¶ 131-134, 142-188. Plaintiffs cannot avoid Section 230 in this fashion.

Even if Plaintiffs' aiding and abetting claim could be fairly characterized as resting on only an account-provision theory, Section 230 would still bar the claim. Any such reimagined claim inevitably would seek to penalize a protected publishing decision: "the decision to permit third parties to post content." *Fields I*, 200 F. Supp. 3d at 972. That is because a service provider's "choices as to who may use its platform are inherently bound up in its decisions as to what may be said on its platform." *Cohen*, 252 F. Supp. 3d at 157. In similar ATA cases, courts have consistently rejected the argument that plaintiffs' claims turned on the provision of "accounts," "infrastructure," or "equipment," rather than the publication of terrorism-related content. *See Pennie*, 281 F. Supp. 3d at 877, 890; *see also Fields II*, 217 F. Supp. 3d at 1123-26; *Gonzalez I*, 282 F. Supp. 3d at 1165; *Force*, 304 F. Supp. 3d at 321-22; *Cohen*, 252 F. Supp. 3d at 157. Likewise, outside the ATA context, other Courts of Appeals have rejected attempts to evade

Section 230 by casting claims as concerning only the provision of accounts. *See Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 416, 420, 422 (1st Cir. 2007) (platform's decision not to prevent users from "registering under multiple screen names" was "as much an editorial decision … as a decision not to delete a particular posting"); *Doe v. MySpace, Inc.*, 528 F.3d 413, 419-20 (5th Cir. 2008) (suit premised on failure to screen users opening accounts was "merely another way of claiming that MySpace was liable for publishing [users'] communications"); *Daniel*, 926 N.W.2d at 722-23 (Section 230 bars claims based on a platform operator's acts or omissions regarding "who may post or view" content on the platform).

*Plaintiffs' Implied-Repeal Theory.* Finally, Plaintiffs argued in the district court that JASTA, the 2016 statute that (among other things) added to the ATA the limited civil cause of action for secondary liability discussed above, somehow overrode Section 230. This argument has been rejected by every court to address it. *See Gonzalez II*, 335 F. Supp. 3d at 1167; *Gonzalez I*, 282 F. Supp. 3d at 1159-61; *Force*, 304 F. Supp. 3d at 322-23; *Pennie*, 281 F. Supp. 3d at 889. And for good reason: the argument has no basis in the text or legislative history of JASTA and flies in the face of established principles of statutory interpretation.

Where a party asserts that a statute "overrides" an earlier federal statute, the established presumption against implied repeals governs. *United States v.*

- 51 -

*$493,850.00 in U.S. Currency*, 518 F.3d 1159, 1167 (9th Cir. 2008). Repeal by implication occurs only where two statutes are "in 'irreconcilable conflict,' or where the latter act covers the whole subject of the earlier one and 'is clearly intended as a substitute.'" *Branch v. Smith*, 538 U.S. 254, 273 (2003) (quoting *Posadas v. Nat'l City Bank of N.Y.*, 296 U. S. 497, 503 (1936)); *see also Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018). Congress' intent to repeal must be "clear and manifest." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154 (1976) (citation omitted).

Here, there is no "irreconcilable conflict" nor any manifestation of congressional intent to have JASTA displace Section 230. JASTA says nothing about Section 230 or the responsibilities of interactive computer service providers. It states only that, under certain circumstances involving a defined act of international terrorism, "liability *may be asserted* as to any person who aids and abets … or who conspires with the person who committed [the] act." 18 U.S.C. § 2333(d)(2) (emphasis added). It does not say that such liability is assured, nor does it include any provision providing for liability "notwithstanding" existing immunities or defenses. *See PLIVA, Inc. v. Mensing*, 564 U.S. 604, 621-22 (2011) (describing absence of "*non obstante*" provision as indicating that legislature did not intend a repeal by implication).

And giving Section 230 its usual effect is entirely consistent with JASTA's creation of secondary liability. Immunities, by their nature, protect against liabilities. If that were sufficient to constitute an irreconcilable conflict, then every later-enacted liability would automatically override every previously enacted immunity. But the Supreme Court has rejected any such notion. *See Hui v. Castaneda*, 559 U.S. 799, 809-10 (2010) (no "irreconcilable conflict" created where older, "more comprehensive immunity" would protect some defendants from liabilities created by new law). Courts routinely apply Section 230 to immunize online platforms against claims arising under other federal statutes—including *later*-enacted statutes. *See, e.g.*, *Doe v. Backpage.com, LLC*, 817 F.3d 12, 22-23 (1st Cir. 2016) (Trafficking Victims Protection Reauthorization Act of 2008); *Roommates.com*, 521 F.3d 1157 (Fair Housing Act). Doing so does not create an irreconcilable conflict; it simply reflects the ordinary interplay between a provision that creates a cause of action and one that affords immunity to certain actors under certain conditions.

Yet another reason to reject Plaintiffs' implied repeal argument is that it relies entirely on JASTA's prefatory, uncodified findings and statement of purpose, JASTA § 2(a)(6), (b), rather than JASTA's substantive provisions. Such hortatory preambles do not change the operative scope of a statute—much less impliedly repeal pre-existing laws. *See Hawaii v. Office of Hawaiian Affairs*, 556

- 53 -

U.S. 163, 175 (2009) (prefatory "whereas" clause "cannot bear the weight" of effecting an implied repeal: "[W]here the text of a clause itself indicates that it does not have operative effect, such as 'whereas' clauses in federal legislation … , a court has no license to make it do what it was not designed to do." (quoting *District of Columbia v. Heller*, 554 U.S. 570, 578, n.3 (2008)); *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1978 (2016) ("prefatory clauses or preambles cannot change the scope of the operative clause").[8] And what the preamble does say—that injured persons may "seek relief" through a newly created cause of action for secondary liability—is consistent with Section 230 immunity, as explained above.

All of this is enough to end the inquiry. But even if Plaintiffs could identify some conflict, nothing in JASTA evinces a "clear and manifest" intent to eliminate the protections of Section 230. *Hawaii*, 556 U.S. at 175; *see also Force*, 304 F. Supp. 3d at 322-23; *Pennie*, 281 F. Supp. 3d at 889; *Gonzalez I*, 282 F. Supp. 3d at

---

[8] In any event, Plaintiffs are wrong about even the meaning of JASTA's preamble. As initially drafted, JASTA would have added a subsection (e) to 18 U.S.C. § 2333 to allow for personal jurisdiction "to the maximum extent permissible under the 5th Amendment to the Constitution of the United States," consistently with the "Purpose" language on which Plaintiffs rely. *See* S. Res. 2040, 114th Cong. § 2(b) (2016) (enacted); *see also* H.R. 3143, 113th Cong., 1st Sess. §§ 2(b), 5 (as introduced in the House in 2013). The enacted version deleted the personal jurisdiction provision, but retained the prefatory language without explanation. The preamble thus most naturally refers to constitutional limits on personal jurisdiction.

- 54 -

1150, 1159-61.  Both the text and legislative history are entirely silent, offering no indication whatsoever "that Congress sought to eliminate all forms of statutory immunity in terrorism-related cases."  *Gonzalez I*, 282 F. Supp. 3d at 1160. Indeed, JASTA's treatment of a different federal statutory immunity confirms that Congress did not intend that result: JASTA *expressly* amended the Foreign Sovereign Immunities Act to eliminate foreign sovereign immunity for certain claims, including secondary liability claims under Section 2333(d) of the ATA, arising from certain acts of international terrorism.  JASTA § 3(a).  This "demonstrates that where Congress intended JASTA to repeal existing statutory immunities, it made that clear."  *Gonzalez I*, 282 F. Supp. 3d at 1160; *see also Dig. Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 777 (2018).  Plaintiffs' argument would not only render superfluous JASTA's express (but partial) repeal of foreign sovereign immunity, it would improperly override the careful lines that Congress chose to draw about how JASTA's new liability provisions should interact with existing statutory immunities.

\*   \*   \*

Section 230 "protect[s] websites not merely from ultimate liability, but from having to fight costly and protracted legal battles."  *Roommates*, 521 F.3d at 1175. This immunity fully applies here, and provides an alternative basis for affirming the district court in this case.  Resolving this appeal based on Section 230 will

advance Congress's objective to allow and encourage online service providers to self-regulate without fear of the burdens of litigation concerning third-party content.  *Id*. at 1174.

## CONCLUSION

For all of these reasons, the judgment of the district court dismissing this action with prejudice should be affirmed.

Dated:  June 24, 2019

  /s/ Kristin A. Linsley

Kristin A. Linsley
Daniel L. Chen
GIBSON, DUNN & CRUTCHER
  LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: (415) 393-8200
Facsimile:  (415) 393-8306

*Attorneys for Defendant-Appellee
  Facebook, Inc.*

  /s/ Patrick J. Carome

Seth P. Waxman
Patrick J. Carome
Ari Holtzblatt
Jack Starcher
WILMER CUTLER PICKERING
  HALE & DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile:  (202) 663-6363

*Attorneys for Defendant-Appellee
  Twitter, Inc.*

Respectfully submitted,

  /s/ Brian M. Willen

Brian M. Willen
Lauren Gallo White
WILSON SONSINI GOODRICH
  & ROSATI, P.C.
1301 Avenue of the Americas
40th Floor
New York, NY 10019
Telephone: (212) 999-5800
Facsimile:  (212) 999-5899

David H. Kramer
Kelly M. Knoll
WILSON SONSINI GOODRICH
  & ROSATI, P.C.
650 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 493-9300
Facsimile:  (650) 565-5100

*Attorneys for Defendant-Appellee
Google LLC*

## ATTESTATION

I, Brian M. Willen, am the ECF User whose ID and password are being used to file the foregoing document.  In compliance with Circuit Rule 25-5(e), I hereby attest that concurrence in the filing of the document has been obtained from each of the other signatories.

Dated: June 24, 2019                    By:    /s/ Brian M. Willen

                                               Brian M. Willen

- 57 -

## STATEMENT OF RELATED CASES

Counsel for Defendants-Appellees are aware of the following related cases pending in this Court:

1.  *Gonzalez v. Google LLC*, No. 18-16700

2.  *Copeland v. Twitter, Inc.*, No. 18-17327 (stayed pending issuance of mandates in this action and in *Clayborn*, No. 19-15043)

3.  *Clayborn v. Twitter, Inc.*, No. 19-15043

4.  *Sinclair v. Twitter, Inc.*, No. 19-15625 (stayed pending issuance of mandates in this action and in *Clayborn*, No. 19-15043)

5.  *Palmucci v. Twitter, Inc.*, No. 19-15937 (stayed pending issuance of mandates in this action and in *Clayborn*, No. 19-15043)

Each of the cases identified above raises issues that are the same or closely related to those presented by this case.


Dated: June 24, 2019          By:  */s/ Brian M. Willen*
                                   Brian M. Willen

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**  | 18-17192

I am the attorney or self-represented party.

**This brief contains** | 13,265 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ⦿ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*
  - ○ it is a joint brief submitted by separately represented parties;
  - ○ a party or parties are filing a single brief in response to multiple briefs; or
  - ○ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated _____.
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Brian M. Willen | **Date** | 6/24/2019

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                        *Rev. 12/01/2018*

# STATUTORY ADDENDUM

# STATUTORY ADDENDUM
## TABLE OF CONTENTS

All relevant statutes are contained in the brief filed by Appellants, Dkt. No.

15, except for the following, included in full herein:

<u>Page</u>

18 U.S.C. § 2333 ................................................................................Add. 1

18 U.S.C. § 2339B ............................................................................Add. 2

47 U.S.C. § 230 ................................................................................Add. 6

Justice Against Sponsors of Terrorism Act, Pub. L. 114-222,
   130 Stat. 852 (Sept. 28, 2016) ...................................................Add. 9

uses, attempts or conspires to use, or possesses and threatens to use, any item or items described in subsection (a), shall be fined not more than $2,000,000 and imprisoned for not less than 30 years or imprisoned for life.

(3) SPECIAL CIRCUMSTANCES.—If the death of another results from a person's violation of subsection (a), the person shall be fined not more than $2,000,000 and punished by imprisonment for life.

(Added Pub. L. 108–458, title VI, §6905, Dec. 17, 2004, 118 Stat. 3772.)

### § 2333. Civil remedies

(a) ACTION AND JURISDICTION.—Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

(b) ESTOPPEL UNDER UNITED STATES LAW.—A final judgment or decree rendered in favor of the United States in any criminal proceeding under section 1116, 1201, 1203, or 2332 of this title or section 46314, 46502, 46505, or 46506 of title 49 shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding under this section.

(c) ESTOPPEL UNDER FOREIGN LAW.—A final judgment or decree rendered in favor of any foreign state in any criminal proceeding shall, to the extent that such judgment or decree may be accorded full faith and credit under the law of the United States, estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding under this section.

(Added Pub. L. 102–572, title X, §1003(a)(4), Oct. 29, 1992, 106 Stat. 4522; amended Pub. L. 103–429, §2(1), Oct. 31, 1994, 108 Stat. 4377.)

#### AMENDMENTS

1994—Subsec. (b). Pub. L. 103–429 substituted ''section 46314, 46502, 46505, or 46506 of title 49'' for ''section 902(i), (k), (l), (n), or (r) of the Federal Aviation Act of 1958 (49 U.S.C. App. 1472(i), (k), (l), (n), or (r))''.

#### EFFECTIVE DATE

Section applicable to any pending case or any cause of action arising on or after 4 years before Oct. 29, 1992, see section 1003(c) of Pub. L. 102–572, set out as a note under section 2331 of this title.

### § 2334. Jurisdiction and venue

(a) GENERAL VENUE.—Any civil action under section 2333 of this title against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent. Process in such a civil action may be served in any district where the defendant resides, is found, or has an agent.

(b) SPECIAL MARITIME OR TERRITORIAL JURISDICTION.—If the actions giving rise to the claim occurred within the special maritime and territorial jurisdiction of the United States, as defined in section 7 of this title, then any civil ac-

tion under section 2333 of this title against any person may be instituted in the district court of the United States for any district in which any plaintiff resides or the defendant resides, is served, or has an agent.

(c) SERVICE ON WITNESSES.—A witness in a civil action brought under section 2333 of this title may be served in any other district where the defendant resides, is found, or has an agent.

(d) CONVENIENCE OF THE FORUM.—The district court shall not dismiss any action brought under section 2333 of this title on the grounds of the inconvenience or inappropriateness of the forum chosen, unless—

(1) the action may be maintained in a foreign court that has jurisdiction over the subject matter and over all the defendants;

(2) that foreign court is significantly more convenient and appropriate; and

(3) that foreign court offers a remedy which is substantially the same as the one available in the courts of the United States.

(Added Pub. L. 102–572, title X, §1003(a)(4), Oct. 29, 1992, 106 Stat. 4522.)

#### EFFECTIVE DATE

Section applicable to any pending case or any cause of action arising on or after 4 years before Oct. 29, 1992, see section 1003(c) of Pub. L. 102–572, set out as a note under section 2331 of this title.

### § 2335. Limitation of actions

(a) IN GENERAL.—Subject to subsection (b), a suit for recovery of damages under section 2333 of this title shall not be maintained unless commenced within 4 years after the date the cause of action accrued.

(b) CALCULATION OF PERIOD.—The time of the absence of the defendant from the United States or from any jurisdiction in which the same or a similar action arising from the same facts may be maintained by the plaintiff, or of any concealment of the defendant's whereabouts, shall not be included in the 4-year period set forth in subsection (a).

(Added Pub. L. 102–572, title X, §1003(a)(4), Oct. 29, 1992, 106 Stat. 4523.)

#### EFFECTIVE DATE

Section applicable to any pending case or any cause of action arising on or after 4 years before Oct. 29, 1992, see section 1003(c) of Pub. L. 102–572, set out as a note under section 2331 of this title.

### § 2336. Other limitations

(a) ACTS OF WAR.—No action shall be maintained under section 2333 of this title for injury or loss by reason of an act of war.

(b) LIMITATION ON DISCOVERY.—If a party to an action under section 2333 seeks to discover the investigative files of the Department of Justice, the Assistant Attorney General, Deputy Attorney General, or Attorney General may object on the ground that compliance will interfere with a criminal investigation or prosecution of the incident, or a national security operation related to the incident, which is the subject of the civil litigation. The court shall evaluate any such objections in camera and shall stay the discovery if the court finds that granting the discovery re-

15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law.

(b) DEFINITIONS.—As used in this section—

(1) the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;

(2) the term "training" means instruction or teaching designed to impart a specific skill, as opposed to general knowledge; and

(3) the term "expert advice or assistance" means advice or assistance derived from scientific, technical or other specialized knowledge.

(Added Pub. L. 103–322, title XII, §120005(a), Sept. 13, 1994, 108 Stat. 2022; amended Pub. L. 104–132, title III, §323, Apr. 24, 1996, 110 Stat. 1255; Pub. L. 104–294, title VI, §§601(b)(2), (s)(2), (3), 604(b)(5), Oct. 11, 1996, 110 Stat. 3498, 3502, 3506; Pub. L. 107–56, title VIII, §§805(a), 810(c), 811(f), Oct. 26, 2001, 115 Stat. 377, 380, 381; Pub. L. 107–197, title III, §301(c), June 25, 2002, 116 Stat. 728; Pub. L. 107–273, div. B, title IV, §4002(a)(7), (c)(1), (e)(11), Nov. 2, 2002, 116 Stat. 1807, 1808, 1811; Pub. L. 108–458, title VI, §6603(a)(2), (b), Dec. 17, 2004, 118 Stat. 3762; Pub. L. 109–177, title I, §110(b)(3)(B), Mar. 9, 2006, 120 Stat. 208; Pub. L. 111–122, §3(d), Dec. 22, 2009, 123 Stat. 3481.)

#### AMENDMENTS

2009—Subsec. (a). Pub. L. 111–122 inserted ", 1091" after "956" and substituted ", 2340A, or 2442" for ", or 2340A".

2006—Subsec. (a). Pub. L. 109–177 struck out "1993," after "1992,".

2004—Subsec. (a). Pub. L. 108–458, §6603(a)(2)(B), which directed amendment of this section by inserting "or any offense listed in section 2332b(g)(5)(B) (except for sections 2339A and 2339B)" after "section 60123(b) of title 49,", was executed by making the insertion in subsec. (a) after "section 46502 or 60123(b) of title 49," to reflect the probable intent of Congress.

Pub. L. 108–458, §6603(a)(2)(A), struck out "or" before "section 46502".

Subsec. (b). Pub. L. 108–458, §6603(b), reenacted heading without change and amended text generally. Prior to amendment, text read as follows: "In this section, the term 'material support or resources' means currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials."

2002—Subsec. (a). Pub. L. 107–273, §4002(a)(7), (e)(11), struck out "2332c," after "2332b," and substituted "of an escape" for "or an escape".

Pub. L. 107–197 inserted "2332f," before "or 2340A".

Subsec. (b). Pub. L. 107–273, §4002(c)(1), repealed amendment by Pub. L. 104–294, §601(b)(2). See 1996 Amendment note below.

2001—Subsec. (a). Pub. L. 107–56, §811(f), inserted "or attempts or conspires to do such an act," before "shall be fined".

Pub. L. 107–56, §810(c)(1), substituted "15 years" for "10 years".

Pub. L. 107–56, §810(c)(2), which directed substitution of ", and, if the death of any person results, shall be imprisoned for any term of years or for life." for period, was executed by making the substitution for the period at end of the first sentence to reflect the probable intent of Congress and the intervening amendment by section 805(a)(1)(F) of Pub. L. 107–56. See below.

Pub. L. 107–56, §805(a)(1)(F), inserted at end "A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law."

Pub. L. 107–56, §§805(a)(1)(A)–(E), struck out ", within the United States," after "Whoever", and inserted "229," after "175,", "1993," after "1992,", ", section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284)," after "2340A of this title", and "or 60123(b)" after "section 46502".

Subsec. (b). Pub. L. 107–56, §805(a)(2), substituted "or monetary instruments or financial securities" for "or other financial securities" and inserted "expert advice or assistance," after "training,".

1996—Pub. L. 104–294, §604(b)(5), amended directory language of Pub. L. 103–322, §120005(a), which enacted this section.

Pub. L. 104–132 amended section generally, reenacting section catchline without change and redesignating provisions which detailed what constitutes offense, formerly contained in subsec. (b), as subsec. (a), inserting references to sections 37, 81, 175, 831, 842, 956, 1362, 1366, 2155, 2156, 2332, 2332a, 2332b, and 2340A of this title, striking out references to sections 36, 2331, and 2339 of this title, redesignating provisions which define "material support or resource", formerly contained in subsec. (a), as subsec. (b), substituting provisions excepting medicine or religious materials from definition for provisions excepting humanitarian assistance to persons not directly involved in violations, and struck out subsec. (c) which authorized investigations into possible violations, except activities involving First Amendment rights.

Subsec. (a). Pub. L. 104–294, §601(s)(2), (3), inserted "930(c)," before "956,", "1992," before "2155,", "2332c," before "or 2340A of this title", and "or an escape" after "concealment".

Subsec. (b). Pub. L. 104–294, §601(b)(2), which directed substitution of "2332" for "2331", "2332a" for "2339", "37" for "36", and "or an escape" for "of an escape" and which could not be executed after the general amendment by Pub. L. 104–132, was repealed by Pub. L. 107–273, §4002(c)(1). See above.

#### EFFECTIVE DATE OF 2002 AMENDMENT

Pub. L. 107–273, div. B, title IV, §4002(c)(1), Nov. 2, 2002, 116 Stat. 1808, provided that the amendment made by section 4002(c)(1) is effective Oct. 11, 1996.

#### EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by section 604(b)(5) of Pub. L. 104–294 effective Sept. 13, 1994, see section 604(d) of Pub. L. 104–294, set out as a note under section 13 of this title.

### § 2339B. Providing material support or resources to designated foreign terrorist organizations

(a) PROHIBITED ACTIVITIES.—

(1) UNLAWFUL CONDUCT.—Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person

must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

(2) FINANCIAL INSTITUTIONS.—Except as authorized by the Secretary, any financial institution that becomes aware that it has possession of, or control over, any funds in which a foreign terrorist organization, or its agent, has an interest, shall—

(A) retain possession of, or maintain control over, such funds; and

(B) report to the Secretary the existence of such funds in accordance with regulations issued by the Secretary.

(b) CIVIL PENALTY.—Any financial institution that knowingly fails to comply with subsection (a)(2) shall be subject to a civil penalty in an amount that is the greater of—

(A) $50,000 per violation; or

(B) twice the amount of which the financial institution was required under subsection (a)(2) to retain possession or control.

(c) INJUNCTION.—Whenever it appears to the Secretary or the Attorney General that any person is engaged in, or is about to engage in, any act that constitutes, or would constitute, a violation of this section, the Attorney General may initiate civil action in a district court of the United States to enjoin such violation.

(d) EXTRATERRITORIAL JURISDICTION.—

(1) IN GENERAL.—There is jurisdiction over an offense under subsection (a) if—

(A) an offender is a national of the United States (as defined in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22))) or an alien lawfully admitted for permanent residence in the United States (as defined in section 101(a)(20) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(20)));

(B) an offender is a stateless person whose habitual residence is in the United States;

(C) after the conduct required for the offense occurs an offender is brought into or found in the United States, even if the conduct required for the offense occurs outside the United States;

(D) the offense occurs in whole or in part within the United States;

(E) the offense occurs in or affects interstate or foreign commerce; or

(F) an offender aids or abets any person over whom jurisdiction exists under this paragraph in committing an offense under subsection (a) or conspires with any person over whom jurisdiction exists under this paragraph to commit an offense under subsection (a).

(2) EXTRATERRITORIAL JURISDICTION.—There is extraterritorial Federal jurisdiction over an offense under this section.

(e) INVESTIGATIONS.—

(1) IN GENERAL.—The Attorney General shall conduct any investigation of a possible violation of this section, or of any license, order, or regulation issued pursuant to this section.

(2) COORDINATION WITH THE DEPARTMENT OF THE TREASURY.—The Attorney General shall work in coordination with the Secretary in investigations relating to—

(A) the compliance or noncompliance by a financial institution with the requirements of subsection (a)(2); and

(B) civil penalty proceedings authorized under subsection (b).

(3) REFERRAL.—Any evidence of a criminal violation of this section arising in the course of an investigation by the Secretary or any other Federal agency shall be referred immediately to the Attorney General for further investigation. The Attorney General shall timely notify the Secretary of any action taken on referrals from the Secretary, and may refer investigations to the Secretary for remedial licensing or civil penalty action.

(f) CLASSIFIED INFORMATION IN CIVIL PROCEEDINGS BROUGHT BY THE UNITED STATES.—

(1) DISCOVERY OF CLASSIFIED INFORMATION BY DEFENDANTS.—

(A) REQUEST BY UNITED STATES.—In any civil proceeding under this section, upon request made ex parte and in writing by the United States, a court, upon a sufficient showing, may authorize the United States to—

(i) redact specified items of classified information from documents to be introduced into evidence or made available to the defendant through discovery under the Federal Rules of Civil Procedure;

(ii) substitute a summary of the information for such classified documents; or

(iii) substitute a statement admitting relevant facts that the classified information would tend to prove.

(B) ORDER GRANTING REQUEST.—If the court enters an order granting a request under this paragraph, the entire text of the documents to which the request relates shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal.

(C) DENIAL OF REQUEST.—If the court enters an order denying a request of the United States under this paragraph, the United States may take an immediate, interlocutory appeal in accordance with paragraph (5). For purposes of such an appeal, the entire text of the documents to which the request relates, together with any transcripts of arguments made ex parte to the court in connection therewith, shall be maintained under seal and delivered to the appellate court.

(2) INTRODUCTION OF CLASSIFIED INFORMATION; PRECAUTIONS BY COURT.—

(A) EXHIBITS.—To prevent unnecessary or inadvertent disclosure of classified information in a civil proceeding brought by the United States under this section, the United States may petition the court ex parte to

admit, in lieu of classified writings, recordings, or photographs, one or more of the following:

(i) Copies of items from which classified information has been redacted.

(ii) Stipulations admitting relevant facts that specific classified information would tend to prove.

(iii) A declassified summary of the specific classified information.

(B) DETERMINATION BY COURT.—The court shall grant a request under this paragraph if the court finds that the redacted item, stipulation, or summary is sufficient to allow the defendant to prepare a defense.

(3) TAKING OF TRIAL TESTIMONY.—

(A) OBJECTION.—During the examination of a witness in any civil proceeding brought by the United States under this subsection, the United States may object to any question or line of inquiry that may require the witness to disclose classified information not previously found to be admissible.

(B) ACTION BY COURT.—In determining whether a response is admissible, the court shall take precautions to guard against the compromise of any classified information, including—

(i) permitting the United States to provide the court, ex parte, with a proffer of the witness's response to the question or line of inquiry; and

(ii) requiring the defendant to provide the court with a proffer of the nature of the information that the defendant seeks to elicit.

(C) OBLIGATION OF DEFENDANT.—In any civil proceeding under this section, it shall be the defendant's obligation to establish the relevance and materiality of any classified information sought to be introduced.

(4) APPEAL.—If the court enters an order denying a request of the United States under this subsection, the United States may take an immediate interlocutory appeal in accordance with paragraph (5).

(5) INTERLOCUTORY APPEAL.—

(A) SUBJECT OF APPEAL.—An interlocutory appeal by the United States shall lie to a court of appeals from a decision or order of a district court—

(i) authorizing the disclosure of classified information;

(ii) imposing sanctions for nondisclosure of classified information; or

(iii) refusing a protective order sought by the United States to prevent the disclosure of classified information.

(B) EXPEDITED CONSIDERATION.—

(i) IN GENERAL.—An appeal taken pursuant to this paragraph, either before or during trial, shall be expedited by the court of appeals.

(ii) APPEALS PRIOR TO TRIAL.—If an appeal is of an order made prior to trial, an appeal shall be taken not later than 14 days after the decision or order appealed from, and the trial shall not commence until the appeal is resolved.

(iii) APPEALS DURING TRIAL.—If an appeal is taken during trial, the trial court shall adjourn the trial until the appeal is resolved, and the court of appeals—

(I) shall hear argument on such appeal not later than 4 days after the adjournment of the trial, excluding intermediate weekends and holidays;

(II) may dispense with written briefs other than the supporting materials previously submitted to the trial court;

(III) shall render its decision not later than 4 days after argument on appeal, excluding intermediate weekends and holidays; and

(IV) may dispense with the issuance of a written opinion in rendering its decision.

(C) EFFECT OF RULING.—An interlocutory appeal and decision shall not affect the right of the defendant, in a subsequent appeal from a final judgment, to claim as error reversal by the trial court on remand of a ruling appealed from during trial.

(6) CONSTRUCTION.—Nothing in this subsection shall prevent the United States from seeking protective orders or asserting privileges ordinarily available to the United States to protect against the disclosure of classified information, including the invocation of the military and State secrets privilege.

(g) DEFINITIONS.—As used in this section—

(1) the term "classified information" has the meaning given that term in section 1(a) of the Classified Information Procedures Act (18 U.S.C. App.);

(2) the term "financial institution" has the same meaning as in section 5312(a)(2) of title 31, United States Code;

(3) the term "funds" includes coin or currency of the United States or any other country, traveler's checks, personal checks, bank checks, money orders, stocks, bonds, debentures, drafts, letters of credit, any other negotiable instrument, and any electronic representation of any of the foregoing;

(4) the term "material support or resources" has the same meaning given that term in section 2339A (including the definitions of "training" and "expert advice or assistance" in that section);

(5) the term "Secretary" means the Secretary of the Treasury; and

(6) the term "terrorist organization" means an organization designated as a terrorist organization under section 219 of the Immigration and Nationality Act.

(h) PROVISION OF PERSONNEL.—No person may be prosecuted under this section in connection with the term "personnel" unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objec-

tives shall not be considered to be working under the foreign terrorist organization's direction and control.

(i) RULE OF CONSTRUCTION.—Nothing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States.

(j) EXCEPTION.—No person may be prosecuted under this section in connection with the term "personnel", "training", or "expert advice or assistance" if the provision of that material support or resources to a foreign terrorist organization was approved by the Secretary of State with the concurrence of the Attorney General. The Secretary of State may not approve the provision of any material support that may be used to carry out terrorist activity (as defined in section 212(a)(3)(B)(iii) of the Immigration and Nationality Act).

(Added Pub. L. 104–132, title III, §303(a), Apr. 24, 1996, 110 Stat. 1250; amended Pub. L. 107–56, title VIII, §810(d), Oct. 26, 2001, 115 Stat. 380; Pub. L. 108–458, title VI, §6603(c)–(f), Dec. 17, 2004, 118 Stat. 3762, 3763; Pub. L. 111–16, §3(6)–(8), May 7, 2009, 123 Stat. 1608.)

REFERENCES IN TEXT

Section 212(a)(3)(B) of the Immigration and Nationality Act, referred to in subsecs. (a)(1) and (j), is classified to section 1182(a)(3)(B) of Title 8, Aliens and Nationality.

Section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989, referred to in subsec. (a)(1), is classified to section 2656f(d)(2) of Title 22, Foreign Relations and Intercourse.

The Federal Rules of Civil Procedure, referred to in subsec. (f)(1)(A)(i), are set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

Section 1(a) of the Classified Information Procedures Act, referred to in subsec. (g)(1), is section 1(a) of Pub. L. 95–456, which is set out in the Appendix to this title.

Section 219 of the Immigration and Nationality Act, referred to in subsec. (g)(6), is classified to section 1189 of Title 8, Aliens and Nationality.

AMENDMENTS

2009—Subsec. (f)(5)(B)(ii). Pub. L. 111–16, §3(6), substituted "14 days" for "10 days".

Subsec. (f)(5)(B)(iii)(I). Pub. L. 111–16, §3(7), inserted ", excluding intermediate weekends and holidays" after "trial".

Subsec. (f)(5)(B)(iii)(III). Pub. L. 111–16, §3(8), inserted ", excluding intermediate weekends and holidays" after "appeal".

2004—Subsec. (a)(1). Pub. L. 108–458, §6603(c), struck out ", within the United States or subject to the jurisdiction of the United States," after "Whoever" and inserted at end "To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989)."

Subsec. (d). Pub. L. 108–458, §6603(d), designated existing provisions as par. (2), inserted par. (2) heading, and added par. (1).

Subsec. (g)(4). Pub. L. 108–458, §6603(e), amended par. (4) generally. Prior to amendment, par. (4) read as follows: "the term 'material support or resources' has the same meaning as in section 2339A;".

Subsecs. (h) to (j). Pub. L. 108–458, §6603(f), added subsecs. (h) to (j).

2001—Subsec. (a)(1). Pub. L. 107–56 substituted "15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life" for "10 years, or both".

EFFECTIVE DATE OF 2009 AMENDMENT

Amendment by Pub. L. 111–16 effective Dec. 1, 2009, see section 7 of Pub. L. 111–16, set out as a note under section 109 of Title 11, Bankruptcy.

FINDINGS AND PURPOSE

Section 301 of title III of Pub. L. 104–132 provided that:

"(a) FINDINGS.—The Congress finds that—

"(1) international terrorism is a serious and deadly problem that threatens the vital interests of the United States;

"(2) the Constitution confers upon Congress the power to punish crimes against the law of nations and to carry out the treaty obligations of the United States, and therefore Congress may by law impose penalties relating to the provision of material support to foreign organizations engaged in terrorist activity;

"(3) the power of the United States over immigration and naturalization permits the exclusion from the United States of persons belonging to international terrorist organizations;

"(4) international terrorism affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States;

"(5) international cooperation is required for an effective response to terrorism, as demonstrated by the numerous multilateral conventions in force providing universal prosecutive jurisdiction over persons involved in a variety of terrorist acts, including hostage taking, murder of an internationally protected person, and aircraft piracy and sabotage;

"(6) some foreign terrorist organizations, acting through affiliated groups or individuals, raise significant funds within the United States, or use the United States as a conduit for the receipt of funds raised in other nations; and

"(7) foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.

"(b) PURPOSE.—The purpose of this subtitle [subtitle A (§§301–303) of title III of Pub. L. 104–132, enacting this section and section 1189 of Title 8, Aliens and Nationality] is to provide the Federal Government the fullest possible basis, consistent with the Constitution, to prevent persons within the United States, or subject to the jurisdiction of the United States, from providing material support or resources to foreign organizations that engage in terrorist activities."

§ 2339C. Prohibitions against the financing of terrorism

(a) OFFENSES.—

(1) IN GENERAL.—Whoever, in a circumstance described in subsection (b), by any means, directly or indirectly, unlawfully and willfully provides or collects funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out—

(A) an act which constitutes an offense within the scope of a treaty specified in subsection (e)(7), as implemented by the United States, or

(B) any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed

---

**47 USC 230: Protection for private blocking and screening of offensive material**
Text contains those laws in effect on June 23, 2019

**From Title 47-TELECOMMUNICATIONS**
    CHAPTER 5-WIRE OR RADIO COMMUNICATION
    SUBCHAPTER II-COMMON CARRIERS
    Part I-Common Carrier Regulation
**Jump To:**
    <u>Source Credit</u>
    <u>References In Text</u>
    <u>Codification</u>
    <u>Amendments</u>
    <u>Effective Date</u>
    <u>Miscellaneous</u>

---

## §230. Protection for private blocking and screening of offensive material

**(a) Findings**

The Congress finds the following:

(1) The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

(2) These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

(3) The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

(4) The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

(5) Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

**(b) Policy**

It is the policy of the United States-

(1) to promote the continued development of the Internet and other interactive computer services and other interactive media;

(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

(5) to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

**(c) Protection for "Good Samaritan" blocking and screening of offensive material**

**(1) Treatment of publisher or speaker**

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

**(2) Civil liability**

No provider or user of an interactive computer service shall be held liable on account of-

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).[1]

**(d) Obligations of interactive computer service**

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

**(e) Effect on other laws**

1/3

Add. 6

**(1) No effect on criminal law**

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, or any other Federal criminal statute.

**(2) No effect on intellectual property law**

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

**(3) State law**

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

**(4) No effect on communications privacy law**

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

**(5) No effect on sex trafficking law**

Nothing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit-

(A) any claim in a civil action brought under section 1595 of title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title;

(B) any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 1591 of title 18; or

(C) any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 2421A of title 18, and promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted.

**(f) Definitions**

As used in this section:

**(1) Internet**

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

**(2) Interactive computer service**

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

**(3) Information content provider**

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

**(4) Access software provider**

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

(A) filter, screen, allow, or disallow content;

(B) pick, choose, analyze, or digest content; or

(C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

(June 19, 1934, ch. 652, title II, §230, as added Pub. L. 104–104, title V, §509, Feb. 8, 1996, 110 Stat. 137 ; amended Pub. L. 105–277, div. C, title XIV, §1404(a), Oct. 21, 1998, 112 Stat. 2681–739 ; Pub. L. 115–164, §4(a), Apr. 11, 2018, 132 Stat. 1254 .)

## References in Text

The Electronic Communications Privacy Act of 1986, referred to in subsec. (e)(4), is Pub. L. 99–508, Oct. 21, 1986, 100 Stat. 1848 , as amended. For complete classification of this Act to the Code, see Short Title of 1986 Amendment note set out under section 2510 of Title 18, Crimes and Criminal Procedure, and Tables.

## Codification

Section 509 of Pub. L. 104–104, which directed amendment of title II of the Communications Act of 1934 (47 U.S.C. 201 et seq.) by adding section 230 at end, was executed by adding the section at end of part I of title II of the Act to reflect the probable intent of Congress and amendments by sections 101(a), (b), and 151(a) of Pub. L. 104–104 designating §§201 to 229 as part I and adding parts II (§251 et seq.) and III (§271 et seq.) to title II of the Act.

## Amendments

**2018**-Subsec. (e)(5). Pub. L. 115–164 added par. (5).

2/3

**1998**-Subsec. (d). Pub. L. 105–277, §1404(a)(3), added subsec. (d). Former subsec. (d) redesignated (e).

Subsec. (d)(1). Pub. L. 105–277, §1404(a)(1), inserted "or 231" after "section 223".

Subsecs. (e), (f). Pub. L. 105–277, §1404(a)(2), redesignated subsecs. (d) and (e) as (e) and (f), respectively.

### EFFECTIVE DATE OF 2018 AMENDMENT

Pub. L. 115–164, §4(b), Apr. 11, 2018, 132 Stat. 1254 , provided that: "The amendments made by this section [amending this section] shall take effect on the date of the enactment of this Act [Apr. 11, 2018], and the amendment made by subsection (a) shall apply regardless of whether the conduct alleged occurred, or is alleged to have occurred, before, on, or after such date of enactment."

### EFFECTIVE DATE OF 1998 AMENDMENT

Amendment by Pub. L. 105–277 effective 30 days after Oct. 21, 1998, see section 1406 of Pub. L. 105–277, set out as a note under section 223 of this title.

### SAVINGS

Pub. L. 115–164, §7, Apr. 11, 2018, 132 Stat. 1255 , provided that: "Nothing in this Act [see Short Title of 2018 Amendment note set out under section 1 of Title 18, Crimes and Criminal Procedure] or the amendments made by this Act shall be construed to limit or preempt any civil action or criminal prosecution under Federal law or State law (including State statutory law and State common law) filed before or after the day before the date of enactment of this Act [Apr. 11, 2018] that was not limited or preempted by section 230 of the Communications Act of 1934 (47 U.S.C. 230), as such section was in effect on the day before the date of enactment of this Act."

### SENSE OF CONGRESS

Pub. L. 115–164, §2, Apr. 11, 2018, 132 Stat. 1253 , provided that: "It is the sense of Congress that-

"(1) section 230 of the Communications Act of 1934 (47 U.S.C. 230; commonly known as the 'Communications Decency Act of 1996') was never intended to provide legal protection to websites that unlawfully promote and facilitate prostitution and websites that facilitate traffickers in advertising the sale of unlawful sex acts with sex trafficking victims;

"(2) websites that promote and facilitate prostitution have been reckless in allowing the sale of sex trafficking victims and have done nothing to prevent the trafficking of children and victims of force, fraud, and coercion; and

"(3) clarification of such section is warranted to ensure that such section does not provide such protection to such websites."

---

[1] *So in original. Probably should be "subparagraph (A)."*

PUBLIC LAW 114–222—SEPT. 28, 2016

JUSTICE AGAINST SPONSORS OF TERRORISM
ACT

130 STAT. 852          PUBLIC LAW 114–222—SEPT. 28, 2016

Public Law 114–222
114th Congress

An Act

Sept. 28, 2016

[S. 2040]

To deter terrorism, provide justice for victims, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Justice Against
Sponsors of
Terrorism Act.
18 USC 1 note.

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Justice Against Sponsors of Terrorism Act".

18 USC 2333
note.

**SEC. 2. FINDINGS AND PURPOSE.**

(a) FINDINGS.—Congress finds the following:

(1) International terrorism is a serious and deadly problem that threatens the vital interests of the United States.

(2) International terrorism affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States.

(3) Some foreign terrorist organizations, acting through affiliated groups or individuals, raise significant funds outside of the United States for conduct directed and targeted at the United States.

(4) It is necessary to recognize the substantive causes of action for aiding and abetting and conspiracy liability under chapter 113B of title 18, United States Code.

(5) The decision of the United States Court of Appeals for the District of Columbia in Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983), which has been widely recognized as the leading case regarding Federal civil aiding and abetting and conspiracy liability, including by the Supreme Court of the United States, provides the proper legal framework for how such liability should function in the context of chapter 113B of title 18, United States Code.

(6) Persons, entities, or countries that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United States, necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities.

(7) The United States has a vital interest in providing persons and entities injured as a result of terrorist attacks committed within the United States with full access to the

Add. 10

court system in order to pursue civil claims against persons, entities, or countries that have knowingly or recklessly provided material support or resources, directly or indirectly, to the persons or organizations responsible for their injuries.

(b) PURPOSE.—The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

### SEC. 3. RESPONSIBILITY OF FOREIGN STATES FOR INTERNATIONAL TERRORISM AGAINST THE UNITED STATES.

(a) IN GENERAL.—Chapter 97 of title 28, United States Code, is amended by inserting after section 1605A the following:

### "§ 1605B. Responsibility of foreign states for international terrorism against the United States

28 USC 1605B.

"(a) DEFINITION.—In this section, the term 'international terrorism'—

"(1) has the meaning given the term in section 2331 of title 18, United States Code; and

"(2) does not include any act of war (as defined in that section).

"(b) RESPONSIBILITY OF FOREIGN STATES.—A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by—

"(1) an act of international terrorism in the United States; and

"(2) a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred.

"(c) CLAIMS BY NATIONALS OF THE UNITED STATES.—Notwithstanding section 2337(2) of title 18, a national of the United States may bring a claim against a foreign state in accordance with section 2333 of that title if the foreign state would not be immune under subsection (b).

"(d) RULE OF CONSTRUCTION.—A foreign state shall not be subject to the jurisdiction of the courts of the United States under subsection (b) on the basis of an omission or a tortious act or acts that constitute mere negligence.".

(b) TECHNICAL AND CONFORMING AMENDMENTS.—

(1) The table of sections for chapter 97 of title 28, United States Code, is amended by inserting after the item relating to section 1605A the following:

28 USC 1602 prec.

"1605B. Responsibility of foreign states for international terrorism against the United States.".

(2) Subsection 1605(g)(1)(A) of title 28, United States Code, is amended by inserting "or section 1605B" after "but for section 1605A".

## SEC. 4. AIDING AND ABETTING LIABILITY FOR CIVIL ACTIONS REGARDING TERRORIST ACTS.

(a) IN GENERAL.—Section 2333 of title 18, United States Code, is amended by adding at the end the following:

"(d) LIABILITY.—

"(1) DEFINITION.—In this subsection, the term 'person' has the meaning given the term in section 1 of title 1.

"(2) LIABILITY.—In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.".

18 USC 2333 note.

(b) EFFECT ON FOREIGN SOVEREIGN IMMUNITIES ACT.—Nothing in the amendment made by this section affects immunity of a foreign state, as that term is defined in section 1603 of title 28, United States Code, from jurisdiction under other law.

Claims.
Courts.
18 USC 1605B note.

## SEC. 5. STAY OF ACTIONS PENDING STATE NEGOTIATIONS.

(a) EXCLUSIVE JURISDICTION.—The courts of the United States shall have exclusive jurisdiction in any action in which a foreign state is subject to the jurisdiction of a court of the United States under section 1605B of title 28, United States Code, as added by section 3(a) of this Act.

(b) INTERVENTION.—The Attorney General may intervene in any action in which a foreign state is subject to the jurisdiction of a court of the United States under section 1605B of title 28, United States Code, as added by section 3(a) of this Act, for the purpose of seeking a stay of the civil action, in whole or in part.

(c) STAY.—

Certification.

(1) IN GENERAL.—A court of the United States may stay a proceeding against a foreign state if the Secretary of State certifies that the United States is engaged in good faith discussions with the foreign state defendant concerning the resolution of the claims against the foreign state, or any other parties as to whom a stay of claims is sought.

(2) DURATION.—

(A) IN GENERAL.—A stay under this section may be granted for not more than 180 days.

(B) EXTENSION.—

(i) IN GENERAL.—The Attorney General may petition the court for an extension of the stay for additional 180-day periods.

(ii) RECERTIFICATION.—A court shall grant an extension under clause (i) if the Secretary of State recertifies that the United States remains engaged in good faith discussions with the foreign state defendant concerning the resolution of the claims against the foreign state, or any other parties as to whom a stay of claims is sought.

PUBLIC LAW 114–222—SEPT. 28, 2016          130 STAT. 855

**SEC. 6. SEVERABILITY.**

If any provision of this Act or any amendment made by this Act, or the application of a provision or amendment to any person or circumstance, is held to be invalid, the remainder of this Act and the amendments made by this Act, and the application of the provisions and amendments to any other person not similarly situated or to other circumstances, shall not be affected by the holding.

18 USC 2333 note.

**SEC. 7. EFFECTIVE DATE.**

The amendments made by this Act shall apply to any civil action—

(1) pending on, or commenced on or after, the date of enactment of this Act; and

(2) arising out of an injury to a person, property, or business on or after September 11, 2001.

Applicability.
18 USC 2333 note.

Mac Thornberry

*Speaker of the House of Representatives pro tempore.*

John Cornyn

*Acting President of the Senate pro tempore.*

IN THE SENATE OF THE UNITED STATES,

*September 28, 2016.*

The Senate having proceeded to reconsider the bill (S. 2040) entitled "An Act to deter terrorism, provide justice for victims, and for other purposes.", returned by the President of the United States with his objections, to the Senate, in which it originated, it was

*Resolved,* That the said bill pass, two-thirds of the Senators present having voted in the affirmative.

Julie E. Adams

*Secretary.*

I certify that this Act originated in Senate.

Julie E. Adams

*Secretary.*

130 STAT. 856    PUBLIC LAW 114–222—SEPT. 28, 2016

IN THE HOUSE OF REPRESENTATIVES, U.S.

*September 28, 2016.*

The House of Representatives having proceeded to reconsider the bill (S. 2040) entitled "An Act to deter terrorism, provide justice for victims, and for other purposes.", returned by the President of the United States with his objections, to the Senate, in which it originated, and passed by the Senate on reconsideration of the same, it was

*Resolved,* That the said bill do pass, two-thirds of the House of Representatives agreeing to pass the same.

Karen L. Haas
*Clerk.*

---

LEGISLATIVE HISTORY—S. 2040:

CONGRESSIONAL RECORD, Vol. 162 (2016):
    May 17, considered and passed Senate.
    Sept. 9, considered and passed House.
DAILY COMPILATION OF PRESIDENTIAL DOCUMENTS (2016):
    Sept. 23, Presidential veto message.
CONGRESSIONAL RECORD, Vol. 162 (2016):
    Sept. 28, Senate and House overrode veto.

○

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.


Dated: June 24, 2019                    By:  */s/ Brian M. Willen*
                                             Brian M. Willen