# Case No. 18-17192

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

MEHIER TAAMNEH; LAWRENCE TAAMNEH;
SARA TAAMNEH; DIMANA TAAMNEH,

*Plaintiffs - Appellants,*

v.

TWITTER, INC.; GOOGLE LLC; FACEBOOK, INC.,

*Defendants - Appellees.*

On Appeal from the United States District Court
for the Northern District of California
No. 17-cv-04107-EMC
Hon. Edward M. Chen

## APPELLANTS' REPLY BRIEF

Daniel W. Weininger
Keith L. Altman
EXCOLO LAW, PLLC
26700 Lahser Road, Suite 401
Southfield, MI 48033
Tel: (248) 251-0594

*Counsel for Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... iii

ARGUMENTS ........................................................................................ 1

I.   Section 2333(d)(2) Does Not Require Secondary Actors To Knowingly And Substantially Assist The Specific Act of International Terrorism ...................................................................... 1

     A.   ATA Precedents .................................................................. 1

     B.   Statutory Language ........................................................... 3

     C.   Misinterpretation ............................................................... 4

     D.   Basic Principles of Aiding and Abetting .......................... 6

     E.   Policy Considerations ........................................................ 8

II.   The Amended Complaint Plausibly Alleges That Defendants Knowingly Provided Substantial Assistance To ISIS ................... 10

     A.   Plausible Allegations Regarding Defendants' Substantial Assistance To ISIS .................................... 10

     B.   Plausible Allegations Regarding Defendants' Culpable Mental State ................................................... 14

III.   Plaintiffs Properly Raised The Issue Of Proximate Causation ..... 16

IV.   JASTA Overrides Section 230(c)(1) Immunity For "Interactive Computer Service" Providers Such As Defendants ....................... 18

     A.   Codification .................................................................... 22

B.      Implied Repeal ........................................................... 26

CONCLUSION ........................................................................... 30

CERTIFICATE OF COMPLIANCE........................................... 31

CERTIFICATE OF SERVICE................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Acosta v. Gonzales,*
    439 F.3d 550 (9th Cir. 2006) .........................................................26

*Adamis v. Lampropoulou,*
    659 F. App'x 11 (2d Cir. 2016).....................................................23

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................13, 16

*Association of American Railroads v. Costle,*
    562 F.2d 1310 (D.C. Cir. 1977).....................................................24

*Batzel v. Smith,*
    333 F.3d 1018 (9th Cir. 2003) .......................................................20

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 54 (2007) ..................................................................13, 16

*Blumenthal v. Drudge,*
    992 F. Supp. 44 (D.D.C. 1998).....................................................20

*Butts v. Merchants & Miners Transp. Co.,*
    230 U.S. 126 (1913) .......................................................................23

*Corporacion Venezolana de Fomento v. Vintero Sales Corp.,*
    629 F.2d 786 (2d Cir. 1980)...........................................................23

*Crosby v. Twitter, Inc.,*
    921 F.3d 617 (6th Cir. 2019) ...........................................................2

*Dodd v. Hood River County,*
    59 F.3d 852 (9th Cir. 1995) ...........................................................18

*Doe v. Internet Brands, Inc.*,
  824 F.3d 846 (9th Cir. 2016) ........................................................ 19

*Fields v. Twitter, Inc.*,
  881 F.3d 739 (9th Cir. 2018) ........................................................ 18

*Frontera Res. Azer. Corp. v. State Oil Co. of the Azer. Republic*,
  582 F.3d 393 (2d Cir. 2009) ........................................................... 29

*Force v. Facebook, Inc.*,
  2019 U.S. App. LEXIS 22698 (2d Cir. Jul. 31, 2019) ............. 15, 27

*Force v. Facebook, Inc.*,
  304 F. Supp. 3d 315 (E.D.N.Y. 2018) ...................................... 22, 27

*Gonzalez v. Google, Inc.*,
  282 F. Supp. 3d 1150 (N.D. Cal. 2017) ................... 22, 25, 27-28, 30

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ................................................. passim

*Hauser v. Farrell*,
  14 F.3d 1338 (9th Cir. 1994) ......................................................... 6

*Hawaii v. Office of Hawaiian Affairs*,
  556 U.S. 163 (2009) ...................................................................... 25

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) .......................................................................... 23

*Hussein v. Dahabshiil Transfer Servs.*,
  230 F. Supp. 3d 167 (S.D.N.Y. 2017) ........................................... 11

*International Union, United Auto., Aero. & Agric. Implement Workers,
Local 737 v. Auto Glass Emples. Fed. Credit Union*,
  72 F.3d 1243 (9th Cir. 1996) ....................................................... 26

iv

*Jackson v. People's Republic of China*,
    794 F.2d 1490 (11th Cir. 1986) ..................................................... 23

*John Doe I v. Nestle USA*,
    766 F.3d 1013 (9th Cir. 2014) ......................................................... 6

*Kenaitze Indian Tribe v. Alaska*,
    860 F.2d 312 (9th Cir. 1988) ........................................................... 5

*Kingdomware Techs., Inc. v. United States*,
    136 S. Ct. 1969 (2016) .............................................................. 24-25

*Leatherman v. Tarrant County Narcotics
Intelligence & Coordination Unit*,
    507 U.S. 163 (1993) ............................................................... 14, 16

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018) ..................................................... passim

*Mosier v. Stonefield Josephson, Inc.*,
    815 F.3d 1161 (9th Cir. 2016) ......................................................... 6

*Owens v. BNP Paribas, S.A.*,
    897 F.3d 266 (D.C. Cir. 2018) ....................................................... 17

*Pennie v. Twitter, Inc.*,
    281 F. Supp. 3d 874 (N.D. Cal. 2017) ..................... 22, 25, 27-28, 30

*Price v. Socialist People's Libyan Arab Jamahiriya*,
    294 F.3d 82 (D.C. Cir. 2002) .................................................... 28-29

*Principality of Monaco v. Mississippi*,
    292 U.S. 313 (1934) .................................................................... 28

*Rothe Dev., Inc. v. United States DOD*,
    836 F.3d 57 (D.C. Cir. 2016) ........................................................ 23

*SEC v. Fehn,*
    97 F.3d 1276 (9th Cir. 1996) ........................................................6

*SEC v. Todd,*
    642 F.3d 1207 (9th Cir. 2011) ......................................................6

*Swierkiewicz v. Sorema N.A.,*
    534 U.S. 506 (2002) ...............................................................13, 16

*TRW Inc. v. Andrews,*
    534 U.S. 19 (2001) .........................................................................5

*United States v. De La Torre-Jimenez,*
    771 F.3d 1163 (9th Cir. 2014) ....................................................18

*United States v. Gonzalez-Mendez,*
    150 F.3d 1058 (9th Cir. 1998) ....................................................26

*United States v. Juvenile Male,*
    670 F.3d 999 (9th Cir. 2012) ......................................................26

*Verlinden B.V. v. Cent. Bank of Nig.,*
    461 U.S. 480 (1983) .....................................................................29

*Yazoo & M. v. R. Co. v. Thomas,*
    132 U.S. 174 (1889) .................................................................24-25

## Statutes

Justice Against Sponsors of Terrorism Act,
Pub. L. No. 114-222, 130 Stat. 852 (2016) ....................................passim

1 U.S.C. § 1 ...................................................................................9

8 U.S.C. § 1189 .............................................................................9

18 U.S.C. § 2331 ...........................................................................9

vi

18 U.S.C. § 2333(a) ...............................................................................3

18 U.S.C. § 2333(d) ..................................................................... passim

18 U.S.C. § 2339B.............................................................................3, 23

28 U.S.C. § 636(b)(3) ...........................................................................21

28 U.S.C. § 1602 ...................................................................................20

28 U.S.C. § 1604 ...................................................................................28

28 U.S.C. § 1605B .................................................................................28

28 U.S.C. § 2254(a) ...............................................................................21

42 U.S.C. § 1983 ...................................................................................21

42 U.S.C. § 9163(a)(1).............................................................................21

47 U.S.C. § 230(b)(1) ............................................................................19

47 U.S.C. § 230(c)(1) .................................................................... passim

47 U.S.C. § 230(f)(2) .............................................................................19

## Rules and Regulations

Executive Order 13224, 31 C.F.R. Part 594 ............................................9

## Other Sources

Norman Singer & Shambie Singer,
Sutherland Statutes & Statutory Construction (7th ed. 2008)..............22

Wright & Miller,
Fed. Prac. & Proc. Civ. (3d ed.) (April 2019 Update) ......................14, 16

## ARGUMENTS

I. **Section 2333(d)(2) Does Not Require Secondary Actors To Knowingly And Substantially Assist The Specific Act Of International Terrorism**

Defendants' urge this Court to affirm the dismissal of Plaintiffs' 18 U.S.C. § 2333(d)(2) claim on the ground that the first amended complaint ("FAC") fails to plausibly allege that Defendants knowingly and substantially assisted the Reina nightclub attack. For the following reasons, Defendants' stance on the contours of section 2333(d)(2) liability is incorrect.

A. ATA Precedents

Citing *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018), Defendants maintain that section 2333(d)(2) imposes ATA aiding and abetting liability only where the secondary actor has advance "knowledge [of] the terrorist act from which [the] injuries arose." (Defs.' Br., DE 26, Page ID # 34, *see also* Page ID # 32). *Linde* actually says the opposite. As the Second Circuit held, "aiding and abetting an *act* of international terrorism requires . . . the secondary actor to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities." *Linde*, 882 F.3d at 329 (emphasis in original). This "awareness," which the

1

*Linde* Court denominated as a form of *mens rea*, did not "require proof that Arab Bank *knew of the specific attacks at issue* when it provided financial services for Hamas." *Id.* (emphasis added).

The *Linde* Court never ruled that a jury would be unable to conclude – as a matter of law – "that Arab Bank aided and abetted the Hamas acts of international terrorism that injured plaintiffs" absent proof that the bank knew about the specific attacks that injured the plaintiffs. *Id.* at 332. The *Linde* Court simply held that the evidence adduced at trial did not affirmatively "compel that conclusion as a matter of law." *Id.*

Defendants misread *Crosby v. Twitter, Inc.*, 921 F.3d 617 (6th Cir. 2019) as well. The portion of the decision they rely on does not address any connection between Defendants' "knowledge," "substantial assistance," and the specific attack in that case. The *Crosby* Court instead dismissed the section 2333(d)(2) claim for a more fundamental reason: the plaintiffs failed to plausibly establish that Defendants had ever aided and abetted the principal. *Id.* at 626-27 ("Mateen is the person who 'committed' the shooting—not ISIS. And Plaintiffs do not allege that Defendants directly helped Mateen.").

2

B.    Statutory Language

Section 2333(d)(2)'s plain text further rebuts Defendants' notion that the FAC had to plausibly allege they "knowingly" and "substantially assisted" the Reina nightclub attack.

Section 2333(d)(2) assigns liability to "any person who aids and abets . . . *the person* who committed such an act of international terrorism." *Id.* (emphasis added).  ATA claimants must, therefore, link the secondary actor's substantial assistance to "the person" who perpetrated the terrorist attack, not to the specific "act of international terrorism" itself.  To be sure, the secondary actor must exhibit the requisite mental culpability before aiding and abetting liability attaches. But this requirement is satisfied when the secondary actor's mental state evidences an awareness of his role in the principal's overall terrorist activities. *Linde*, 882 F.3d at 329.

Defendants also distinguish section 2333(d)(2) claims from ATA material support claims. *See* 18 U.S.C. §§ 2333(a), 2339B.  While material support claims prohibit the knowing provision of material support to a designated foreign terrorist organization ("FTO"), Defendants argue that section 2333(d)(2) requires something "more than" just material support.

3

*Linde*, 882 F.3d at 329. Plaintiffs agree. But the additional element that the *Linde* Court identified in section 2333(d)(2) claims is the secondary actor's general awareness of his role in the principal's overall terrorist activities, not the advance knowledge of some discrete terrorist act. *Id.*

Next, Defendants assert that section 2333(d)(2)'s singular use of the term "committed" to describe the principal's conduct – as opposed to "committed, planned, or authorized" to describe the designated FTO's conduct – "further underscores the requirement that the assistance must have been provided to the 'commission' of the terrorist act itself." (Defs.' Br., DE 26, Page ID # 38). Read together, though, the word "commission," coupled with the term "act of international terrorism," only serve to delineate the extent of the *principal*'s conduct. They carry no import with respect to the secondary actor's supportive activities.

C.   <u>Misinterpretation</u>

According to Defendants, section 2333(d)(2) imposes not one, but two culpable mental states on the secondary actor. *First*, the secondary actor must be generally aware of "his role as part of an overall illegal or tortious activity at the time he provided the assistance." *Linde*, 882 F.3d at 329. And *second*, he must "knowingly and substantially assist" the

4

specific terrorist attack. (Defs.' Br., DE 26, Page ID # 34-35, 45).
Defendant's construction is unpersuasive, however, because proof of the
second (more specific) mental state dispenses with the need to prove the
first (more general) mental state.

For instance, suppose an ATA claimant can show that the
secondary actor knew in advance that the principal intended to commit
a specific "act of international terrorism." Under these circumstances,
there is no need for the claimant to further establish the secondary actor's
general awareness of his role in the principal's "overall illegal or tortious
activity." Since the secondary actor already knew about the specific
terrorist attack, that same knowledge necessarily establishes his general
awareness of his overall role in the principal's terrorist activities.

Congress could not have intended this redundancy in mental
culpability when it enacted section 2333(d)(2). And the Court should not
ascribe that intention to Congress either. *TRW Inc. v. Andrews*, 534 U.S.
19, 31 (2001); *Kenaitze Indian Tribe v. Alaska*, 860 F.2d 312, 317 (9th Cir.
1988) ("We cannot adopt a statutory interpretation that renders one
portion of the statute redundant when there is another interpretation
that avoids such redundancy.").

D. <u>Basic Principles of Civil Aiding and Abetting</u>

Defendants point to several cases that ostensibly advance their view of how ATA aiding and abetting liability functions. (Defs.' Br., DE 26, Page ID # 38). The Court should reject these authorities for three reasons.

*One* – none of them pertain to the ATA. *Mosier v. Stonefield Josephson, Inc.*, 815 F.3d 1161, 1167-68 (9th Cir. 2016) (discussing aiding and abetting under California state law); *John Doe I v. Nestle USA,* 766 F.3d 1013, 1023 (9th Cir. 2014) (applying "[c]ustomary international law – not domestic law – [to] provide[ ] the legal standard for aiding and abetting ATS claims."); *SEC v. Todd*, 642 F.3d 1207 (9th Cir. 2011) (securities fraud); *SEC v. Fehn*, 97 F.3d 1276 (9th Cir. 1996) (same); *Hauser v. Farrell*, 14 F.3d 1338 (9th Cir. 1994) (same).

T*wo* – none of them follow, no less cite to *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), although Congress expressly stated that *Halberstam* is "the leading case regarding Federal civil aiding and abetting . . . liability" and "provides the proper legal framework for how such liability should function" under the ATA. JASTA §2(a)(5).

And *three* – even *Halberstam* itself rebuts Defendants' conception of ATA aiding and abetting liability.   In *Halberstam*, the plaintiffs commenced a wrongful death action against the defendant for, among other things, aiding and abetting her companion in the shooting death of the decedent. *Id.* at 474. The killing occurred outside the defendant's presence when the companion burglarized the decedent's residence. *Id.* at 488.   Evaluating whether the defendant "knowingly assisted the principal violation," the *Halberstam* Court found sufficient evidence in the record demonstrating that the defendant knew about the companion's history of theft. *Id.*   And on that basis, the *Halberstam* Court affirmed the district court's conclusion that the defendant "assisted Welch with knowledge that he had engaged in illegal acquisition of goods." *Id.*

What the *Halberstam* Court *did not* require was evidence showing that the defendant assisted the companion while knowing he intended to burglarize the decedent's residence, *i.e.*, the specific tortious conduct at issue.   As the *Halberstam* Court observed, "[i]t was not necessary that Hamilton knew specifically that Welch was committing burglaries. Rather, when she assisted him, it was enough that she knew he was

involved in some type of personal property crime at night – whether as a fence, burglar, or armed robber made no difference." *Id.*

Turning to the six "substantial assistance" factors, the *Halberstam* Court not once discussed how any of them related to the specific burglary resulting in the decedent's death. The Court instead analyzed these factors in connection with "a long-running burglary enterprise," "a five-year-long burglary campaign against private homes," and "an ongoing illicit enterprise." *Id.* And when considering the second *Halberstam* factor – the amount of assistance – the *Halberstam* Court held that "although the amount of assistance Hamilton gave Welch may not have been overwhelming *as to any given burglary* in the five-year life of this criminal operation, it added up over time to *an essential part of the pattern.*" *Id.* (emphasis added).

In sum, *Halberstam*'s principles of aiding and abetting liability support Plaintiffs' reading of section 2333(d)(2).

E.  Policy Considerations

Since no policy argument is complete without its Doomsday predictions, Defendants contend that Plaintiffs' take on ATA aiding and abetting liability, "would mean that widely available online platforms

could be held liable for virtually every act of terrorism committed anywhere in [the] world." (Defs.' Br., DE 26, Page ID # 40). In real terms, ATA aiding and abetting liability is not that expansive.

Section 2333(d)(2) is an intricate legal web that cross-references several other federal civil and criminal statutes. *See, e.g.,* 1 U.S.C. § 1, 8 U.S.C. § 1189, 18 U.S.C. § 2331. Perhaps the most constraining element is showing that a designated FTO "committed, planned, or authorized" the "act of international terrorism." While there is certainly no shortage of FTOs across the world, the Secretary of State has designated only 68 of them pursuant to Executive Order 13224.[1] ATA claimants must further demonstrate that the secondary actor "knowingly" and "substantially" assisted the person who "committed" the "act of international terrorism" by traversing *Halberstam* – a three-pronged test that unfolds into multi-factor balancing analysis. Each of these prerequisites alone poses a significant hurdle to satisfying section 2333(d)(2). ATA claimants must plausibly establish *all* of them.

---

[1] https://www.state.gov/foreign-terrorist-organizations/

## II. The Amended Complaint Plausibly Alleges That Defendants Knowingly Provided Substantial Assistance To ISIS

### A. Plausible Allegations Regarding Defendants' Substantial Assistance To ISIS

Defendants contend that "no reasonable jury could find substantial assistance taking into account" the six *Halberstam* factors. (Defs.' Br., DE 26, Page ID # 42). Matching each of the *Halberstam* factors with the corresponding allegations in the FAC proves otherwise.

*Halberstam* Factor One ("Nature of the Principal's Conduct") – Defendants assert that the FAC does not allege they "actively assisted with ISIS's general terrorist mission." (*Id.*). On the contrary, the FAC sufficiently pleads that Defendants provided ISIS with the infrastructure to "virtually" radicalize prospective recruits and encourage them to commit acts of terrorism throughout the world. (ER 99-101).

*Halberstam* Factor Two ("Amount of Assistance") – Defendants maintain that the FAC does not allege they "played a major or integral part in ISIS's terrorist attacks." (Defs.' Br., DE 26, Page ID # 42). But the FAC plausibly alleges that without Defendants' social media platforms ISIS would practically have no means of radicalizing prospective recruits beyond its territorial borders. Not to mention,

10

providing ISIS with access to Defendants' social media platforms is a financial boon for the terrorist group. By way of comparison, the United States government spent $124 million on Radio Free Europe/Radio Liberty in fiscal year 2018.[2] Congress expended $43.1 million on Radio Free Asia over the same period.[3] Defendants' platforms afford ISIS with comparable services that reach a significantly wider audience *for free*.

*Halberstam* Factor Four ("Relationship") – Defendants argue that ISIS "incidentally" uses the same social media platforms Defendants make "generally available to members of the public." (Defs.' Br., DE 26, Page ID # 43). But just as banks may be liable under the ATA when they have "reason to believe that their customers were terrorists or were assisting terrorists," the same principle governs Defendants' provision of social media accounts to ISIS. *Hussein v. Dahabshiil Transfer Servs.*, 230 F. Supp. 3d 167, 176 (S.D.N.Y. 2017). Since ISIS posts publicly viewable images of gruesome executions and violent terrorist training videos on Defendants' platforms, the FAC plausibly establishes that Defendants

---

[2] https://pressroom.rferl.org/about-us
[3] https://www.usagm.gov/networks/rfa/

had "reason to believe" that ISIS operated those accounts or, at the very least, that the account holders "were assisting" ISIS.

*Halberstam* Factor Five ("Awareness") – Defendants' harken back to their core theme that the FAC contains no plausible allegations that they were generally aware of their "role" in ISIS's "violent or life-endangering activities." (Defs.' Br., DE 26, Page ID # 43-44). This point is belied by the FAC's allegations that Defendants allowed ISIS to publicly weaponize their social media platforms for radicalization, recruitment, and to an extent, training initiatives. (ER 99, 101, 104, 133, 169 at ¶¶ 142-44, 153-55, 168-69, 331-332, 490).

*Halberstam* Factor Six ("Duration") – Although Defendants do not directly address the duration of their assistance, the FAC plausibly alleges that Defendants' social media platforms facilitated ISIS's radicalization, recruitment, and operational efforts over the course of several years.[4] (ER 95, 97, 100, 102, 105-07, 112-14, 118, 120-23, 126-31 at ¶¶ 116, 131, 147, 154-56, 177-88, 220-23, 228, 245, 248, 256-61, 273-76, 290-310, 319).

---

[4] As for the third *Halberstam* factor – the secondary actor's presence when the principal committed the tort – Plaintiffs acknowledge that Defendants were not present during the Reina nightclub attack.

Defendants' definition of "substantial assistance" also conflicts with the Second Circuit's decision in *Linde*. There, the plaintiffs demonstrated that "Arab Bank held accounts, or processed wire transfers, for known Hamas leaders and operatives." *Id.* at 321. The bank "processed transfers totaling approximately $32,000,000 on behalf of purported charities known to funnel money to Hamas." *Id.* And those charities "used funds to disseminate Hamas propaganda; support Hamas-affiliated terrorists; and make payments to the families of Hamas suicide bombers, prisoners, and operatives." *Id.*

Defendants would claim that Arab Bank merely provided "routine services" to Hamas that were "generally available to members of the public." The Second Circuit would reject that assertion. Based on the above evidence, the *Linde* Court never ruled that a jury would be unable to *legally* conclude that Arab Bank substantially assisted Hamas. As with *Halberstam*'s knowledge prong, the *Linde* Court merely held that the trial evidence did not "compel" that finding "as a matter of law."[5] *Id.*

---

[5] Defendants say that Plaintiffs' revenue sharing allegations must reference specific "instances where Google purportedly shared revenue with anyone whom it knew to be part of ISIS." (Defs.' Br., DE 26, Page ID # 48 n.6). Neither the Federal Rules of Civil Procedure, nor *Iqbal* or *Twombly*, require that level of particularity. *See Swierkiewicz v. Sorema*

at 332. Transplanting *Linde* to the Rule 12(b)(6) context, Plaintiffs'

section 2333(d)(2) claim should have survived Defendants' motion to

dismiss.

B. Plausible Allegations Regarding Defendants' Culpable
   Mental State

Contrary to Defendants' view, the FAC adequately alleges that

Defendants were generally aware of their "role as part of an overall illegal

---

*N.A.*, 534 U.S. 506, 513 (2002) ("Rule 8(a)'s simplified pleading standard
applies to all civil actions, with limited exceptions," such as Rule 9(b));
*Leatherman v. Tarrant County Narcotics Intelligence & Coordination
Unit*, 507 U.S. 163, 168-69 (1993); *see also* 5 Wright & Miller, Fed. Prac.
& Proc. Civ. § 1221 (3d ed.) (April 2019 Update) ("with the exception of
actions falling within Rule 9 or a federal statute, no special pleading
requirements exist for certain areas of the law").

The FAC's allegations that (1) "[i]n order for ads to appear
associated with a YouTube video, the poster must create a Google
'AdSense' account and register the account for 'monetization,'" (2) "Google
agrees to share a percentage of the revenue it generates from ads placed
before YouTube videos with the user who posts the video," (3) Google
reviews each posting before it allows advertisements to appear alongside
such postings, coupled with (4) a screenshot depicting an ISIS
propaganda video alongside an advertisement, together raise the
plausible inference that Google shares revenue with ISIS pursuant to its
own policies. (ER 151-153).

Defendants counter that Plaintiffs "do not even try to explain how
any hypothetical revenue sharing would have substantially assisted
ISIS's terrorist acts." (Defs.' Br., DE 26, Page ID # 48 n.6). But whether
Google's advertisement revenue sharing policies substantially assist ISIS
depends upon the *Halberstam* factors, which in turn depends upon the
amount of advertising revenue Google shares with ISIS. Only discovery
can supply that information.

14

or tortious activity" when they substantially assisted ISIS. (ER 99, 101, 104, 133, 169 at ¶¶ 142-44, 153-55, 168-69, 331-332, 490). Defendants knowingly provided ISIS with the infrastructure to post images (clearly marked with ISIS's insignia) of executions, decapitations, immolations, and other violent material for the purpose of radicalizing, recruiting, and "virtually" training operatives across the globe – all of which were publicly viewable on Defendants' platforms.

It is indeed difficult for Defendants to disavow their knowledge about the centrality of their platforms to ISIS's radicalization and recruitment efforts when it has been apparent to so many for so long. *See Force v. Facebook, Inc.*, No. 18-397, 2019 U.S. App. LEXIS 22698, at *67 (2d Cir. Jul. 31, 2019) (Katzmann, C.J., dissenting) ("[r]ecent news reports suggest that many social media sites have been slow to remove the plethora of terrorist and extremist accounts populating their platforms, and that such efforts, when they occur, are often underinclusive.") (collecting scholastic and journalistic publications).

Lastly, Defendants persist that the FAC is deficient because it fails to plead that they "knew about, yet failed to remove from their platforms, any particular item of content supplied by ISIS or its supporters" or "any

particular account belonging to ISIS or its supporters." (Defs.' Br., DE 26, Page ID # 46). Again, neither the federal rules, nor *Iqbal* or *Twombly*, mandate this level of particularity. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002); *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168-69 (1993); *see also* 5 Wright & Miller, Fed. Prac. & Proc. Civ. § 1221 (3d ed.) (April 2019 Update).

### III. Plaintiffs Properly Raised The Issue Of Proximate Causation

Defendants label Plaintiffs' discussion of proximate causation an "odd detour." (Defs.' Br., DE 26, Page ID # 48). At first, they suggest that causation has no bearing on the disposition of ATA aiding and abetting claims. (*Id.*). Then, Defendants appear to retract their position and concede that "[f]or any claim under Section 2333(d), the plaintiff must have been injured 'by reason of' an act of international terrorism committed by the principal wrongdoer." (*Id.* at Page ID # 50 n.7). Plaintiffs concur with the last iteration of Defendants' position, so long as they mean to say that the alleged injuries must proximately *and exclusively* flow from the principal's terrorist attack as opposed to the secondary actor's supportive conduct. (Pls.' Br., DE 15, Page ID # 31).

16

Another problem is that Defendants seem to conflate substantial assistance with proximate causation. At various points in their brief, Defendants suggest that ISIS's presence on their social media platforms had to "causally affect[ ]" the Reina nightclub attack. (Defs.' Br., DE 26, Page ID # 30). At other times, they contend that aiding and abetting liability requires some "causal link" between the furnished assistance and the accomplished tort. (*Id.* at Page ID # 39). Or they posit that the FAC's revenue sharing allegations cannot plausibly establish substantial assistance by referencing decisions where courts have dismissed ATA direct liability claims for lack of proximate causation. (*Id.* at Page ID # 48 n.6).

To be clear, ATA aiding and abetting liability claims hinge upon whether the alleged injuries proximately flow from the principal's terrorist attack, not the secondary actor's supportive conduct. *See Linde*, 882 F.3d at 331; *see also Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 276-77 (D.C. Cir. 2018). And Defendants eventually concede this point as well. (Defs.' Br., DE 26, Page ID # 49; *see also* Page ID # 48) (regarding "Plaintiffs' aiding and abetting claim . . . causation is not at issue").

17

The parties' views more clearly diverge over a related issue: whether *Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018) supplies the appropriate standard for evaluating proximate causation. On this question, the Court is more than welcome to reference Plaintiffs' opening brief to ascertain their position. (Pls.' Br., DE 15, Page ID # 31-39). While Defendants correctly observe that this Court lacks the authority to overrule *Fields* because a three-judge panel cannot reconsider or overrule the decision of a previous panel, Plaintiffs raise the issue to preserve the question for subsequent appellate review should it become necessary. *See, e.g.*, *United States v. De La Torre-Jimenez*, 771 F.3d 1163, 1169 (9th Cir. 2014) ("Litigants may, of course, preserve [an] argument for en banc or Supreme Court review.").

## IV. JASTA Overrides Section 230(c)(1) Immunity For "Interactive Computer Service" Providers Such As Defendants

As a preliminary matter, this Court should refrain from deciding whether 47 U.S.C. § 230(c)(1) bars Plaintiffs' section 2333(d)(2) claim because the district court below declined to rule on the question. *See e.g.*, *Dodd v. Hood River County*, 59 F.3d 852, 863 (9th Cir. 1995). In the event

18

the Court addresses the issue for the first time on appeal, section 230(c)(1) does not preclude Plaintiffs' section 2333(d)(2) claim.

Congress passed the Communications Decency Act of 1996 ("CDA") "to promote the continued development of the Internet and other interactive computer services and other interactive media." 47 U.S.C. § 230(b)(1). To further that aim, the statute protects against two forms of civil liability. Only the first one is pertinent to this appeal. Section 230(c)(1) states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."[6] 47 U.S.C. § 230(c)(1).

With few exceptions, the statute "protects websites from liability for material posted on the website by someone else." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 850 (9th Cir. 2016). Section 230(c)(1) reflects Congress's studied policy "not to treat providers of interactive computer services like other information providers such as newspapers, magazines

---

[6] "The term 'interactive computer service' means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2).

or television and radio stations, all of which may be held liable for publishing or distributing obscene or defamatory material written or prepared by others." *Batzel v. Smith*, 333 F.3d 1018, 1026 (9th Cir. 2003) (quoting *Blumenthal v. Drudge*, 992 F. Supp. 44, 49 (D.D.C. 1998)).

The September 11, 2001 terror attacks ushered in a wave of anti-terrorism legislation, marking a decided shift away from this policy. In 2016, Congress enacted the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852, to amend both the ATA, and the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*. JASTA vastly expands civil anti-terrorism enforcement remedies. Among other things, JASTA assigns aiding and abetting liability to any person who "knowingly provid[es] substantial assistance," or "conspires" to commit acts of international terrorism. 18 U.S.C. § 2333(d)(2).

JASTA's scope is unprecedented. As discussed above, Congress explicitly intended the statute to provide:

> civil litigants with the ***broadest possible basis, consistent with the Constitution of the United States***, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

20

JASTA § 2(b) (emphasis added).

This language is anomalous to federal law. The United States Code is replete with examples where Congress employed the formula "consistent with the Constitution and laws of the United States" (or some other variant) to demarcate statutory authority, judicial powers, or territorial jurisdiction. *See, e.g.*, 28 U.S.C. § 636(b)(3) ("A magistrate may be assigned such additional duties as are not inconsistent with the Constitution and laws of the United States."); 28 U.S.C. § 2254(a) (providing habeas corpus relief for individuals in state custody "in violation of the Constitution or laws or treaties of the United States."); 42 U.S.C. § 1983 (providing a federal cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws"); 42 U.S.C. § 9163(a)(1) (requiring that "[t]he Constitution, laws, and treaties of the United States . . . apply to an ocean thermal energy conversion facility or plantship licensed under" the Ocean Thermal Energy Conversion Act of 1980).

Counsel's research yielded only one federal civil statute whose purview is limited by the "Constitution of the United States" alone. That statute is JASTA. Yet, notwithstanding JASTA's unique breadth,

several district courts have decided that civil anti-terrorism lawsuits are not excepted from section 230(c)(1) immunity. *See Force v. Facebook*, *Inc.*, 304 F. Supp. 3d 315, 322-24 (E.D.N.Y. 2018); *Gonzalez v. Google, Inc.*, 282 F. Supp. 3d 1150, 1158-61 (N.D. Cal. 2017); *Pennie v. Twitter, Inc.*, 281 F. Supp. 3d 874, 889 (N.D. Cal. 2017). Those district courts offered two main reasons supporting that conclusion: (1) JASTA's broad statement of purpose is "uncodified" and, therefore, possesses no operative import; and (2) JASTA does not implicitly repeal section 230(c)(1) immunity for "interactive computer service" providers. Neither reason is compelling.

## A.  Codification

JASTA's statement of purpose carries substantial interpretative weight even though Congress never "codified" it.

For one, the statement of purpose is not a preamble or prefatory clause because Congress included it in the *enacted* portion of JASTA. *See* JASTA § 2(b) (demonstrating that JASTA's statement of purpose follows the customary recital "Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled"); *see also* 1A Norman Singer & Shambie Singer, Sutherland

22

Statutes & Statutory Construction § 20:3 (7th ed. 2008) (stating that a "preamble" to a statute is a "prefatory explanation or statement" that "customarily precedes the enacting clause in the text of a bill, and consequently is frequently understood not to be part of the law."); *Rothe Dev., Inc. v. United States DOD*, 836 F.3d 57, 80 n.9 (D.C. Cir. 2016) (Henderson, J., dissenting) ("The enacting clause in federal legislation – '*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*' – has remained remarkably consistent throughout the nation's history.").

Assuming the statement of purpose could be viewed as preambular or prefatory, federal courts have historically consulted such statements when interpreting statutory texts. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 7 (2010) (examining the findings and purpose of section 2339B); *Butts v. Merchants & Miners Transp. Co.*, 230 U.S. 126, 133 (1913) (reviewing the preamble to the Civil Rights Act of 1875); *see also Adamis v. Lampropoulou*, 659 F. App'x 11, 12 (2d Cir. 2016) (consulting the Hague Convention's preamble); *Jackson v. People's Republic of China*, 794 F.2d 1490, 1498-99 (11th Cir. 1986) (examining FSIA's preamble to ascertain its retroactivity); *Corporacion Venezolana*

*de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 790 (2d Cir. 1980) (same).

Courts generally consider preambular or prefatory language so long as it is (1) consistent with the statute's operative text, and (2) clarifies an otherwise ambiguous operative provision. *See Association of American Railroads v. Costle*, 562 F.2d 1310, 1316 (D.C. Cir. 1977) ("Where the enacting or operative parts of a statute are unambiguous, the meaning of the statute cannot be controlled by language in the preamble."); *see also Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1978 (2016) (holding that a statute's prefatory clause "cannot change the plain meaning of [its] operative clause"); *Yazoo & M. v. R. Co. v. Thomas*, 132 U.S. 174, 188 (1889) (holding that a preamble is given effect solely when the statute's operative language is "doubtful or ambiguous"). These two factors are particularly relevant because JASTA's operative text poses no bar to civil anti-terrorism actions against "interactive computer service" providers, but is silent regarding whether the statute supersedes section 230(c)(1). Insofar as JASTA and section 230(c)(1) conflict, JASTA's statement of purpose dispels any doubt about how to resolve the inconsistency.

24

The cases referenced in *Gonzalez* and *Pennie* do not require a different analysis or result. In *Yazoo & M. v. R. Co. v. Thomas*, 132 U.S. 174, 188 (1889), for example, the Supreme Court interpreted an actual preamble that fully preceded the enacting clause of a statute chartering a Mississippi railroad. Specifically considering that statutory format, the Court held that "the preamble is no part of the act, and cannot enlarge or confer powers, nor control the words of the act, unless they are doubtful or ambiguous." *Id.* Likewise, in *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1978 (2016), the Court ruled that an openly prefatory clause to a federal agency's procurement statute could not "*change* the plain meaning of [its] operative clause." *Id. Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163, 175 (2009) is no different. There, the Court confronted whether a series of "whereas" clauses preceding the body of a Congressional joint resolution eliminated the State of Hawaii's power to alienate its own lands. Holding they did not, the Court concluded that the "whereas" clauses lacked the "operative effect" of altering what the joint resolution's plain language "was not designed to do." *Id.* (quotation omitted).

25

Consequently, whether JASTA's statement of purpose is "uncodified" has no bearing on its interpretive significance.

B. <u>Implied Repeal</u>

Plaintiffs do not maintain – nor have they ever asserted – that JASTA implicitly (or explicitly) repealed section 230(c)(1) immunity for "interactive computer service" providers. Rather, this Court should follow traditional canons of statutory interpretation in determining whether JASTA creates a narrow exception to section 230(c)(1) immunity.

This Circuit recognizes that "when Congress drafts a statute, courts presume that it does so with full knowledge of the existing law." *International Union, United Auto., Aero. & Agric. Implement Workers, Local 737 v. Auto Glass Emples. Fed. Credit Union*, 72 F.3d 1243, 1248 (9th Cir. 1996); *see also United States v. Gonzalez-Mendez*, 150 F.3d 1058, 1061 (9th Cir. 1998). As a result, "[w]here two statutes conflict, the later-enacted, more specific provision generally governs." *United States v. Juvenile Male*, 670 F.3d 999, 1008 (9th Cir. 2012); *see also Acosta v. Gonzales*, 439 F.3d 550, 555 (9th Cir. 2006) ("[C]onflicting statutes should be interpreted so as to give effect to each but to allow a later enacted,

26

more specific statute to amend an earlier, more general statute.")
(internal quotation marks omitted).

None of the parties dispute that Congress enacted JASTA nearly
twenty years after the CDA's passage in 1996. And JASTA is the more
specific provision because it creates a narrow carve-out from section
230(c)(1) immunity for civil anti-terrorism lawsuits. Congress could not
have been more direct and unqualified in this last respect since section
2333(d)(2) expressly mandates that "*liability may be asserted as to any
person* who aids and abets, by knowingly providing substantial
assistance, or who conspires with the person who committed such an act
of international terrorism." (Emphasis added). Accordingly, the district
courts in *Force*, *Gonzalez*, and *Pennie* incorrectly determined that JASTA
does not supersede section 230(c)(1).[7]

The *Gonzalez* and *Pennie* Courts further erred in that JASTA's
express amendment to FSIA's "foreign state" immunity provision *does*

---

[7] The Second Circuit recently affirmed the district court's decision in
*Force*. *Force v. Facebook, Inc.*, No. 18-397, 2019 U.S. App. LEXIS 22698
(2d Cir. Jul. 31, 2019). Chief Judge Robert Katzmann dissented in part
from the majority's "treatment of Facebook's friend-and-content
suggestion algorithms under the Communications Decency Act." *Id.* at
*46.

*not* foreclose JASTA from abrogating every other form of statutory immunity in a manner "consistent with the Constitution."

Aside from specified statutory exceptions, FSIA immunizes foreign states "from the jurisdiction of the courts of the United States and of the States." 28 U.S.C. § 1604. JASTA repealed this immunity in the anti-terrorism context by clearing the way for private civil lawsuits against foreign states "for personal injury or death occurring in the United States" caused by "the tortious act or omission of that foreign state" within the United States. 28 U.S.C. § 1605B(b); JASTA § 3(a) (adding 28 U.S.C. § 1605B, "Responsibility of foreign states for international terrorism against the United States").

But *Gonzalez* and *Pennie* overlooked that the Constitution does not apply to foreign states. *See Principality of Monaco v. Mississippi*, 292 U.S. 313, 330 (1934) (observing that "[t]he foreign State lies outside the structure of the Union."); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 97 (D.C. Cir. 2002) ("It is especially significant that the Constitution does not limit foreign states" and "[n]ever has the Supreme Court suggested that foreign nations enjoy rights derived from the Constitution, or that they can use such rights to shield themselves

28

from adverse actions taken by the United States"); *see also Frontera Res. Azer. Corp. v. State Oil Co. of the Azer. Republic*, 582 F.3d 393, 400 (2d Cir. 2009) (endorsing *Price* and holding that "foreign states are not 'persons' entitled to rights under the Due Process Clause").

Only sovereign immunity doctrine – which FSIA codifies into federal law – precludes civil litigants from haling foreign states into American courts. "[N]othing in the Constitution limits congressional authority to modify or remove the sovereign immunity that foreign states otherwise enjoy." *Price*, 294 F.3d at 99; *see also Verlinden B.V. v. Cent. Bank of Nig.*, 461 U.S. 480, 486 (1983) (stating that "foreign sovereign immunity is a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution").

Consequently, although JASTA provides terror victims "with the broadest possible basis" to obtain redress "consistent with the Constitution," Congress had no choice but to expressly amend FSIA to hold foreign states accountable for acts of international terrorism committed within the United States because questions of sovereign immunity fall outside the Constitution's ambit. Failing to appreciate the extra-constitutional place sovereign immunity occupies in American

jurisprudence, the district courts in *Gonzalez* and *Pennie* inferred that Congress intended JASTA to solely repeal FSIA's statutory immunities to the exclusion of all others. That inference was mistaken.

For all these reasons, JASTA abrogates section 230(c)(1) immunity in the limited context of civil ATA liability.

## CONCLUSION

In view of the foregoing, Plaintiffs respectfully request that the Court (1) vacate the judgment in Defendants' favor, (2) reverse the portion of the district court's order dismissing the ATA aiding and abetting claim, and (3) remand the case for further proceedings.


Dated: August 14, 2019        */s/ Daniel W. Weininger*
                                     Daniel W. Weininger
                                     Keith L. Altman
                                     EXCOLO LAW, PLLC
                                     26700 Lahser Road, Suite 401
                                     Southfield, MI 48033
                                     Tel: (248) 251-0594

                                     *Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

With Type-Volume Limitation, Typeface Requirements,
and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f):

[X]    this brief contains <u>5,745</u> words, or

[ ]    this brief uses a monospaced typeface and contains [state the number of] lines of text.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X]    this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook, or

[ ]    this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].


Dated: August 14, 2019                /s/ *Daniel W. Weininger*

                                      *Counsel for Appellants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: August 14, 2019 /s/ *Daniel W. Weininger*

*Counsel for Appellants*